1
2
3
4
5
6
7                          UNITED STATES DISTRICT COURT

8                         EASTERN DISTRICT OF CALIFORNIA

9

10   KEITH GUTHRIE, individually, on a          Case No.   1:21-cv-000729-AWI-EPG
     representative basis, and on behalf of all
11   others similarly situated,                 FINDINGS AND RECOMMENDATIONS,
                                                 RECOMMENDING THAT PLAINTIFF'S
12                     Plaintiff,                MOTION FOR PRELIMINARY APPROVAL
                                                 OF A CLASS ACTION SETTLEMENT BE
13          v.                                   DENIED WITHOUT PREJUDICE

14   ITS LOGISTICS, LLC,                         (ECF Nos. 21, 22, 23, 38, 40)

15                     Defendant.                OBJECTIONS, IF ANY, DUE WITHIN 14
                                                 DAYS
16

17          Plaintiff Keith Guthrie moves for preliminary approval of a class action settlement of

18   California state labor claims and a single unfair-and-unlawful-competition claim. (ECF No. 21

19   (motion for preliminary approval); ECF No. 22 (supporting memorandum); ECF No. 23

20   (corrected attachments in support of motion); ECF No. 38 (supplement); (ECF No. 40 (further

21   supplement)). Defendant does not oppose the motion. (*See* ECF No. 40, p. 35 ("Defendant will

22   not object to Plaintiff's motion for preliminary approval")). The presiding District Judge has

23   referred the motion for entry of findings and recommendations under 28 U.S.C. § 636(b)(1).

24   (ECF No. 24).

25          The parties reached the proposed settlement in a private mediation, before formal

26   discovery or motion practice. The motion for preliminary approval, as supplemented by a revised

27   settlement agreement, provides a gross settlement amount of $365,000, with a net amount of

28
                                                  1

$218,500 going to the class members.[1]

As set forth more fully below, the Court cannot conclude, based on the information provided, that the proposed settlement is fair, reasonable, and adequate to the class members. According to Plaintiff, the projected maximum value of the class claims is $3,581,927, making the gross settlement amount less the PAGA penalties ($330,000) a recovery of approximately 10%—and the net settlement amount ($218,500) a recovery of approximately 6%. For the PAGA claims, Plaintiff projects a maximum value of $1,700,700, making the gross amount ($35,000) for the PAGA penalties a recovery of approximately 2%.  Moreover, the gross settlement amount is only 38% of the expected recovery using Plaintiff's own estimate of the likely value of all claims, which Plaintiff estimates at $947,294.50 even after taking steep discounts for the risks involved in the litigation.

Following a hearing on this motion, during which the Court expressed these concerns, the parties submitted a supplement with an almost identical gross settlement amount (originally $365,000 and now $350,000), yet with substantial changes to the underlying valuation of claims supporting such number. For example, some claims are now valued at 35% and 66% of the estimate previously provided to the Court. Given these varying estimates, the Court is concerned that the parties are now attempting to backfill calculations to fit the already-agreed upon settlement amount, rather than making good-faith and informed calculations to reach a fair, reasonable, and adequate settlement.

Thus, while the Court is sympathetic to the parties' desire to resolve this case for the amount already agreed upon during mediation, the Court does not find that the settlement reflects a fair, reasonable, and adequate recovery to the class members and aggrieved employees. Accordingly, the Court will recommend that Plaintiff's motion for preliminary approval be denied without prejudice.

I.      **BACKGROUND**

A.      **Procedural History**

Plaintiff filed this action in state court on March 9, 2021, against Defendant and Does 1-

---

[1] Of the gross amount, $35,000 total is allocated for penalties under California's Private Attorneys General Act (PAGA). Of the $35,000, the Labor Workforce Development Agency receives $26,250 and the aggrieved employees receive $8,750.

20. (ECF No. 1-1). The complaint alleges that, in connection with Defendant's employment of Plaintiff and other truck drivers, Defendant violated California employment and unfair-and-unlawful competition laws. Specifically, Plaintiff brings the following claims on behalf of himself and putative class members for alleged violations of California's Labor Code (Counts 1-7) and California's Business and Professions Code (Count 8): (1) failure to pay minimum wages; (2) failure to pay for rest, recovery, and nonproductive time; (3) failure to provide rest breaks; (4) failure to provide meal periods; (5) failure to reimburse business expenses; (6) failure to timely pay final wages; (7) failure to provide accurate itemized wage statements; and (8) unfair and unlawful competition. (*Id.* at 11-24). Plaintiff also brings claims (Counts 9-16) under California's Private Attorneys General Act (PAGA), Cal. Lab. Code § 2698-2699.5, "which allows aggrieved employees to recover civil penalties for Labor Code violations on behalf of themselves, the state, or other current or former employees." *Callahan v. Brookdale Senior Living Communities, Inc.*, 42 F.4th 1013, 1017 (9th Cir. 2022); (ECF No. 1-1, pp. 24-34).

Defendant filed its answer in state court and removed the case on May 5, 2021. (ECF No. 1, p. 2; ECF No. 1-1, p. 42). A case schedule was entered on August 6, 2021. (ECF No. 15). Shortly thereafter, on September 21, 2021, the parties scheduled a mediation set to occur on March 8, 2022, and requested that the Court vacate all deadlines to allow them "an opportunity to participate in mediation without incurring substantial costs to conduct discovery and prepare briefing for class certification." (ECF No. 16). The Court vacated all deadlines, and on March 16, 2022, Plaintiff filed a status report, stating that the parties had reached a settlement following their mediation. (ECF Nos. 17, 18). The parties have not engaged in any formal discovery or motion practice.

On June 15, 2022, Plaintiff filed this motion for preliminary approval, which includes a request for class certification. (ECF Nos. 21, 22, 23). The parties' initial agreement proposed a gross settlement of $350,000, of which $15,000 was to go to Plaintiff's counsel as litigation costs. (ECF No. 22, p. 6). While some calculations were offered to reach the gross settlement amount, Plaintiff's original motion generally failed to specify the valuation of the claims or explain how the parties had reached the settlement amount. The Court held a hearing on August 16, 2022, discussing its concerns with the proposed settlement and allowing the parties to file a supplement.

(ECF Nos. 28, 29, 31). After a series of extensions, supplemental briefing was finalized on January 13, 2023. (ECF Nos. 32-40).

The supplement contains a revised settlement agreement, providing for a gross settlement amount of $365,000 and reflecting an agreement between the parties for Plaintiff's counsel to seek only $9,000 in litigation costs. (ECF No. 38, p. 4). While the gross settlement amount has stayed nearly the same from the initial settlement agreement, the valuation of the claims varies considerably from the previous estimates, with some claims being valued at 35% and 66% of their original amount.

In support of the motion for preliminary approval, Plaintiff provides the declarations of its counsel, the declaration of defense counsel, the declaration of Timothy Aboussleman (Defendant's Senior Director of Logistics), and the parties' proposed settlement agreement. (ECF Nos. 22-1, 38-1, 38-2, 40).

**B.    Overview of the Settlement Agreement**

**1.    Proposed settlement class and class period; aggrieved employees and PAGA period**

The proposed "settlement class" of approximately 270 class members includes "all current and former truck drivers who resided in California and who were employed by Defendant at any time during the Class Period," which is defined as "March 1, 2019 through May 7, 2022." (ECF No. 40, pp. 32, 37).[2]

The PAGA claims involve approximately 163[3] "aggrieved employees," who include "all current and former truck drivers who resided in California and who were employed by Defendant at any time during the PAGA Period," which is defined as "March 9, 2020 through May 7, 2022." (ECF No. 40, pp. 31, 34).

**2.    Terms of the settlement agreement**

The "gross settlement amount"—or maximum amount (aside from payroll taxes) that Defendant will pay to settle this case—is $365,000, with a "net settlement amount" of $218,500

---

[2] For readability, minor alterations, such as changing capitalization, have been made to some quotations without indicating each change.

[3] While the settlement agreement (ECF No. 40, p. 31) states there are approximately 169 aggrieved employees, the supplement states there are approximately 163 aggrieved employees. (ECF No. 38, p. 9; ECF No. 38-1, p. 2).

being expected to go to the settlement class after the following deductions:

| **GROSS SETTLEMENT AMOUNT** | $365,000 |
|---|---|
| Attorneys' Fees (25% of GSA) | $87,500 |
| Litigation Costs not to Exceed | $9,000 |
| Administrator Costs not to Exceed | $7,500 |
| PAGA Penalties | $35,000 |
| *Labor Workforce Development Agency Payment - 75% from PAGA Penalties* | *$26,250* |
| *Remaining 25% to Aggrieved employees* | *$8,750* |
| Class Representative Service Award not to Exceed | $7,500 |
| **Expected Net Settlement Amount** | **$218,500** |

(ECF No. 38, p. 32).

From the $218,500 net settlement amount for the class claims, the average payment to each of the 270 class members will be approximately $809 per class member.[4] (ECF No. 38, p. 4). From the $8,750 in PAGA penalties expected to go to 163 "aggrieved employees," the average payment is approximately $54 per employee.[5] Settlement payments will be mailed by check, and class members and aggrieved employees will have 180 calendar days after the mailing of the check to cash it. (ECF No. 40, pp. 47, 59). If a check is not cashed, the funds will be issued to the California State Controller's Office in the name of the person to whom the check was issued. (*Id.* at 59).

### 3.     Notice

Within twenty-one days after the order granting preliminary approval of the settlement, Defendant will provide the Settlement Administrator with data regarding the "settlement class" and "aggrieved employees," such as their contact information and information to calculate their estimated payment. (ECF No. 40, pp. 53-54; *see* ECF No. 22, pp. 15-16). Within ten days of the

---

[4] Evidently, this $809 amount is calculated by dividing $218,500 (the net settlement amount) by 270 (the estimated number of class members).
[5] Evidently, this $54 amount is calculated by dividing $8,750 (the PAGA penalty paid to the class) by 163 (the estimated number of aggrieved employees).

receipt of the data, the Settlement Administrator will mail a notice written in English and Spanish. (ECF No. 40, pp. 33, 54). If a notice is returned, the Settlement Administrator will use skip tracking to obtain forwarding addresses. (*Id.* at 54). The notice will contain language explaining how a class member may opt out of the settlement. (ECF No. 38-1, p. 5, 11; ECF No. 40, p. 56). However, aggrieved employees cannot opt out of the PAGA action. ECF No. 40, p. 55).

### 4.      Release

Any class member who does not opt-out of the settlement agreement will be deemed to have released all claims arising from facts alleged in Plaintiff's complaint for the duration of the class period. (ECF No. 40, pp. 35, 48). Further, the settlement agreement includes a waiver of rights as to unknown claims under California Civil Code § 1542. (*Id.* at 48-49). All aggrieved employees will be deemed to have released all PAGA claims arising from the facts alleged in Plaintiff's complaint during the PAGA period. (*Id.* at 34).

## II.      LEGAL STANDARDS FOR CLASS CERTIFICATION AND SETTLEMENT AND APPROVAL OF PAGA REPRESENTATIVE ACTION

A court tasked with determining whether to approve a proposed class action settlement will almost always be confronted with a "difficult balancing act." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). "On the one hand, . . .  there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Id.* (internal quotation marks and citations omitted). "But on the other hand, settlement class actions present unique due process concerns for absent class members, and the district court has a fiduciary duty to look after the interests of those absent class members." *Id.* (internal quotation marks and citations omitted). "To ensure the interests of the absent class members are properly safeguarded, the judge must adopt the role of a skeptical client and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation." *Lusk v. Five Guys Enterprises LLC*, No. 1:17-CV-00762-AWI-EPG, 2021 WL 2210724, at *2 (E.D. Cal. June 1, 2021) (internal quotation marks and citation omitted).

Class actions are governed by Federal Rule of Civil Procedure 23. There are two stages to approving a class action settlement. In the first stage, at issue here, "the court preliminarily approves the settlement pending a fairness hearing, temporarily certifies a settlement class, and authorizes notice to the class." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014). At the

second stage, the Court holds a fairness hearing, entertaining objections from putative class members, and thereafter making "a final determination as to whether the parties should be allowed to settle the class action pursuant to the terms agreed upon." *Id.*

"Parties seeking class certification must satisfy each of the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b)," with Plaintiff arguing here that, under Rule 23(b)(3), common questions of law or fact predominate over individual class member questions and that a class action is superior to other methods for fairly and efficiently adjudicating this case. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017); (ECF No. 22, p. 24). Plaintiff, as the party seeking class certification, bears the burden of showing these requirements. *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir. 1977).

After the certification inquiry, the Court considers whether the settlement is "fair, reasonable, and adequate" under Rule 23(e)(2). *See Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (describing factors guiding inquiry under Rule 23(e)(2)); *see also Gonzalez v. NCI Grp.*, Inc., No. 1:18-CV-00948-AWI-SKO, 2020 WL 4547303, at *9 (E.D. Cal. Aug. 6, 2020) (internal quotation marks and citation omitted) (noting that some courts decline to consider all the Rule 23(e)(2) factors at the preliminary-approval stage but agreeing with courts who reason that "it is better to closely scrutinize the settlement terms at the earliest opportunity so that if a fatal flaw exists, it can be addressed before the parties waste a great deal of time and money in the notice and opt-out process").

The Court will evaluate the settlement agreement "as a whole" and "for overall fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). The Court does not "have the ability to delete, modify or substitute certain provisions"; rather, "[t]he settlement must stand or fall in its entirety." *Id.* (internal citation and quotation marks omitted). "The court may, however, voice its reservations about the proposed settlement and set conditions that, if satisfied, might lead the court to approve it." *Manzo v. McDonald's Restaurants of California*, No. 1:20-CV-1175-HBK, 2022 WL 183492, at *4 (E.D. Cal. Jan. 20, 2022) (citing Manual for Complex Litigation (Fourth) at 309, § 21.61 (2004)).

Plaintiff does not seek class certification for his PAGA claims but pursues PAGA penalties in a representative capacity. *See Kim v. Reins Int'l California, Inc.*, 9 Cal. 5th 73, 86, 459 P.3d 1123, 1130 (2020) ("Although representative in nature, a PAGA claim is not simply a collection of individual claims for relief, and so is different from a class action."); *see also Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1914 (2022) (quoting Cal. Lab. Code Ann. § 2699(a) ("PAGA authorizes any 'aggrieved employee' to initiate an action against a former employer 'on behalf of himself or herself and other current or former employees' to obtain civil penalties that previously could have been recovered only by the State in [a Labor Workforce Development Agency] enforcement action."). "PAGA actions need not satisfy Rule 23 class certification requirements." *Hamilton v. Wal-Mart Stores*, Inc., 39 F.4th 575, 583 (9th Cir. 2022).

However, PAGA claims still require court approval under California Labor Code § 2699(*l*)(2). This provision also requires a plaintiff to submit a proposed settlement to the Labor Workforce Development Agency. "Although there is no binding authority setting forth the proper standard of review for PAGA settlements, California district courts have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes." *Clayborne v. Lithia Motors, Inc.*, No. 1:17-CV-00588-AWI-BAM, 2022 WL 16701278, at *2 (E.D. Cal. Oct. 24, 2022) (internal quotation marks and citations omitted).

## III.    ANALYSIS

The Court will recommend denying Plaintiff's motion for preliminary approval without prejudice. Based on the information provided, the Court cannot find that the proposed settlement agreement is fair, reasonable, and adequate. In short, the proposed settlement amount appears too low based on the total potential recovery, and is substantially lower than Plaintiff's own steeply discounted risk-adjusted valuation of the claims. Moreover, the timing of the early mediation, combined with the heavily revised calculations justifying the recovery, raises the concern that the settlement amount may have been reached without a sufficiently reasoned basis and at a great discount, with the parties now trying to justify the settlement amount after the fact.

The Court reviews the requirements of Rule 23 below, noting which requirements the Court believes are satisfied and which are not. The Court begins with the Rule 23(a) factors

regarding class certification and then turns to the Rule 23(e) factors regarding approval of the settlement.

### A.   Rule 23(a) Requirements

#### 1.   Numerosity

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 330 (1980). Courts in the Ninth Circuit have found the requirement satisfied when the class is composed of as few as thirty-nine members. *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citing *Jordan v. L.A. County*, 669 F.2d 1311, 1319 (9th Cir. 1982) (noting that class sizes of thirty-nine, sixty-four, and seventy-one are sufficient to satisfy the numerosity requirement), *vacated on other grounds*, 459 U.S. 810, 103 (1982)).

Here, joinder of the 270 estimated class members as plaintiffs would be impracticable. (ECF No. 22, p. 5). Thus, the Court finds the numerosity requirement satisfied.

#### 2.   Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Class members need not "have all suffered a violation of the same provision of law"; rather, their claims must "depend upon a common contention." *Dukes*, 564 U.S. at 350. The "common contention . . . must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon*, 150 F.3d at 1019. "Indeed, Rule 23(a)(2) has been construed permissively." *Id.* "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

The claims here are based on Defendant's company-wide polices and practices that allegedly led to violations concerning employees' wages, the provision of rest and meal breaks, and the reimbursement of expenses. (*See* ECF 1-1, p. 3). Thus, the Court finds the commonality

requirement satisfied. *See Goodwin v. Winn Mgmt. Grp. LLC*, No. 1:15-CV-00606-DAD-EPG, 2017 WL 3173006, at *6 (E.D. Cal. July 26, 2017) (finding commonality requirement met for similar Labor Code claims).

### 3.   Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); *see Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001). This typicality requirement is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Armstrong*, 275 F.3d at 868. While representative claims must be "reasonably co-extensive with those of absent class members," they "need not be substantially identical." *Hanlon*, 150 F.3d at 1020.

Here, Plaintiff was a truck driver subject to Plaintiff's uniform policies and practices that he alleges resulted in numerous violations of California law. (ECF No. 22, p. 23). And Plaintiff alleges that the putative class members were subjected to these same violations giving rise to the claims alleged in the complaint. Thus, the Court finds the typicality requirement satisfied.

### 4.   Adequacy of representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (citations omitted). "The proper resolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000), *as amended* (June 19, 2000) (citations omitted).

For the reasons detailed below in connection with the Rule 23(e) factors, the Court is unable to conclude that Plaintiff and counsel will fairly and adequately protect the interests of the class. Accordingly, the Court does not find the adequacy requirement satisfied.

### B.   Rule 23(b) Requirements

Plaintiff seeks certification under Rule 23(b)(3), which requires that "questions of law or

fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); (ECF No. 22, p. 24). The test of Rule 23(b)(3) is "far more demanding," than that of Rule 23(a). *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623-24).

### 1.    Predominance

First, questions of law or fact common to class members must predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). This "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (quoting *Amchem*, 521 U.S. at 623). "This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)." *Id.* "In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues." *Id.* "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1778 (2d ed.1986)).

Here, Plaintiff asserts that common questions to class members raised in this action predominate over any individualized questions. Based on the information provided thus far, the Court agrees. Plaintiff's case hinges on whether Defendant's policies and practices violated California provisions regarding the payment and itemization of wages, the availability of rest and meal breaks, and the reimbursement of expenses. For example, one of Plaintiff's claims alleges that various employee handbooks required drivers to maintain personal cell phones for business use and the employees were not properly compensated for this expense. (ECF No. 1-1, p. 17; ECF No. 38, p. 24). Because "[a] common nucleus of facts and potential legal remedies dominates this litigation," the Court finds that the predominance requirement is met. *Hanlon*, 150 F.3d at 1022.

### 2.    Superiority

Under Rule 23(b)(3), a class action must be "superior to other available methods for fairly

and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Pertinent to this finding is: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.; see Amchem*, 521 U.S. at 616. The purpose of this "requirement is to assure that the class action is the most efficient and effective means of resolving the controversy," and "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted); *see Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands*, 244 F.3d 1152, 1163 (9th Cir. 2001) ("This case involves multiple claims for relatively small individual sums. . . . If plaintiffs cannot proceed as a class, some – perhaps most – will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover.").

Absent concerns discussed below regarding the adequacy of the settlement amount, the Court finds that a class action is a superior method of resolving this action. First, it does not appear economical for each class member to bring his or her claim separately. *See Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sand*s, 244 F.3d 1152, 1163 (9th Cir. 2001) ("This case involves multiple claims for relatively small individual sums. . . . If plaintiffs cannot proceed as a class, some – perhaps most – will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover.").

Further, lack of knowledge of the legal system and limited economic resources would also likely deprive most class members of the opportunity to pursue their claims outside of a class action. Class action treatment will allow these similarly situated workers to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. There also does not appear to be any related pending litigation. Finally, there are no apparent difficulties likely to be encountered in managing this class action. The Court finds that the superiority requirement is met.

\\\

### C.     Rule 23(e) Requirements

If a proposed settlement agreement "would bind class members," the Court must find that

it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). A court considers whether:

> (A) the class representatives and class counsel have adequately represented the
> class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the
>> class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of
>> payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Ninth Circuit has provided the following guidance regarding Rule 23(e)(2):

> In this Circuit, a district court examining whether a proposed settlement comports
> with Rule 23(e)(2) is guided by the eight "*Churchill* factors," viz., "(1) the strength
> of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of
> further litigation; (3) the risk of maintaining class action status throughout the trial;
> (4) the amount offered in settlement; (5) the extent of discovery completed and the
> stage of the proceedings; (6) the experience and views of counsel; (7) the presence
> of a governmental participant; and (8) the reaction of the class members of the
> proposed settlement."

*Kim*, 8 F.4th at 1178 (quoting *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th

Cir. 2011)); *see Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (listing the

*Churchill* factors). "In addition, the settlement may not be the product of collusion among the

negotiating parties." *In re Mego*, 213 F.3d at 458. "This list is not exclusive and different factors

may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370,

1376 (9th Cir. 1993) (citations omitted).

Moreover, consideration of these factors alone is insufficient. *Id.* at 1179. Because Rule

23(e)(2) also requires courts to "now consider 'the terms of any proposed award of attorney's

fees' when determining whether 'the relief provided for the class is adequate[,]' . . . courts must

balance the 'proposed award of attorney's fees" vis-à-vis the 'relief provided for the class' in

determining whether the settlement is 'adequate' for class members." *Briseño v. Henderson*, 998

F.3d 1014, 1024 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)(C)(iii)). This is done by

reviewing the "so-called *Bluetooth* factors to smoke out potential collusion." *Id.* at 1023. Signs of such collusion include:

> (1) "when counsel receive[s] a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class.

*Id.* (quoting *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d at 947).

The Court will begin with the *Churchill* factors and then turn to collusion, the *Bluetooth* factors, and other considerations. As explained in detail below, the settlement amount appears too low for the Court to deem it fair, reasonable, and adequate. The class members will receive a gross recovery of approximately 10% of the potential maximum value of the class claims and a net recovery of approximately 6%. And the aggrieved employees will receive a gross recovery of approximately 2% of the potential maximum value of the PAGA claims. Even based on Plaintiff's risk-adjusted valuation of all claims, the gross settlement amount ($365,000) yields a recovery of only approximately 38%.

### 1. The strength of Plaintiff's case

A court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Adoma v. Univ. of Phoenix, Inc.*, 913 F.Supp.2d 964, 975 (E.D. Cal. 2012) (citation omitted). However, "the court does not reach any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this litigation." *Id.* (internal citation and quotation marks omitted).

Plaintiff asserts that various risks and defenses warrant 50% to 100% reductions in the maximum value of the claims, leading to an estimated 10% gross recovery (if based on the gross settlement amount) and 6% net recovery (if based on the net settlement amount) of the total value of the class claims.[6] (ECF No. 22, pp. 10-15, 26-30; *see* ECF No. 38, pp. 17-33). The Court provides an overview of the parties' positions for each claim, keeping in mind that the proposed settlement amount is substantially less than even these steeply discounted estimates.

\\\

---

[6] The PAGA claims represents approximately a 2% gross recovery.

14

### a.   Wage-statement claims

Plaintiff asserts that his "strongest claim [is] for wage statement violations, based on the allegation that Defendant failed to include all information required by Labor Code § 226(a)." (ECF No. 22, p. 27). Specifically, Defendant provided uniform wage statements that did not accurately state the total hours worked for an employee. (*Id.* at 10). However, Defendant has raised two main defenses: (1) that § 226 does not apply because its drivers' principal place of work is not California; and (2) that it was not required to include total hours worked on wage statements for drivers paid on a flat daily rate or by the load on a mileage basis. (*Id.* at 10-11, 26-27). Plaintiff concedes that these defenses are sufficiently viable to pose a risk to full recovery and discounts the value of these claims by 50%. (*Id.* at 27).

### b.   Failure-to-pay-wages claims

Plaintiff alleges that Defendant had policies resulting in the failure to pay all wages due, including unpaid non-piece rate tasks, unpaid $12.50 per-stop payments per contract, and unpaid rest periods. (*Id.* at 11, 27). However, Defendant has argued that its pay scheme is not piece-rate pay as to invoke California's applicable Labor Code provision, § 226.2. (*Id.* at 12). Further, Defendant has argued that the stop-pay claim could not be certified due to the individualized nature of the proof regarding the number of stops each driver took. (*Id.* at 27). And Defendant has maintained that California rest-break requirements are preempted by federal law. (*Id.*). Plaintiff concedes that these defenses are sufficiently viable to pose a risk to full recovery and discounts the value of these claims by 75%. (*Id.*).

### c.   Failure to pay timely wages

Plaintiff alleges that Defendant failed to timely pay all wages owed to class members each period and upon their separation from employment as required by Labor Code § 201-204. (*Id.* at 14, 28). As these claims are derivative of the alleged violations of Plaintiff's other claims, Defendant argues that they fail due to the defenses raised to the non-derivative claims. (*Id.* at 14). Plaintiff concedes that these defenses are sufficiently viable to pose a risk to full recovery and discounts the value of these claims by 90%. (*Id.* at 28).

### d.   Failure to provide meal periods and rest breaks

Plaintiff alleges that Defendant failed to provide compliant meal periods and rest breaks to

1    class members. (*Id.* at 13, 27). However, Plaintiff states that the Ninth Circuit's opinion in *Int'l*

2    *Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841, 845-46 (9th

3    Cir.), *cert. denied sub nom. Trescott v. Fed. Motor Carrier Safety Admin.*, 142 S. Ct. 93 (2021),

4    which concluded that California's meal and rest break rules as applied to certain drivers were

5    preempted by federal law, renders his meal and rest claims unviable to the extent that they are

6    based on Labor Code violations and has thus assigned them no value. (*Id.* at 27). But Plaintiff

7    asserts that his rest-related claims also rely on a contractual guarantee and he included these

8    damages as part of his claim for unpaid wages.

### e.    Failure to reimburse for business expenses

9

10   Plaintiff alleges that Defendant failed to reimburse him and other class members for cell

phone expenses under Labor Code § 2802 despite a written policy requiring employees to provide

11   their own cell phones for work. (*Id.* at 13-14, 28). Defendant argues that this provision does not

12   apply because it provided an in-cab device making it unnecessary for drivers to use their personal

13   cell phones for business purposes and, starting in 2021, Defendant expressly told employees that

14   they were no longer required to provide cell phones for work purposes. (*Id.* at 14). Plaintiff

15   concedes that these defenses are sufficiently viable to pose a risk to full recovery and discounts

16   the value of these claims by 50%.[7]

### f.    Unfair and unlawful competition claim

17

18   Lastly, Plaintiff alleges a claim under the Business and Professions Code that unlawfully

19   withheld wages are recoverable under the statute. (*Id.* at 15, 28). However, Plaintiff states that

20   this claim's only real value is in extending the statute of limitations beyond what the Labor Code

21   allows, and since there is no limitations issue here, there is no value in this claim. (*Id.* at 28).

### g.    Conclusion

22

23   While the Court appreciates that Plaintiff has provided some very general reasoning for

24   discounting these claims, the discounts of 50 to 100% are very steep indeed, leading to a

25   ───────────────────

[7] As the PAGA claims are derivative of the Labor Claims, the analysis regarding the Labor Claims informs
the strength of Plaintiff's PAGA claims. *See Mejia v. Walgreen Co.*, No. 2:19-CV-00218 WBS AC, 2021
26   WL 1122390, at *5 (E.D. Cal. Mar. 24, 2021) ("Because PAGA penalties arise from underlying violations
of the California Labor Code, all of these defenses would apply to plaintiff's PAGA claim as well."). 
27   Plaintiff concedes that these defenses are sufficiently viable to pose a risk to full recovery and discounts
the value of these claims by 75%

28

substantially reduced recovery to the class, even before other deductions, like attorney fees. This creates the Court concern that the settlement is not fair, reasonable, and adequate.

### 2. The risk, expense, complexity, likely duration of further litigation, and risks of maintaining class action status throughout trial

"Approval of settlement is 'preferable to lengthy and expensive litigation with uncertain results.'" *Munoz v. Giumarra Vineyards Corp.*, 2017 WL 2665075, at *9 (E.D. Cal. June 21, 2017). Moreover, "[e]mployment law class actions are, by their nature, time-consuming and expensive to litigate." *Aguilar v. Wawona Frozen Foods*, 2017 WL 2214936, at *3 (E.D. Cal May 19, 2017).

Plaintiff argues that, without settlement, the parties would need to engage in further litigation, including the certification of the class and discovery regarding damages, and the resulting time and expense may outweigh any additional recovery obtained. (ECF No. 22, p. 31). However, because the Court does not find the recovery offered here to be fair, adequate, and reasonable, it cannot conclude that further litigation would outweigh the value afforded by an early settlement in this case.  Moreover, the Court is not convinced that the parties had sufficient discovery and litigation at such an early stage in the case to support a reasoned and supported settlement amount.

### 3. The amount offered in settlement

The amount offered in settlement "is generally considered the most important" factor of any class settlement. *See Bayat v. Bank of the West*, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015). In determining whether the amount offered in settlement is fair and reasonable, a court compares the proposed settlement amount to the maximum potential amount recoverable through successful litigation. *See In re Mego*, 213 F.3d at 459. "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Id.* (citation omitted); *see Bravo v. Gale Triangle, Inc.*, 2017 WL 708766, at *10 (C.D. Cal. Feb. 16, 2017) ("Thus, Plaintiffs argue that a settlement for fourteen percent recovery of Plaintiffs' maximum recovery is reasonable under the circumstances. The Court agrees.") (internal citation to record omitted); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D. Cal. 2015) ("From here, the agreed upon common fund represents between 27 percent and 11 percent of the total potential recovery. The Court is satisfied that these numbers

are fair."). For complex class action cases, Ninth Circuit has "a strong judicial policy that favors settlements. Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific Enter. Sec. Lit.*, 47 F.3d 373, 378 (9th Cir. 1995) (internal quotation marks and citation omitted).

### a. Projected maximum and risk-adjusted values

The following table illustrates the maximum value assigned to the claims and the risk-adjusted value after applying Plaintiff's proposed percentage discount, as set forth in Plaintiff's moving papers. Before turning to the comparison between the maximum potential value of the claims and the recovery offered by the settlement, the Court notes that, even accepting Plaintiff's risk-adjusted value of the claims, the gross recovery in the settlement is only approximately 38% of the expected recovery.[8] Thus, under the revised settlement agreement, even accounting for discounts ranging between 50% to 100%, the class members and aggrieved employees would recover only about a third of the risk-adjusted value of the claims.

| Claims | Class Claims Potential Value | Class Claims Percentage discounted | Class Claims Risk-adjusted Value | PAGA Claims Potential Value |
|---|---|---|---|---|
| Wage-statement claims | $202,250 | 50% risk adjustment | $101,125 | $249,500 |
| Failure-to-pay-wages claims (including stop pay and rest breaks) | Stop pay ($414,750) + rest breaks ($303,200)[9] = *$717,950 total* | 75% risk adjustment | $179,487 | $515,100 |
| Meal-and-rest-break claims | No value (see discussion above) | | | $0 |
| Failure-to- | $44,635 | 50% risk | $22,317.50 | $443,700 |

---

[8] This is percentage is calculated by dividing the gross settlement amount ($365,00) by Plaintiff's risk-adjusted value for all claims ($947,294.50).

[9] Plaintiff calculated this number as $302,200. (ECF No. 38, p. 22). However, the calculations ($40 x 7,580 workweeks) reveal that the correct amount is $303,200.

| | | | | |
|---|---|---|---|---|
| reimburse-business-expenses claims | | adjustment | | |
| Failure-to-pay-timely-wages claims | $2,191,917 | 90% risk adjustment | $219,191 | § 204 claims ($481,400) + § 203 claims ($11,000) = *$492,400 total* |
| Unfair-competition claims | No value (see discussion above) | | | N/A |
| | Total potential value class claims = $3,156,752 | | Total risk-adjusted penalties and damages = $522,120.5 | Total maximum value of PAGA claims $1,700,700 x 75% discount for all PAGA claims = $425,175 risk-adjusted value |
| Totals: | Maximum value of class claims ($3,156,752) + PAGA claims ($1,700,700) = **$4,857,452 total** | | Risk-adjusted value of class claims ($522,120.5) + PAGA claims ($425,174) = **$947,294.50 total** | |

19

Thus, using Plaintiff's own calculations of estimated recovery from its motion papers, with the steep discounts included to reflect risks in the claims, Plaintiff estimates that the class will recovery $947,294.50. Again, the proposed gross settlement amount is $365,000, with only $218,500 going to the class members. Plaintiff's motion does not set forth any calculations that add up to the actual settlement amount, or otherwise support the fairness of the proposed settlement amount.

Turning to the potential maximum recovery, if Plaintiff were to prevail on all claims, the estimated recovery would be $4,857,452. Of this amount, $1,700,700 derives from PAGA penalties, from which the LWDA would receive 75% ($1,275,525) and the remaining 25% ($425,175) would go to the aggrieved employees. *See* Cal. Labor Code § 2699(i). Deducting LDWA's proportion ($1,275,525) of the PAGA penalty from the projected maximum leaves $3,581,927 going to the class and aggrieved employees. *See Lusk v. Five Guys Enterprises LLC*, No. 1:17-CV-00762-AWI-EPG, 2022 WL 4791923, at *8 (E.D. Cal. Sept. 30, 2022) (deducting LWDA's portion of estimated PAGA penalty from the projected recovery amount before calculating the percentage rate of recovery). The gross settlement amount is approximately 10% of $3,581,927 and the net settlement amount is approximately 6% of this amount.

If considering the class claims in isolation, the $330,000 of the gross settlement for the class claims ($365,000 gross settlement amount less the $35,000 allocated for PAGA penalties) compared to the maximum value of $3,156,752 of the class claims yields a recovery of approximately 10%. If considering the PAGA claims in isolation, the $35,000 of the gross settlement amount allocated for PAGA penalties compared to the maximum value of $1,700,700 yields a recovery of approximately 2%.

From these calculations, one thing is clear, no matter how the percentages are computed the recovery represents a very low percentage of the potential maximum. *Almanzar v. Home Depot U.S.A., Inc.*, No. 2:20-CV-0699-KJN, 2022 WL 2817435, at *12 (internal quotation marks and citation omitted) (E.D. Cal. July 19, 2022) ("In fact, 10% of the verdict value of non-PAGA claims is generally considered the low end of reasonable recovery."). Of course, the Court is mindful that "a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural*

*Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004). However, before recommending the approval of a settlement, especially one offering such a low recovery percentage, Plaintiff must show that the claims have been adequately valued. *See Gonzalez v. CoreCivic of Tennessee, LLC*, No. 1:16-CV-01891-DAD-JLT, 2018 WL 4388425, at *9 (E.D. Cal. Sept. 13, 2018) (noting that "the court must be convinced that the plaintiff knows the value of the claims he proposes to settle and can adequately explain why he has discounted them in reaching that settlement."). However, the information Plaintiff provides does not show that the claims have been adequately valued or that the allocation of shares is fair to the class members.

### b.  Valuation of claims

The Court must understand how Plaintiff determined the value of the claims to be able to assess whether the amount offered affords adequate relief to the class. *See O'connor v. Uber Techs.*, Inc., No. 13-CV-03826-EMC, 2016 WL 3548370, at *6 (N.D. Cal. June 30, 2016) (ordering supplemental briefing where there was "inadequate information on the value of full verdict value of the new claims that are being released"). The Court stressed this point at the hearing before giving leave to file a supplement. (*See* ECF No. 31, p. 7 - "[M]y overall question, how did you come up with a number and how is it tied to the claims that are settled."). Likewise, the Court stressed the importance of justifying the discounted values assigned to the claims, which vary from 50% to 90% of the claims that have some value. (*See id.* at 26 – "So you discounted 75 percent of the stop pay claim and unpaid rest, 75 percent discount. So why is that a fair discount?"). Moreover, Plaintiff discounts some claims by 100%, yet they are nonetheless included in the release of the settlement agreement, without offering any corresponding compensation.

Turning to the calculation methodology, for some of the claims, Plaintiff has provided an adequate explanation for how the maximum potential value was determined. As one example, Plaintiff has calculated the maximum potential value of the failure-to-reimburse business expenses claim at $44,635. (ECF No. 38, p. 25). This claim is based on Defendant's alleged failure to properly reimburse its employees for cell phone expenses after requiring them to maintain personal cell phones for business use. Based on an estimated average $47.36 monthly cell phone bill during the relevant period obtained from data from the U.S. Bureau of Labor

1   Statistics, Plaintiff estimates an average weekly cost of $11.01 for a cell phone plan, and

2   thereafter estimates $5 (or roughly half) as a reasonable reimbursement per week for employees

3   having to use their cell phone for work.

4          Plaintiff includes all flat-rate, mileage-rate, and hourly employees in this claim from the

5   beginning of the class period on March 1, 2019, and ending on September 18, 2021, when

6   Defendant implemented a cell phone reimbursement policy. Based on Defendant's representation

7   that there were 8,927 workweeks during this period, Plaintiff multiplied the 8,927 workweeks by

8   $5 per week to obtain the maximum claim value of $44,635. Plaintiff applies a 50% discount to

9   this claim based on the risks and defenses to reach a risk-adjusted value of $22,317.50.

10          While the Court appreciates Plaintiff's efforts to explain the valuation of this and other

11   claims, Plaintiff has failed to explain the methodology for calculating the PAGA claims and the

    rationale behind the percentage discounts for all claims.

12          Beginning with the PAGA penalties, the supplement identifies a maximum value as

13   follows for each: wage-statement claims $249,500; unpaid-wage claims $515,100; meal-and-rest

14   claims $0; § 204 claims $481,400; § 203 claims $11,000;[10] and business-expenses claims

15   $443,700. (ECF No. 38, p. 29). However, Plaintiff fails to explain the calculations for any of

16   these amounts.[11] The failure to explain these amounts in the supplement is even more concerning

17   after considering that most of the new estimates are substantially different than those in the initial

18   motion for preliminary approval: wage-statement claims $188,500; unpaid-wage claims

19   $188,500; meal-and-rest claims $0; § 204 claims $188,500; § 203 claims $12,400; and business-

20   expenses claims $188,500, with a total PAGA penalties value of $766,400.[12] (ECF No. 22-1, p.

21   10). Notably, in the supplement, the total valuation of the PAGA penalties has increased by

22   _____

[10] For the § 203 claims Plaintiff states: "(110 drivers within PAGA period x $100)." However, Plaintiff
23   fails to explain the basis for including only 110 drivers out of the estimated 163 aggrieved employees or
    why $100 was used. Notably, if there were subsequent violations, PAGA allows for $200 penalties under
24   California Labor Code § 2699(f)(2).
[11] The supplement states that "the PAGA claims are allocated to drivers in the same manner as the Labor
25   Code Claims." (ECF No. 38, p. 28). However, there is no clearly discernible formula used for the Labor
    Code claims that the Court can simply transfer to the PAGA claims.
26   [12] These initial estimates were primarily based on Plaintiff's contention that there were 1885 pay periods at
    issue and "the default amount of $100 per pay period," i.e., 1885 x $100 = $188,500 for most claims. To
27   the extent that Plaintiff is exclusively using the $100 "default amount" per pay period, Plaintiff failed to
    explain why the $200 for subsequent penalties under California Labor Code § 2699(f)(2) is not used in
28   calculating the PAGA penalties.

22

nearly $1 million ($766,400 to $1,700,700) but the gross recovery of $35,000 from the initial

settlement agreement is still the amount offered in the revised settlement agreement. (ECF No.

28, pp. 28-29). Without explanation as to how the PAGA penalties were calculated, or why they

differ markedly from the prior estimate, the Court is unable to conclude that the amount offered is

fair.

The Court now considers the following discounts for the claims: wage-statement claims

50%; unpaid-wage claims 75%; business-expenses claims 50%; failure-to-pay-timely-wages

claims 90%; and PAGA penalties 75%. As noted above, Plaintiff has outlined the various risks

and defenses for each of these claims, which he states supports these discounts. However,

Plaintiff fails to explain why the relevant risks and defenses warrant these specific discounts.

Taking the business-expenses claims as an example. Plaintiff applies a 50% reduction

"reflecting the risks and defenses faced." (ECF No. 38, p. 25). Beginning with risks, Plaintiff lists

none specifically in the section for this claim, but to the extent that Plaintiff means that he faces

general risks associated with all litigation, such is not sufficient to justify a 50% reduction. *See*

*Lusk v. Five Guys Enterprises LLC*, No. 1:17-CV-00762-AWI-EPG, 2019 WL 7048791, at *6

(E.D. Cal. Dec. 23, 2019) (noting that Plaintiff's "risk assessment merely identifie[d] generalized

risks that are inherent and ubiquitous in virtually all wage-and-hour putative class action

lawsuits" and  "failed to explain with any precision or detail how and why the [] risks [were] at

play in this lawsuit"). Turning to the defenses, Defendant provided "an electronic logging device"

that drivers could use so any cell phone expenses would not be needed for work purposes, the

requested "$40 per month" cell phone reimbursement was excessive, and it provided a cell phone

reimbursement benefit starting September 18, 2021, so any exposure cuts off after this date. (ECF

No. 38, p. 24). However, the existence of such defenses is insufficient to conclude that a 50%

discount is warranted as opposed to 25% or 10% or any other percentage.

Notably, while Defendant states that it provided a device so cell phones were not

necessary, Plaintiff states that "various employee handbooks [] require[d] drivers to maintain

personal cell phones for business use." (ECF No. 38, p. 24). Plaintiff does not describe how a

Court would resolve this factual dispute in light of legal authority, or a reasoned opinion as to

who is likely to prevail. *See Eddings v. DS Servs. of Am., Inc.*, No. 15-CV-02576-VC, 2016 WL

3390477, at *1 (N.D. Cal. May 20, 2016) ("Nor have the parties given the Court enough information to evaluate the strengths and weaknesses of the plaintiffs' case. The plaintiffs list legal issues that this case might present and positions that the defendants might take, but they don't analyze those issues or evaluate the strength or weakness of defendants' positions. A party moving for preliminary approval should cite case law and apply it to explain why each claim or defense in the case is more or less likely to prove meritorious.").

As for the allegedly unreasonable $40 per month reimbursement request, Plaintiff does not seek $40 per month but requests $5 per week, which would equal about $20 per month, an amount that does not appear inherently unreasonable. Moreover, as for Defendant implementing a policy to reimburse cell phone expenses in September 2021, Plaintiff already accounted for this when calculating the value of these claims. (ECF No. 38, p. 25 – noting that period for claims was "from March 1, 2019 to September 18, 2021 when Defendant implemented its cell phone reimbursement policy."). The Court sees no basis to further discount the value of these claims by a defense that was already accounted for in the initial calculations.

In short, the Court cannot conclude that the claims have been properly valued so as to afford a fair settlement amount.

### c.  Allocation of settlement shares

The individual settlement payments will be allocated based on the number of shares each class member and aggrieved employee is credited. (ECF No. 40, pp. 41-42). Shares are allocated based on the type of claim and on a "workweek" basis, *e.g.*, one share is assigned for each workweek for the business-expenses claims. Workweeks are determined by the primary pay structure for an employee in a week:

> During the entire three-year and two-month class period, Defendant's records show that the class members worked 4,521 weeks at flat daily rate only; 573 weeks where the majority percentage of their pay was flat daily rate; 1669 weeks at mileage pay only; 817 weeks where the majority percentage of their pay was mileage pay; 2732 weeks with hourly pay only; and 159 weeks where the majority percentage of their pay was hourly pay.

(ECF No. 38, p. 11).

The per share value for the class members is calculated by totaling all the shares for the individuals together and dividing that number by the net settlement amount of $218,500, or, in the

case of aggrieved employees, by dividing the total number of shares by the PAGA penalty of $8750.[13] The Settlement administrator will determine how many shares per workweek each class member and aggrieved employee is credited and multiply that by the per share value to obtain the individual settlement payment due to each individual.[14]

The follow table (ECF No. 38, pp. 30-31) illustrates the number of shares awarded by claim and who receives a share:[15]

| Claim | Share/wk | Period Covered | Pay Weeks Covered |
|---|---|---|---|
| Cell phone reimbursement | 1 | 3/1/19 to 9/18/21 | All flat/mileage/hourly |
| Minimum wage – stop pay | 1 | 3/1/19 to 5/31/20 | Flat or majority flat/mileage or majority mileage |
| Minimum wage – rest break | .5 | 3/1/19 to 5/7/22 | Flat or majority flat/mileage or majority mileage |
| Wage statements | .5 (capped at 20.5 shares) | 3/9/20 to 4/23/21 | Flat or majority flat/mileage or majority mileage |
| Section 201-203 ("former" drivers only) | 3 (capped at 15 shares) | 3/1/19 to 5/7/22 | All flat/mileage/hourly |
| *PAGA Cell phone reimbursement* | *.5* | *3/9/20 to 9/18/21* | *All flat/mileage/hourly* |
| *PAGA Minimum wage – stop pay* | *.5* | *3/9/20 to 5/31/20* | *Flat or majority flat/mileage or majority mileage* |

---

[13] For example, if there were 10,000 shares total for the class members, the per share value would be $21.85 (*i.e.*, $218,500 net settlement amount divided by 10,000 shares equals $21.85 per share).

[14] For example, assuming that the per share value was $21.85 for the class members, and an individual class member was credited 10 shares, that class member would receive $218.50 from the class settlement (*i.e.*, $21.85 per share value multiplied by 10 shares equals $218.50).

[15] The table does not include claims for where no value is attached, like the failure to provide meal break claims.

| | | | |
|---|---|---|---|
| *PAGA Minimum wage – rest break* | *.25* | *3/9/20 to 5/7/22* | *Flat or majority flat/mileage or majority mileage* |
| *PAGA Wage statements* | *.25* | *3/9/20 to 4/23/21* | *Flat or majority flat/mileage or majority mileage* |
| *PAGA Section 201-203* | *1.5 (capped at 5 shares)* | *3/9/20 to 5/7/22* | *All flat/mileage/hourly* |
| *PAGA Section 204* | *.25* | *3/9/20 to 5/7/22* | *Flat or majority flat/mileage or majority mileage* |

     While the Court appreciates this information, Plaintiff has failed to explain the rationale for how shares are allocated for each claim. For example, it is unclear why the business-expenses claims, with a risk-adjusted estimate of $22,317.5, are valued at one share, while the failure to pay minimum wage for stop-pay claims, with a risk-adjusted estimate of $103,687.50, are valued at half a share. Stated another way, the business-expenses claims, which have roughly 20% the value of the stop-pay claims, are allocated double the share.

     Moreover, it is noteworthy that hourly employees get a share of only two types of claims—the failure to reimburse business expenses and the §§ 201-203 claims. They do not get a share of claims regarding whether they were properly paid a minimum wage or had correct wage statements—moreover, they waive any such future claims during the applicable period. (ECF No. 40, pp. 35-36). Plaintiff was primarily paid on a flat-rate basis and thus the settlement agreement's structure favors him and like-paid drivers more than hourly drivers. (ECF No. 38-2, pp. 9-10 (declaration of Timothy Aboussleman) – "Between March 1, 2019 and May 13, 2022 (pay date for work through May 7, 2022), Guthrie received flat pay for every week that he worked. . . . For eight of the weeks he worked during that time, Guthrie also received line hours pay for work outside of his normal daily routes that were paid based upon his agreed flat daily rate. The line hours pay Guthrie received was for unanticipated and out of the ordinary situations, such as when his truck broke down (breakdown pay); occasional testing he was required to do

(testing pay); and on two occasions where he showed up for work and a load could not be provided for him (show-up pay).").

While Plaintiff has failed to explain the methodology behind the allocation of shares, it may be possible for Plaintiff to provide a more reasoned explanation for the shares, and the Court is not recommending denying the motion for preliminary approval on this basis alone. However, it does not have sufficient information to conclude that these calculations were fair, reasonable, and adequate based on information provided.

**4.      The extent of discovery completed and the stage of proceedings; experience and views of counsel**

"An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Riker v. Gibbons*, No. 3:08-CV-00115-LRH, 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010) (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11:42 (4th ed.2002)); *see also Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527–28 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." (citations omitted)). Plaintiff's counsel declares that the parties engaged in extensive informal discovery, listing nearly thirty categories of information that counsel obtained and reviewed. (ECF No. 22-1, pp. 5-7). Further the settlement was reached after informed arm's-length negotiations with the help of an experienced mediator, who is a retired Judge. (*Id.* at 12).

While the Court appreciates that the mediation took place after some informal discovery, the fact remains that the settlement was reached very early in the case. Notably, shortly after this Court issued a scheduling order on August 6, 2021, the parties filed a stipulation stating that, on September 21, 2021, they scheduled a mediation and wished to vacate all deadlines "to allow the Parties an opportunity to participate in mediation without incurring substantial costs to conduct discovery and prepare briefing for class certification." (ECF No. 16, p. 3). The Court approved the stipulation; thus, that the parties did not engage in any formal discovery or motion practice. On March 8, 2022, the parties reached a settlement of $350,000 pursuant to a mediator's proposal. (ECF No. 18; ECF No. 22, p. 10). This is almost the same amount as the $365,000 currently offered in the revised settlement agreement, albeit it with markedly different valuations of the underlying claims and an agreement for Plaintiff's counsel to recover $6,000 less in

litigation costs,[16] despite a substantial number of additional filings since the parties revised their initial settlement agreement.

Accordingly, this factor weighs against approval.

### 5.      The presence of a government participant

Although there is no governmental party to this lawsuit, the California Labor & Workforce Development Agency (LWDA) may express its views. Under California Labor Code § 2699(*l*)(2), a "proposed settlement shall be submitted to the [LDWA] at the same time that it is submitted to the court" for the LWDA's review and approval. While Plaintiff has attached an email appearing to confirm such submission here, that was before the parties substantially revised their settlement agreement. (ECF No. 22-1, p. 64). The Court has not found anything in the record confirming that the revised settlement (ECF No. 40, p. 29) was provided to the LWDA. But even if Plaintiff had, because the Court is recommending that the settlement agreement not be preliminarily approved, the parties may again revise their settlement agreement in the future, thus requiring a further submission to the LWDA. Accordingly, this factor does not weigh in favor of approval.

### 6.      The reaction of the class members to the proposed settlement

At this stage, the reaction of the class members to the proposed settlement is unknown, so this factor cannot be addressed.

### 7.      Collusion

"The potential for collusion reaches its apex pre-class certification because, among other things, (1) the court has not yet approved class counsel, who would owe a fiduciary duty to the class members; and (2) plaintiffs' counsel has not yet devoted substantial time and money to the case, and may be willing to cut a quick deal at the expense of class members' interests." *Briseño*, 998 F.3d at 1024.

#### a.  Collusion in settlement amount

While the Court does not find direct evidence of collusion between counsel in reaching the initial settlement and believes that the mediation was truly at arms-length, the Court is

---

[16] The initial agreement provided for $15,000 in costs and the revised agreement provides for $9,000 in costs.

nevertheless concerned that both counsel may have been unduly motivated to reach a settlement amount early in the case without expending litigation costs, and without the necessary discovery and information to arrive at a truly reasoned and fair amount. Moreover, it is concerned that, at this point, both parties are attempting to justify a settlement amount close to their initial negotiated amount of $350,000 in order to avoid further negotiation or litigation. In other words, the parties appear to have initially agreed on a lump sum that reflected what Defendant was willing to pay at that time, rather than a truly reasoned and fair amount based on an informed assessment of the claims, and the parties are now revising calculations to justify that amount.

A comparison between the valuations initially given to the Court, and the revised valuations included in the supplement to the Court is set forth below.

| Claim | Former Valuation of Claims | Current Valuation of Claims | Percentage Difference |
|---|---|---|---|
| Wage statements – failed to include information required by § 226(a) | $306,900 with 50% discount = $153,450 risk adjusted amount | $202,250 with 50% discount = $101,125 risk adjusted amount | 66% of original amount |
| Failure to pay wages § 226.2 – stop pay and rest breaks – contractual theory for stop pay; rest break claims likely preempted | Stop pay - $1,184,625 with 75% discount = $296,156<br><br>Break pay - $126,360 with 75 discount = $31,590 | Stop pay - $414,750 with 75% discount = 103,687.50<br><br>Break pay - $302,200 with 75% discount = $75,800 | 35% of original amount for stop pay<br><br>239% of original amount for break pay |
| Meal/rest periods | $0 | $0 | |
| Business expenses – cell phone reimbursement under § 2802 | $31,590 with 50% discount = $15,795 | $44,635 with 50% discount = $22,317.5 | 140% of original amount |
| Failure to pay timely wages | $1,252,524 with 90% discount = $125,252.4 | $2,191,917 with 90% discount = $219,191 | 175% of original amount |
| UCL | $0 | $0 | |
| PAGA | $766,400 with 75% discount = $191,600 | $1,700,700 with 75% discount = $425,175 | 220% of original amount |

The Court will not recount all the calculations giving rise to these substantial variations. But as one example, the original business-expenses claims were calculated at a maximum value of $31,590 based on an estimated $10 per week cell phone reimbursement multiplied by 3,159 workweeks. (ECF No. 22-1, p. 9) (incorrectly listed as "3,195 workweeks). By comparison, the current valuation of the business-expenses claims is calculated at a maximum value of $44,635 based on an estimated $5 per week cell phone reimbursement multiplied by 8,927 workweeks. (ECF No, 38, p. 25). While the Court appreciates any effort to more accurately value these and other claims, the disparities in the methodologies used cast serious doubt onto the care used to calculate the original gross settlement amount of $350,000.

And such doubt carries over to the current gross settlement amount of $365,000. It is noteworthy that the individual valuation of the claims has varied wildly, yet the amount offered in settlement has stayed remarkably consistent since the parties' mediation in March 2022. Despite the claims varying 35% to 239% of the original amount, the gross settlement amount of $365,000 is a nearly equal to (or 104% of) the original $350,000 amount.

Creating further concern is the parties' explanation for how they agreed to fund this $15,000 difference between the original ($350,000) and current ($365,000) amounts. As part of the deal, Plaintiff's counsel agreed to seek $9,000 in litigation costs rather than the $15,000 originally sought. (ECF No. 38, p. 4; *see* ECF No. 22, p. 6). Such a marked reduction—Plaintiff's counsel now seeks 60% of the prior costs—with having expended more effort to reach and justify a revised settlement suggests either that the original costs sought were overstated, or that Plaintiff's counsel is making substantial concessions to obtain approval for the amount already agreed upon without engaging in further litigation.

### b. *Bluetooth* factors

The Court now turns to the *Bluetooth* factors, which are signs courts indicating that class counsel have allowed their own interests to infect settlement negotiations—(1) whether counsel receives a disproportionate amount of the settlement; (2) whether there is a clear "sailing agreement"; (3) and whether the agreement contains a "kicker" or "reverter" clause. *Briseño*, 998 F.3d at 1024. The Court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*,

654 F.3d at 941; *see also Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328–29 (9th Cir. 1999). Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). As a result, the Court must assume a fiduciary role for the class members in evaluating a request for an award of attorneys' fees from the common fund. *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009).

The Ninth Circuit has approved two methods for determining attorneys' fees in cases where the award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The Court retains discretion in common fund cases to choose either method. *Id.*; *Vu v. Fashion Inst. of Design & Merch.*, No. CV 14-08822 SJO (EX), 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22, 2016). Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the Court may award class counsel a given percentage of the common fund recovered for the class. *Id.* In the Ninth Circuit, a twenty-five percent award, which is what is sought here, is the "benchmark" amount of attorneys' fees, but courts may adjust this figure if the record shows "special circumstances justifying a departure." *Id.* (quoting *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)). The Ninth Circuit has permitted courts to award attorneys' fees using this method "in lieu of the often more time-consuming task of calculating the lodestar." *Bluetooth*, 654 F.3d at 942. In evaluating a percentage for attorneys' fees, the Court is required to "consider[] all the circumstances of the case and reach a reasonable percentage." *Vizcaino*, 290 F.3d at 1048. Such circumstances include (1) the results reached for the class; (2) the risk to class counsel; (3) counsel's performance; and (4) the amount sought to be awarded compared to the market rate. *Id.* at 1048-49.

Here, Plaintiff's counsel has requested a benchmark recovery of 25%.[17] (ECF No. 40, p.

---

[17] Plaintiff lists $87,500 as the amount sought, which is approximately 24% of the gross settlement now

43). Plaintiff's counsel will set forth the exact amount requested in a motion to be filed at a future deadline set by the Court. (ECF No. 22, p. 32). While this amount is not necessarily unreasonable if counsel achieves a reasonable outcome in the case, it does appear high given how quickly in the case settlement was reached, and how low the recovery is to the class. Put another way, Plaintiffs' counsel is requesting the benchmark recovery rate for itself, despite settling early in litigation for a very discounted recovery for the class.

Nor has Plaintiff's counsel sought to justify this rate based on its specific fees and rates. While this alone is not improper, because the information can be supplemented at any motion for final approval of settlement, it once again gives the Court pause. The Court cannot determine based on the information submitted that the requested recovery is truly justified based on counsel's effort and success in this case.

Next, the proposed settlement contains a clear sailing provision, *i.e.*, a provision that Defendant will not object to a certain fee request. Specifically, "Defendant agrees to not oppose a request by Class Counsel to the District Court for an award of attorneys' fees of not more than twenty-five percent (25%) of the Gross Settlement Amount ($87,500), plus reasonable litigation costs and expenses not to exceed $9,000." (ECF No. 40, p. 43). While not dispositive, such a provision weighs against approval of the proposed amount.

However, there is no "reverter" clause, *i.e.*, a provision that fees not awarded revert to Defendant rather than the class fund. Rather, the settlement agreement expressly states that "[u]nder no circumstances will any portion of the Gross Settlement Amount revert to Defendant." (ECF No. 40, p. 47).

In summary, Plaintiff's counsel's request for the benchmark amount of fees, without specific fee and cost information and combined with the heavily discounted recovery to the class so early in the case, weighs against approval.

### 8.    Class representative service payment

A court may award incentive payments to named plaintiffs in class action cases. *Rodriguez*, 563 F.3d at 958-59. The purpose of incentive awards is to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk

---

that the amount has increased to $365,000. (ECF No. 40, p. 43).

1  undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a

2  private attorney general." *Id.* To justify notable disparities between a class representative award

3  and what other class members receive, a Plaintiff must present "evidence demonstrating the

4  quality of plaintiff's representative service," such as "substantial efforts taken as class

5  representative to justify the discrepancy between [his] award and those of the unnamed

6  plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).

7       The Ninth Circuit has emphasized, however, that "district courts must be vigilant in

8  scrutinizing all incentive awards." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165

9  (9th Cir. 2013) (internal quotation marks and citation omitted). In keeping with that admonition,

10 courts have declined to approve incentive awards that represent an unreasonably high proportion

11 of the overall settlement amount or are disproportionate to the recovery of other class members.

12 *See Ontiveros*, 303 F.R.D. at 365-66 (finding an incentive award of $20,000, comprising 1% of

13 the common fund, to be excessive under the circumstances, and reducing the award to $15,000,

14 where class representative spent 271 hours on the litigation and relinquished the opportunity to

15 bring several of his own claims in order to act as class representative)*; see also Ko v. Natura Pet*

16 *Prods., Inc.*, Civ. No. 09–2619 SBA, 2012 WL 3945541, at *15 (N.D. Cal. Sept. 10, 2012)

17 (holding that an incentive award of $20,000, comprising one percent of the approximately $2

18 million common fund was "excessive under the circumstances" and reducing the award to

19 $5,000). In reducing an award, courts have noted that overcompensation of class representatives

20 could encourage collusion by causing a divergence between the interests of the named plaintiff

21 and the absent class members, destroying the adequacy of class representatives. *See Staton*, 327

   F.3d at 977-78; *see also Radcliffe*, 715 F.3d at 1165.

22       Here, the settlement agreement provides for a maximum class representative payment of

23 $7,500. (ECF No. 20, p. 42). The motion states that Plaintiff assumed significant risk in bringing

24 this case while employed by Defendant, Plaintiff could have been ordered to pay Defendant's

25 costs if he lost, and Plaintiff offered invaluable assistance in this case, such as providing

26 documents about Defendant's compensation plan, participating in phone calls to discuss litigation

27 and settlement strategy, and reviewing settlement documents. (ECF No. 22, p. 33). The proposed

28 payment represents about 2% of the gross settlement amount ($7,500 / $365,000) and about 3.5%

of the net settlement amount ($218,500) going to the class members. This amount is about nine times the average $809 estimated to go to a class member.

This proposed amount appears high given the low recovery for the class. However, the Court cannot evaluate whether this amount is excessive as Plaintiff does not provide any detail regarding what the class representative did. The generic descriptions offered—like participating in phone calls and reviewing settlement documents—does not reveal how much specific time or effort Plaintiff put into this case. And the Court notes that the $7,500 award is higher than the $5,000 that has been recognized as "presumptively reasonable" by some courts. *Austin v. Foodliner, Inc.*, No. 16-CV-07185-HSG, 2019 WL 2077851, at *8 (N.D. Cal. May 10, 2019). Moreover, counsel indicates that the bulk of information for settlement purposes was not obtained by Plaintiff but through informal discovery with Defendant. (ECF No. 22, pp. 8-9).

The Court thus cannot recommend the proposed recovery for the class representative at this time.

### 9.      Approval of a settlement administrator

The parties agree to use third-party settlement administrator ILYM Group, Inc., with a $7,500 cap in expenditures. (ECF No. 22, p. 33; ECF No. 40, p. 44). According to Plaintiff's counsel, ILYM Group, Inc. has experience in the administration of class action settlements. The Court finds ILYM Group is an appropriate settlement administrator should the settlement be eventually approved.

### 10.      Notice procedures

For proposed settlements under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B); *see also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e)."). A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC*, 361 F.3d at 575 (internal quotations and citations omitted). The absent class members must be provided with notice, an opportunity to be heard, and a right to opt-out of the class. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 349 (2011). "The notice must clearly and concisely state in plain, easily understood

language" the following information:

> the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

The Court has previously directed the parties to address certain issues regarding the notice. (ECF No. 29, p. 2). The parties have responded to the Court's concerns, agreeing to translate the notice into Spanish as well as English (with Defendant to bear the translation cost); revising an error regarding the attorneys' fees claimed; omitting a requirement for settlement participants to provide the last four digits of their social security number; and providing an email address where class members may send opt-out notification or objections to the settlement. (ECF No. 38, p. 10).

However, the Court notes one major issue that has arisen after the parties substantially changed the methodology for allocating settlement payments—the charts showing how shares are allocated in the notice do not completely match the charts provided in the settlement agreement. (*Compare* 38-1, pp. 8-9, *with* ECF No. 40, pp. 41, 44-45). For example, the chart provided in the settlement agreement states that the period covered for wage-statement claims is March 9, 2020 to April 23, 2021 and applies to flat or majority flat/mileage or majority mileage drivers. (ECF No. 40, p. 41). However, the chart provided in the notice states that the period covered for wage-statement claims is March 9, 2020 to *May 7, 2022* and applies to *all* drivers. (ECF No. 38-1, p. 9).

And there appears to be a smaller issue arising from the language advising participants of how to dispute the number of weeks they are credited: "If you believe that the number of Weeks Credited to you (which is the number of weeks you drove a truck at ITS Logistics *while being paid, in whole or in part, on a mileage or flat rate basis*) is incorrect, you may submit a written dispute to the Settlement Administrator. . . ." (*Id.* at 5) (emphasis added). Given that the settlement agreement also covers hourly employees for some claims, it appears that such employees should be able to dispute the weeks credited, as opposed to only those "paid, in whole or in part, on a mileage or flat rate basis."

35

1   Setting these issues aside, the notice appears to satisfy the notice criteria of Rule

2   23(c)(2)(B). The parties should keep the above instruction in mind should the District Judge

3   approve this or another proposed settlement in the future.

4   **IV.   CONCLUSION AND FINDINGS AND RECOMMENDATIONS**

5   Based on the forgoing, IT IS RECOMMENDED that Plaintiff's motion for preliminary

6   approval (ECF No. 21, *see* 22, 23, 38, 40) be denied without prejudice.

7   These findings and recommendations are submitted to the United States district judge

8   assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within fourteen

9   (14) days after being served with these findings and recommendations, any party may file written

10   objections with the Court. Such a document should be captioned "Objections to Magistrate

11   Judge's Findings and Recommendations." Any response to the objections shall be served and

12   filed within fourteen (14) days after service of the objections. The parties are advised that failure

13   to file objections within the specified time may result in the waiver of rights on appeal.

14   *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d

15   1391, 1394 (9th Cir. 1991)).

16   IT IS SO ORDERED.

17   Dated:   **April 5, 2023**   _____

18   /s/ Erica P. Grosjean

19   UNITED STATES MAGISTRATE JUDGE