1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

10    KEITH GUTHRIE, individually, on a
representative basis, and on behalf of all
11    others similarly situated,

12                        Plaintiff,

13    v.

14    ITS LOGISTICS, LLC,

15                        Defendant.

16

17

Case No.   1:21-cv-000729-KES-EPG

FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND PRELIMINARY APPROVAL OF A CLASS ACTION SETTLEMENT BE GRANTED

(ECF No. 79, *see* ECF Nos. 82, 86, 87)

OBJECTIONS, IF ANY, DUE WITHIN 14 DAYS

18

19

20

21

22

23

24

25

26

27

28

The parties have reached a settlement in this putative class action case, which alleges California state labor law violations. Now before the Court is Plaintiff's unopposed motion (and supporting documents) to preliminarily certify the settlement class and approve the parties' proposed settlement.[1] (ECF No. 79, *see* ECF Nos. 82, 86, 87). The presiding District Judge has referred the motion for the preparation of findings and recommendations under 28 U.S.C. § 636(b)(1). (ECF No. 80).

On May 1, 2025, the Court held a hearing on the motion, thereafter ordering a supplement, which Plaintiff filed on June 6, 2025, along with an additional supplement on June 12, 2025. (ECF Nos. 85, 86, 87). Upon review of the motion, supplemental filings, and record, the Court will recommend that Plaintiff's motion be granted. (ECF No. 79, *see* ECF Nos. 82, 86, 87).

---

[1] Plaintiff also requests related relief, *e.g.*, authorizing notice to the class members, which will be discussed below.

1    **I.     BACKGROUND**

2         **A.     Procedural History**

3         Plaintiff filed this action in state court on March 9, 2021, against Defendant and Does 1-

4    20. (ECF No. 1-1). This complaint alleged that, in connection with Defendant's employment of

5    Plaintiff and other truck drivers, Defendant violated California employment and unfair-and-

6    unlawful competition laws. Specifically, Plaintiff brought the following claims on behalf of

7    himself and putative class members for alleged violations of California's Labor Code (Counts 1-

8    7) and California's Business and Professions Code (Count 8): (1) failure to pay minimum wages;

9    (2) failure to pay for rest, recovery, and other nonproductive time; (3) failure to provide rest

10   breaks; (4) failure to provide meal periods; (5) failure to reimburse business expenses; (6) failure

11   to timely pay final wages; (7) failure to provide accurate itemized wage statements; and (8) unfair

12   and unlawful competition. (*Id.* at 11-24). Plaintiff also brought claims (Counts 9-16) under

13   California's Private Attorneys General Act (PAGA), Cal. Lab. Code § 2698-2699.5, "which

14   allows aggrieved employees to recover civil penalties for Labor Code violations on behalf of

15   themselves, the state, or other current or former employees." *Callahan v. Brookdale Senior Living Communities, Inc.*, 42 F.4th 1013, 1017 (9th Cir. 2022); (ECF No. 1-1, pp. 24-34).

16        Defendant filed its answer in state court and removed the case on May 5, 2021. (ECF No.

17   1, p. 2; ECF No. 1-1, p. 42). A case schedule was entered on August 6, 2021. (ECF No. 15).

18   Shortly thereafter, on September 21, 2021, the parties scheduled a mediation set to occur on

19   March 8, 2022, and requested that the Court vacate all deadlines to allow them "an opportunity to

20   participate in mediation without incurring substantial costs to conduct discovery and prepare

21   briefing for class certification." (ECF No. 16). The Court vacated all deadlines, and on March 16,

22   2022, Plaintiff filed a status report, stating that the parties had reached a settlement following

23   their mediation. (ECF Nos. 17, 18). The parties had not engaged in any formal discovery or

24   motion practice.

25        On June 15, 2022, Plaintiff filed a motion for preliminary approval, which included a

26   request for class certification. (ECF Nos. 21, 22, 23). The parties' initial agreement proposed a

27   gross settlement of $350,000, of which $15,000 was to go to Plaintiff's counsel as litigation costs.

28   (ECF No. 22, p. 6). The Court held a hearing on August 16, 2022, discussing its concerns with the

proposed settlement, including that Plaintiff failed to specify the valuation of the claims or explain how the parties had reached the settlement amount, and permitted supplemental briefing. (ECF Nos. 28, 29, 31). After a series of extensions, supplemental briefing was finalized on January 13, 2023. (ECF Nos. 32-40).

The supplement contained a revised settlement agreement, providing for a gross settlement amount of $365,000 and reflecting an agreement between the parties for Plaintiff's counsel to seek only $9,000 in litigation costs. (ECF No. 38, p. 4). While the gross settlement amount was nearly the same from the initial settlement agreement, the valuation of the claims varied considerably from the previous estimates, with some claims being valued at 35% and 66% of their original amount.

On April 5, 2023, the Court issued findings and recommendations, recommending that Plaintiff's motion be denied. (ECF No. 41). The Court's primary reasoning for this recommendation was that the record failed to support Plaintiff's argument that the settlement was fair, reasonable, and adequate to the class members. More specifically, the Court noted that (1) the recovery for the class members and aggrieved employees (for the PAGA claims) was a very low percentage of the estimated value of the claims, (2) Plaintiff failed to explain the methodology behind the allocation of the settlement proceeds, and (3) the circumstances of the case suggested that the parties had agreed to settle for a certain amount without making good-faith and informed calculations to reach a fair, reasonable, and adequate settlement.

On June 30, 2023, the formerly presiding District Judge issued an order adopting the findings and recommendations in full, overruling the parties' objections, denying Plaintiff's motion, and referring the case back to the undersigned for further proceedings. (ECF No. 51). Among other things, the District Judge noted that the proposed gross settlement amount was low and that the early settlement, without any formal discovery, weighed against approval. (*Id.* at 3).

Thereafter, the Court issued a scheduling order, and Plaintiff filed an amended complaint. (ECF Nos. 54, 56). The first amended complaint alleges fewer claims than the initial complaint— 12 counts as opposed to 16. Specifically, Plaintiff brings the following claims: (1) failure to pay minimum and regular wages; (2) failure to pay nonproductive time; (3) breach of contract; (4) failure to reimburse business expenses; (5) failure to timely pay final wages; and (6) failure to

provide accurate itemized wage statements. (ECF No. 56, pp. 10-17). Plaintiff also brings related claims (Counts 7-12) under PAGA, *e.g.*, Count 7 is a PAGA assessment for failure to pay minimum and regular wages. (*Id.* at 21-27).

On February 28, 2024, the parties filed a joint status report, asking the Court to suspend the case deadlines to allow them to participate in a mediation to occur in August 2024. (ECF No. 62). After the Court granted this request, the parties filed a series of status reports, informing the Court that they did not settle the case at mediation but were continuing to negotiate. (ECF No. 67, 69, 71). On December 9, 2024, the parties informed the Court that they had reached a settlement. (ECF No. 73).

After receiving extensions of time, Plaintiff filed the instant motion for preliminary class certification and approval of the parties' settlement on March 24, 2025. (ECF No. 79). The motion states that it "is unopposed by Defendant ITS Logistics, LLC," and Defendant has filed no timely response to it. (*Id.* at 2). The following table shows the key terms of the parties' current settlement as compared to their prior proposal:

|  | Current Settlement | Prior Proposal |
|---|---|---|
| Gross Settlement Amount (GSA) | $550,000 | $365,000 |
| Attorney's Fees (25% of GSA) | $137,500 | $87,500 |
| Litigation Costs not to Exceed | $27,000 | $9,000 |
| Administrator Costs not to Exceed | $8,000 | $7,500 |
| PAGA Penalties | $100,000 | $35,000 |
| Class Representative Award not to Exceed | $7,500 | $7,500 |
| Expected Net Settlement Amount | $270,000 | $218,500 |

(*Compare* (ECF No. 79-1, p. 7, *with* ECF No. 38, p. 32).

And under the current settlement, the average net recovery for a class member would be about $1,449.[2] (ECF No. 79-1, p. 42).

---

[2] This figure is obtained by dividing the net settlement of $270,000 by 235 anticipated class members. The Court acknowledges that part of this figure includes PAGA penalties, which goes only to aggrieved persons. It is not clear from the record of the exact overlap in the class members and aggrieved persons, so the $1,449 represents an estimate.

4

In support of the motion for preliminary approval, Plaintiff provides the declarations of its counsel, defense counsel, and Timothy Aboussleman (Defendant's Senior Director of Logistics), the parties' proposed settlement agreement, and the proposed class notice. (ECF Nos. 79, 82, 86, 87).

The Court held a hearing on Plaintiff's motion on May 1, 2025. (ECF No. 83). After the hearing, the Court asked Plaintiff to file a supplement to provide documents and address various issues, most pertinent here, to provide a copy of the proposed class notice, to specifically explain why the $7,500 proposed class service award was warranted, and to correct multiple calculation errors in the valuation of the claims. (ECF No. 85). On June 6, 2025, and June 12, 2025, Plaintiff filed his supplements.[3] (ECF Nos. 86, 87).

Accordingly, the matter is now ripe for decision.

**B.      Overview of the Settlement Agreement**

**1.      Proposed settlement class and class period; aggrieved employees and PAGA period**

The proposed "settlement class" of an estimated 235 class members includes "all current and former truck drivers who resided in California and who were employed by Defendant and paid on a piece-rate basis (e.g. per day or per mile) at any time between March 1, 2019 through June 28, 2024 (the Class Period)."[4] (ECF No. 79-1, p. 6).

The PAGA claims involve an estimated 160 "aggrieved employees," who include "all current and former truck drivers who resided in California and who were employed by Defendant and allegedly paid on a piece-rate basis (e.g. per day or per mile) at any time during the PAGA Period," which is defined as "March 9, 2020 through June 28, 2024." (ECF No. 79-1, pp. 7, 35; ECF No. 79-2, pp. 18, 50, 53).

**2.      Terms of the settlement agreement**

The "gross settlement amount" (also called the GSA) that Defendant will pay to settle this case—is $550,000, which is $185,000 more than the previous GSA of $365,000. (ECF No. 79-1, p. 6). This is a "non-reversionary" settlement, meaning that "[u]nder no circumstances will any

---

[3] Plaintiff has provided a redlined version of his motion for preliminary approval, which the Court will cite, as this version provides the revised calculations. (ECF No. 86-1, p. 28).

[4] Minor alterations, such as changing capitalization and punctuation, have been made to some quotations without indicating each change.

portion of the [GSA] revert to Defendant." (ECF No. 79-2, p. 67). From the $550,000, a "net settlement amount" of $270,000 is expected to go to the settlement class, which is $51,500 more than the previous net settlement amount of $218,500. (ECF No. 79-1, p. 6). The following table reflects the deductions from the GSA to form the net settlement amount.

| GROSS SETTLEMENT AMOUNT | $550,000 |
|---|---|
| Attorney's Fees (25% of GSA) | $137,500 |
| Litigation Costs not to Exceed | $27,000 |
| Administrator Costs not to Exceed | $8,000 |
| PAGA Penalties | $100,000 |
| *Labor Workforce Development Agency Payment - 75% from PAGA Penalties* | *$75,000* |
| *Remaining 25% to Aggrieved employees* | *$25,000* |
| Class Representative Service Award not to Exceed | $7,500 |
| **Expected Net Settlement Amount** | **$270,000** |

(*Id.* at 6-7).

From the $270,000 net settlement amount for the class claims, the average payment to each of the 235 class members will be approximately $1,149 per class member (*i.e.*, $270,000 / 235 class members = $1,148.93). (*Id.* at 7). From the $25,000 in PAGA penalties expected to go to 160 aggrieved employees, the average payment is $156.25 per employee (*i.e.*, $25,000 / 160 aggrieved employees = $156.25. (*Id.*).

Settlement payments will be mailed by check, and class members and aggrieved employees will have 180 calendar days after the mailing of the check to cash it. (*Id.* at 19). If a check is not timely cashed, the funds will be issued to the California State Controller's Office in the name of the person to whom the check was issued. (*Id.*).

### 3.    Notice

Within twenty-one days after the order granting preliminary approval of the settlement, Defendant will provide the Settlement Administrator with data regarding the class members and aggrieved employees such as their contact information and information to calculate their

estimated payment. (*Id.* at 15). Within ten days of the receipt of the data, the Settlement

Administrator will mail a notice written in English and Spanish. (ECF No. 79-1, p. 15, (ECF No.

79-2, pp. 52-53). Defendant will pay an estimated $1,500 in addition to the GSA to translate the

notice. (ECF No. 79-2, pp. 52-53).

        To ensure the notice is received, the Settlement Administrator will update the addresses of

interested persons using the National Change of Address database. (ECF No. 79-1, pp. 15-16).

And if a notice is returned as undeliverable, the Settlement Administrator will use skip tracking to

obtain forwarding addresses. (*Id.* at 16). The notice will contain instructions explaining how a

class member may opt out of the settlement. (*Id.* at 20). However, aggrieved employees cannot

opt out of the PAGA action. *See O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133

(N.D. Cal. 2016) ("In short, because the employee's PAGA action acts as a 'substitute' for a

governmental action, the judgment binds all those who would be bound by an action brought by

the government, *including* nonparty employees. Thus, in a lawsuit which asserts . . . PAGA

claims and seeks class certification for labor/wage claims, even class members who opt out of the

class would be bound by an adverse PAGA judgment or settlement.") (citation omitted).

### 4.    Release

        Any class member who does not opt-out of the settlement agreement will be deemed to

have released all claims that were alleged, or that could have been alleged, based on the facts in

the amended complaint. (ECF No. 79-1, p. 20). All aggrieved employees will be deemed to have

released all PAGA claims that were alleged, or that could have been alleged, based on the facts in

the amended complaint. (*Id.* at 21). Further, the settlement agreement includes a limited waiver

of rights as to unknown claims under California Civil Code § 1542.[5] (ECF No. 79-2, pp. 69-70).

## II.    LEGAL STANDARDS FOR CLASS CERTIFICATION AND SETTLEMENT AND APPROVAL OF PAGA REPRESENTATIVE ACTION

        A court tasked with determining whether to approve a proposed class action settlement

will almost always be confronted with a "difficult balancing act." *Allen v. Bedolla*, 787 F.3d

1218, 1223 (9th Cir. 2015). "On the one hand, . . .  there is a strong judicial policy that favors

---

[5] Section 1542 provides as follows: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

settlements, particularly where complex class action litigation is concerned." *Id.* (internal quotation marks and citations omitted). "But on the other hand, settlement class actions present unique due process concerns for absent class members, and the district court has a fiduciary duty to look after the interests of those absent class members." *Id.* (internal quotation marks and citations omitted).

Class actions are governed by Federal Rule of Civil Procedure 23. There are two stages to approving a class action settlement. In the first stage, at issue here, "the court preliminarily approves the settlement pending a fairness hearing, temporarily certifies a settlement class, and authorizes notice to the class." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014). At the second stage, the Court holds a fairness hearing, entertaining objections from putative class members, and thereafter making "a final determination as to whether the parties should be allowed to settle the class action pursuant to the terms agreed upon." *Id.*

"Parties seeking class certification must satisfy each of the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b)," with Plaintiff arguing here that, under Rule 23(b)(3), common questions of law or fact predominate over individual class member questions and that a class action is superior to other methods for fairly and efficiently adjudicating this case. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017); (ECF No. 79-1, p. 30). Plaintiff bears the burden of showing these requirements. *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir. 1977).

After the certification inquiry, the Court considers whether the settlement is "fair, reasonable, and adequate" under Rule 23(e)(2). *See Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (describing factors guiding inquiry under Rule 23(e)(2)); *see also Gonzalez v. NCI Grp., Inc.*, No. 1:18-CV-00948-AWI-SKO, 2020 WL 4547303, at *9 (E.D. Cal. Aug. 6, 2020) (internal quotation marks and citation omitted) (noting that some courts decline to consider all the Rule 23(e)(2) factors at the preliminary-approval stage but agreeing with courts who reason that "it is better to closely scrutinize the settlement terms at the earliest opportunity so that if a fatal flaw exists, it can be addressed before the parties waste a great deal of time and money in the notice and opt-out process").

The Court will evaluate the settlement agreement "as a whole" and "for overall fairness."

8

1  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by*

2  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). The Court does "not have a duty to

3  maximize settlement value for class members," but instead, the "inquiry is much more modest

4  and limited to ensuring that the class settlement is fair, reasonable, and adequate." *In re*

5  *California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 678 (9th Cir. 2025). Relatedly, the

6  Court does not "have the ability to delete, modify or substitute certain provisions"; rather, "[t]he

7  settlement must stand or fall in its entirety." *Id.* (internal citation and quotation marks omitted).

8  Plaintiff's PAGA claims are pursued in a representative capacity and differ from a class

9  action. *See Kim v. Reins Int'l California, Inc.*, 9 Cal. 5th 73, 86, 459 P.3d 1123, 1130 (2020)

10  ("Although representative in nature, a PAGA claim is not simply a collection of individual claims

11  for relief, and so is different from a class action."); *see also Viking River Cruises, Inc. v. Moriana*,

12  596 U.S. 639, 644 (2022)  (quoting Cal. Lab. Code Ann. § 2699(a) ("PAGA authorizes any

13  'aggrieved employee' to initiate an action against a former employer 'on behalf of himself or

14  herself and other current or former employees' to obtain civil penalties that previously could have

15  been recovered only by the State in [a Labor and Workforce Development Agency (LWDA)]

16  enforcement action."). "PAGA actions need not satisfy Rule 23 class certification requirements."

17  *Hamilton v. Wal-Mart Stores*, Inc., 39 F.4th 575, 583 (9th Cir. 2022).

18  However, PAGA claims still require court approval under California Labor Code

19  § 2699(*l*)(2). This provision also requires a plaintiff to submit a proposed settlement to the

20  LWDA. "Although there is no binding authority setting forth the proper standard of review for

21  PAGA settlements, California district courts have applied a Rule 23-like standard, asking whether

22  the settlement of the PAGA claims is fundamentally fair, adequate, and reasonable in light of

23  PAGA's policies and purposes." *Clayborne v. Lithia Motors, Inc.*, No. 1:17-CV-00588-AWI-

24  BAM, 2022 WL 16701278, at *2 (E.D. Cal. Oct. 24, 2022) (internal quotation marks and

25  citations omitted).

### III.    ANALYSIS

26  The Court will recommend granting Plaintiff's motion for the reasons discussed below.

27  The Court begins with the Rule 23(a) factors regarding class certification and then turns to the

28  Rule 23(e) factors regarding approval of the settlement.

9

1

**A.    Rule 23(a) Requirements**

2

**1.    Numerosity**

3

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members

4

is impracticable." Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of

5

the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw. v.*

6

*Equal Employment Opportunity Comm'n*, 446 U.S. 318, 330 (1980). Courts in the Ninth Circuit

7

have found the requirement satisfied when the class is composed of as few as thirty-nine

8

members. *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citing

9

*Jordan v. L.A. County*, 669 F.2d 1311, 1319 (9th Cir. 1982) (noting that class sizes of thirty-nine,

10

sixty-four, and seventy-one are sufficient to satisfy the numerosity requirement), *vacated on other*

11

*grounds*, 459 U.S. 810, 103 (1982)).

12

Here, joinder of the 235 estimated class members as plaintiffs would be impracticable.

13

(ECF No. 79-1, p. 25). Thus, the Court finds the numerosity requirement satisfied.

**2.    Commonality**

14

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed.

15

R. Civ. P. 23(a)(2). Class members need not "have all suffered a violation of the same provision

16

of law"; rather, their claims must "depend upon a common contention." *Dukes*, 564 U.S. at 350.

17

The "common contention . . . must be of such a nature that it is capable of classwide resolution –

18

which means that determination of its truth or falsity will resolve an issue that is central to the

19

validity of each one of the claims in one stroke." *Id.* "The commonality preconditions of Rule

20

23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon*, 150 F.3d

21

at 1019. "Indeed, Rule 23(a)(2) has been construed permissively." *Id.* "The existence of shared

22

legal issues with divergent factual predicates is sufficient, as is a common core of salient facts

23

coupled with disparate legal remedies within the class." *Id.*

24

The claims here are based on Defendant's company-wide polices and practices that led to

25

violations concerning, as Plaintiff alleges, "whether Defendant properly paid all wages,

26

nonproductive time, stop pay, and rest breaks, properly reimbursed business expenses, properly

27

provided accurate itemized wage statements, and timely paid all wages upon termination." (*See*

28

ECF 79-1, p. 26). Thus, the Court finds the commonality requirement satisfied. *See Kincaid v.*

*Educ. Credit Mgmt. Corp., Inc*., No. 2:21-CV-00863-TLN-JDP, 2024 WL 1344595, at *4-10

(E.D. Cal. Mar. 29, 2024) (finding commonality requirement met for similar Labor Code claims);

*Goodwin v. Winn Mgmt. Grp. LLC*, No. 1:15-CV-00606-DAD-EPG, 2017 WL 3173006, at *6

(E.D. Cal. July 26, 2017) (same).

### 3.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). As the Ninth Circuit has

explained, "[t]he test of typicality refers to the nature of the claim or defense of the class

representative, and not to the specific facts from which it arose or the relief sought." *Jones v.

Shalala*, 64 F.3d 510, 514 (9th Cir. 1995) (citing *Hanon*, 976 F.2d at 508).

While representative claims must be "reasonably co-extensive with those of absent class

members," they "need not be substantially identical." *Hanlon*, 150 F.3d at 1020.  Here, Plaintiff

was a truck driver subject to Plaintiff's uniform policies and practices that he alleges resulted in

numerous violations of California law, such as "unpaid wages (including not receiving separate

hourly compensation for on-duty non-driving time, stop pay and rest breaks), failure to reimburse

expenses, and failure to provide accurate wage statements." (ECF No. 79-1, p. 27). And Plaintiff

alleges that the putative class members were subjected to these same violations giving rise to the

claims alleged in the complaint. (*Id.*). Thus, the Court finds the typicality requirement satisfied.

### 4.    Adequacy of representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect

the interests of the class." "[A] class representative must be part of the class and 'possess the

same interest and suffer the same injury' as the class members." *Amchem Prod., Inc. v. Windsor*,

521 U.S. 591, 625-26 (1997) (citations omitted). "The proper resolution of this issue requires that

two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of

interest with other class members and (b) will the named plaintiffs and their counsel prosecute the

action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462

(9th Cir. 2000), *as amended* (June 19, 2000) (citations omitted).

Plaintiff contends that he can adequately represent the class "because he was employed by

Defendant during the Class Period, alleges that he experienced the same wage and hour practices

as the rest of the Class, understood his duties as Class Representative, has been willing to undergo the risk of litigation, and has no conflict of interest." (ECF No. 79-1, p. 28).

As to Plaintiff's counsel, "[t]he competence of counsel seeking to represent a class" may be evaluated by considering whether they "are labor lawyers experienced in class actions." *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001). Here, Plaintiff's counsel, Attorney Misty Lauby, states that, in 2018, she "transitioned to handling exclusively employee vs. employer litigation matters," and has "been the handling attorney on over 45 class action and/or representative PAGA actions." (ECF No. 79-2, pp. 2, 3). Accordingly, the Court finds the adequacy requirement satisfied.

## B.    Rule 23(b) Requirements

Plaintiff seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); (ECF No. 22, p. 24). The test of Rule 23(b)(3) is "far more demanding," than that of Rule 23(a). *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623-24).

### 1.    Predominance

First, questions of law or fact common to class members must predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). This "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (quoting *Amchem*, 521 U.S. at 623). "This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)." *Id.* "In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues." *Id.* "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1778 (2d ed.1986)).

1

Here, Plaintiff states as follows:

There are common issues that may predominate over individual issues in this litigation. For example: (1) whether Defendant's policies resulted in unpaid wages such as non-productive time, stop pay and/or rest breaks; (2) whether Defendant properly reimbursed the Class for business use of their cell phones (3) whether Defendant provided putative Class Members with itemized wage statements that were inaccurate in violation of Labor Code § 226; and (4) whether Defendant failed to pay all wages due and payable to former employees within the times specified under the California Labor Code.

(ECF No. 79-1, p. 26).

Based on the information provided, the Court agrees. Because "[a] common nucleus of facts and potential legal remedies dominates this litigation," the Court finds that the predominance requirement is met. *Hanlon*, 150 F.3d at 1022.

## 2.    Superiority

Under Rule 23(b)(3), a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Pertinent to this finding is

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.; see Amchem*, 521 U.S. at 616.

The purpose of this "requirement is to assure that the class action is the most efficient and effective means of resolving the controversy," and "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted); *see Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands*, 244 F.3d 1152, 1163 (9th Cir. 2001) ("This case involves multiple claims for relatively small individual sums. . . . If plaintiffs cannot proceed as a class, some – perhaps most – will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover.").

The Court concludes that a class action is a superior method of resolving this action. First, it does not appear economical for each class member to bring his or her claim separately. As Plaintiff notes, the class action litigation here allows the class members to pool their individual

13

claims together, which claims would otherwise not be economical to litigate. (ECF No. 79-1, p. 29); *see Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sand*s, 244 F.3d 1152, 1163 (9th Cir. 2001) ("This case involves multiple claims for relatively small individual sums. . . . If plaintiffs cannot proceed as a class, some – perhaps most – will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover."). Further, lack of knowledge of the legal system and limited economic resources would also likely deprive most class members of the opportunity to pursue their claims outside of a class action. And as Plaintiff notes, any class member that wants to pursue their own case may opt out. (ECF No. 79-1, p. 29).

Second, there also does not appear to be any related pending litigation.

Third, this District is a desirable forum for the litigation as the amended complaint alleges that "Defendants transact business in Merced County and the unlawful acts alleged . . .  have a direct effect on Plaintiff and the Represented Employees in Merced County" and "Defendants employed or employ Plaintiff and Represented Employees in Merced County." (ECF No. 56, p. 5). Thus, much of the evidence will likely be found within this District and court proceedings can efficiently proceed here. *See Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 486 (N.D. Cal. 2017) ("This case involves drivers who serviced routes in Northern California, many of whom worked out of Flowers warehouses in San Jose and Salinas, which are in this District. Because much of the evidence will be found here, it would be efficient to try the case here.").

Finally, there are no apparent difficulties likely to be encountered in managing this class action.

Thus, the Court finds that the superiority requirement is met.

**C.    Rule 23(e) Requirements**

If a proposed settlement agreement "would bind class members," the Court must find that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). A court considers whether:

(A) the class representatives and class counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking into account:
       (i) the costs, risks, and delay of trial and appeal;
       (ii) the effectiveness of any proposed method of distributing relief to the

class, including the method of processing class-member claims;
(iii) the terms of any proposed award of attorney's fees, including timing of payment; and
(iv) any agreement required to be identified under Rule 23(e)(3); and
(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Ninth Circuit has provided the following guidance regarding Rule 23(e)(2):

In this Circuit, a district court examining whether a proposed settlement comports with Rule 23(e)(2) is guided by the eight "*Churchill* factors," viz., "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement."

*Kim*, 8 F.4th at 1178 (quoting *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)); *see Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (listing the *Churchill* factors). "In addition, the settlement may not be the product of collusion among the negotiating parties." *In re Mego*, 213 F.3d at 458. "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) (citations omitted).

Moreover, consideration of these factors alone is insufficient. *Id.* at 1179. Because Rule 23(e)(2) also requires courts to "now consider 'the terms of any proposed award of attorney's fees' when determining whether 'the relief provided for the class is adequate[,]' . . . courts must balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *Briseño v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)(C)(iii)). This is done by reviewing the "so-called *Bluetooth* factors to smoke out potential collusion." *Id.* at 1023. Signs of such collusion include:

(1) "when counsel receive[s] a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class.

*Id.* (quoting *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d at 947).

The Court will begin with the *Churchill* factors and then turn to collusion, the *Bluetooth* factors, and other considerations.

### 1.    The strength of Plaintiff's case

A court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Adoma v. Univ. of Phoenix, Inc.*, 913 F.Supp.2d 964, 975 (E.D. Cal. 2012) (citation omitted). However, "the court does not reach any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this litigation." *Id.* (internal citation and quotation marks omitted).

In support of the parties' proposed settlement, Plaintiff asserts that various risks and defenses warrant 44% to 77% reductions in the maximum value of the claims. The Court provides an overview of the parties' positions for each claim.

### a.    Failure to pay wages

Plaintiff states that the failure-to-pay-wages claims are based on three theories: "(1) failure to pay for non-productive time such as pre/post trip inspections, fueling, paperwork, etc., under Labor Code § 226.2; (2) failure to pay including stop pay per contract of $12.50 per stop, and (3) unpaid rest period wages per contract." (ECF No. 79-1, p. 36). These claims are based on contract theories and California labor law, including California Labor Code § 226.2, which, in part, requires employees to "be compensated for rest and recovery periods and other nonproductive time separate from any piece-rate compensation." Cal. Lab. Code § 226.2(a)(1).

Plaintiff calculates a total potential maximum value for the wage claims at $496,655. (ECF No. 79-1, p. 36). Of this amount, $353,030 of the value is based on flat-rate shifts and $143,625 is based on mileage-rate shifts. The higher value for flat rate shifts is because the majority of the shifts worked were flat-rate shifts. (*Id.* at 16, 35). Based on the maximum value of $496,655, Plaintiff calculates a total-risk adjusted value of these claims at $144,808, or approximately a 71% total reduction in the value of the claims. Stated another way, the risk-adjusted value is about 29% of the maximum value. The following table shows the maximum value, total risk-adjusted value, and reductions that Plaintiff makes for each category of claim

based on the risks posed by class certification and the merits.[6]

| Category | Maximum Value | Cert Risk | Merits Risk | Risk Adj. Value |
|---|---|---|---|---|
| | | **FLAT-RATE DRIVERS** | | |
| Non-Productive Time | $164,745 | 50% | 50% | $41,186 |
| Stop pay | $91,400 | 50% | 75% | $11,425 |
| Rest Breaks | $96,885 | 50% | 50% | $24,221 |
| *Subtotal for Flat- rate drivers* | *$353,030.00* | | | *$76,832.00* |
| | | **MILEAGE-RATE-DRIVERS** | | |
| | | | | |
| Category | Maximum Value | Cert Risk | Merits Risk | Risk Adj. Value |
| Non-Productive Time | $29,064 | 50% | 10% | $13,079 |
| Stop pay | $103,800 | 30% | 30% | $50,862 |
| Rest Breaks | $10,761 | 50% | 25% | $4,036 |
| *Subtotal for Mileage- rate drivers* | *$143,625.00* | | | *$67,977.00[7]* |
| *Total Maximum* | **$496,655** | | *Total Risk-* | **$144,809[8]** |

---

[6] Unless otherwise noted, the numbers in these findings and recommendations are rounded to the closest whole dollar.

[7] Plaintiff mistakenly totaled this whole dollar amount as $67,976 ($1 less than the correct amount). (ECF No. 79-1, p. 37).

[8] Because of the $1 error identified above, Plaintiff had the total risk-adjusted value of these claims at $1 less ($144,808) than the correct amount ($144,809). (ECF No. 79-1, p. 37).

| *Value of all Failure-to-pay-wages claims* | | | *adjusted Value of all Failure-to-pay-wages claims* | **(approximate 71% reduction from maximum value)** |
|---|---|---|---|---|

Among other arguments, Plaintiff contends that the following reasons warrant discounting the claims:

> This result here is fully supportable as reasonable. First, off-the-clock claims like those involving non-productive time have proven to be extremely difficult to certify by their very nature. Second, Defendant argues that the policies relating to the promises of stop pay and/or rest break pay differ according to pay type and different periods of time that the policies were in effect calling into question whether the criteria for commonality and typicality can be met. Third, Plaintiff's claims for rest breaks and stop pay are dependent on breach of contract theories requiring that Plaintiff prove there was an agreement to pay, but in speaking with a number of other drivers, that theory was called into question because a few of the drivers reported that they believed that their pay rate encompassed all of their work. Fourth, because of the nature of the work, the drivers were subject to somewhat differing conditions, (for example, they operated out of different locations, serviced different clients and routes, and had different hours and numbers of stops). Therefore, Plaintiff made merits-based adjustments on the flat rate claims of 50% for non-productive time and rest breaks due to the risk that Defendant's argument that the flat rate was all inclusive would prevail. An additional 25% deduction was added to the stop pay arguments because alleged promises to pay stop pay to the flat rate drivers by way of the offer letters was ended early in the class period and at least a few of the flat rate drivers Plaintiff's counsel spoke to had no expectation of being paid any stop pay because they specifically reported that they believed that their flat rate pay encompassed all of their work in a day.
>
> With respect to certification matters, either the claim will be certified, or it will not, making a 50% discount a reasonable estimate, since if the claim fails to be certified, the value to the class is zero. Plaintiff estimates a slightly lower 30% risk on the mileage rate pay, stop pay issues because Defendant does not dispute that the policy existed as to those drivers. However, it does argue that the stop-pay was duly paid when applicable which justifies some certification risk. Moreover, with respect to rest breaks, Defendant argues that it paid rest breaks to MRDs when applicable and that any right to take or be paid for rest breaks is pre-empted by the FMCSA further justifying risk reduction on rest break claims.

(ECF No. 79-1, pp. 38-39).

\\\

### b. Wage statements

Plaintiff states that the wage-statement claims are based on Defendant's failure "to include all information required by Labor Code § 226(a)," which provision generally requires certain information to be included in an itemized wage statement, *e.g.*, the gross wages the employee earned. (ECF No. 79-2, p. 22). "Plaintiff calculated the maximum potential value of this claim as $244,000 under the $50/$100 formula in § 226(e)[9] on 3,131 total wage statements in the one-year statute of limitations with a $4,000 per employee cap as calculated by Plaintiff's consultant." (*Id.*).

Based on the maximum value of $244,000, Plaintiff calculates a total risk-adjusted value of these claims at $117,120, or approximately a 52% total reduction in the value of the claims. Stated another way, the risk-adjusted value is about 48% of the maximum value. The following table shows the maximum value, total risk-adjusted value, and reductions that Plaintiff makes for this claim based on the risks posed by class certification and the merits.

| WAGE-STATEMENT CLAIMS | | | |
|---|---|---|---|
| Maximum Value | Cert Risk | Merits Risk | Risk Adj. Value |
| $244,000 | 20% | 40% | $117,120 (approximate 52% reduction from maximum value) |

Among other arguments, Plaintiff contends that the following reasons warrant discounting the claims:

> . . . Defendant raised further defenses, including that: (a) these violations, if any, did not result in any "injury" under § 226(e), (b) the violations, if any, were not "knowing and intentional" and could not support the assessment of penalties, and any (c) "derivative" wage statement claims are without merit. As a result of the defenses, Plaintiff assigned a 20% risk adjustment at the class certification stage and a 40% risk adjustment at the merits stage for a risk adjusted value of $117,120. Plaintiff assigned a small risk at the certification stage because while not certain,

---

[9] Section 226(e)(1) provides as follows: "An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000) . . . ."

1

2

3

the issues seemed well suited to class treatment as it relates to a class-wide wage
statement policy. However, a larger deduction was assigned on the merits due to
Defendant's potential to defeat the claim on the theory that the flat rate pay
structure is equivalent to a "salary" and therefore, listing the hourly rate was not
required.

4

(ECF No. 79-1, pp. 22-23).

5

### c.    Failure to reimburse for business expenses

6

Plaintiff's failure-to-reimburse-for-business-expenses claims are based on Labor Code

7

§ 2802(a), which provides as follows: "An employer shall indemnify his or her employee for all

8

necessary expenditures or losses incurred by the employee in direct consequence of the discharge

9

of his or her duties, or of his or her obedience to the directions of the employer . . . ."

10

Plaintiff estimates the maximum potential value of these claims as $152,260. (ECF No.

11

79-1, p. 40). This number is based on "$20 per 7,613 workweeks between the March 9, 2020

12

beginning of the three-year statute of limitations for Labor Code § 2802 claims, through

13

September 18, 2021 when Defendant changed its policies." (*Id.* at 39-40).

14

Based on the maximum value of $152,260, Plaintiff calculates a total risk-adjusted value

15

of these claims at $85,266, or approximately a 44% total reduction in the value of the claims.

16

Stated another way, the risk-adjusted value is about 56% of the maximum value. The following

17

table shows the maximum value, total risk-adjusted value, and reductions that Plaintiff makes for

this claim based on the risks posed by class certification and the merits.

18

19

20

21

22

23

|  | **Business-expenses CLAIMS** |  |  |
|---|---|---|---|
| **Maximum Value** | **Cert Risk** | **Merits Risk** | **Risk Adj. Value** |
| $152,260 | 20% | 30% | $85,266 (approximate 44% reduction from maximum value) |

24

Among other arguments, Plaintiff contends that the following reasons warrant discounting

25

the claims:

26

27

28

Defendant also raised defenses to this claim . . . including that it provided an in-
truck messaging system so personal cell phone use was not required and, in 2021,
Defendant issued an interoffice memo that told drivers they were no longer
required to provide a cell phone for work but establishing a policy to pay for any

usage incurred. Consequently, Plaintiff assigned a 20% class certification adjustment and 30% merits adjustment to this claim for a total value of $85,266. The adjustments here are appropriate because certification challenges may arise due to the individualized nature of whether drivers actually utilized their own phones for work and at what cost. For the same reasons, there would also be significant risks when arguing the merits of the claim in trying to establish damages especially after 2021.

(ECF No. 79-1, p. 40).

### d.    Failure to pay timely wages upon separation of employment

Plaintiff's failure-to-pay-timely-wages claims are based on Labor Code §§ 201-203. Section 201(a) states as follows: "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Section 202(a) generally requires payment of wages not later than 72 hours after an employee quits or gives notice that the employee will quit. Section 203(a) provides that, if an employer willfully fails to comply with § 201 or 202 in paying "any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

Plaintiff estimates the maximum potential value of these claims as $2,156,464. (ECF No. 86-1, p. 67). Of this amount, $1,964,483 of the value is based on flat-rate shifts and $191,981 is based on mileage-rate shifts.

Based on the maximum value of $2,156,464, Plaintiff calculates a total risk-adjusted value of these claims at $497,896, or approximately a 77% total reduction in the value of the claims. Stated another way, the risk-adjusted value is about 23% of the maximum value. The following table shows the maximum value, total risk-adjusted value, and reductions that Plaintiff makes for each category of claim based on the risks posed by class certification and the merits.

| | **FLAT-RATE DRIVERS** | | |
|---|---|---|---|
| **Maximum Value** | **Cert Risk** | **Merits Risk** | **Risk Adj. Value** |
| $1,964,483 | 50% | 58% | $412,541 |
| | **MILEAGE-** | | |

| Maximum Value | RATE-DRIVERS | | |
| --- | --- | --- | --- |
| **Maximum Value** | **Cert Risk** | **Merits Risk** | **Risk Adj. Value** |
| $191,981 | 43% | 22% | $85,355 |
| **Total Maximum Value of All Flat-rate and Mileage Shifts = $2,156,464** | | | **Total Risk-adjusted Value of All Flat-rate and Mileage Shifts = $497,896** |

Among other arguments, Plaintiff contends that the following reasons warrant discounting the claims:

> Defendant argued that Plaintiff's Section 203 claim is derivative of his substantive claims – each of which has significant shortcomings. Moreover, the claim fails because ITS acted with a good faith belief that its pay policies fully and properly compensated its drivers, and Plaintiff has provided no evidence that Defendant "willfully" failed to pay the class any wage.

> Due to the derivative nature of the waiting time claims, Plaintiff utilized the average discount attributed to the wage claims above to arrive at the risk adjusted values as set forth [in the table above]:

(ECF No. 79-1, p. 41).

###### e.    PAGA claims

"Although the court does not evaluate the settlement of PAGA claims under the Rule 23 criteria, it must still inquire into the fairness of the PAGA settlement." *Wells v. DCI Donor Servs., Inc.*, No. 2:21-CV-00994-CKD, 2024 WL 4436905, at *11 (E.D. Cal. Oct. 7, 2024). Courts apply standards like Rule 23 in making this assessment, asking if the PAGA settlement is fair, adequate, and reasonable. *See, e.g.*, *Mondrian v. Trius Trucking, Inc.*, No. 1:19-CV-00884-DAD-SKO, 2022 WL 2306963, at *7 (E.D. Cal. June 27, 2022) (applying Rule-23 like standard to PAGA claims). Plaintiff estimates the maximum potential value of these claims as $2,563,600. (ECF No. 79-1, p. 44). Based on this maximum value, Plaintiff calculates a total risk-adjusted value of these claims at $897,260, or a 65% total reduction in the value of the claims. (*Id.* at 45). Stated another way, the risk-adjusted value is 35% of the maximum value. The following table shows the maximum value, total risk-adjusted value, and reductions that Plaintiff offers based on the risks

posed on the merits and discretionary reductions.

| | | PAGA CLAIMS | | |
|---|---|---|---|---|
| Category | Maximum Value | Merits Risk | Discretionary Reduction | Risk Adj. Value |
| Unpaid Wages | $776,000 | 50% | 30% | $271,600 |
| Failure to Pay Wages Each Period | $776,000 | 50% | 30% | $271,600 |
| Business Expenses | $682,000 | 50% | 30% | $238,700 |
| Wage Statement Violations | $313,100 | 50% | 30% | $109,585 |
| Failure to Pay Timely Wages | $16,500 | 50% | 30% | $5,775 |
| | *Total Maximum Potential Value of All PAGA Claims = $2,563,600* | | | *Total Risk-adjusted Value of All PAGA Claims = $897,260* |

Among other arguments, Plaintiff contends that the following reasons warrant discounting the claims:

First, it is unclear whether stacking is permissible and/or whether the court would award penalties in such a way (especially for purely derivative penalties such as 203 and 204 claims). Second, the maximum figure fails to acknowledge that courts have wide latitude to reduce the amount of civil penalties "based on the facts and circumstances of a particular case" and if "to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." Labor Code § 2699(h); *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1037 (N.D. Cal. 2016) (noting in the context of approving settlement that a reduction in PAGA penalties would be "appropriate" based on the "unjust, arbitrary and oppressive, or confiscatory" factors because (i) the employer did not "deliberately evad[e] a clear obligation to provide legally required pay and benefits to employees," (ii) the employer did not "negligently fail to learn about its obligations under the wage and hour laws," and (iii) the employer's obligations were "genuinely unclear" because

23

"there is no straight answer to the question."). (Lauby Decl. ¶ 61).

Plaintiff is also cognizant of the risks facing PAGA claims in federal court, including cases holding that PAGA claims do not satisfy constitutional standing requirements. *See, e.g., Raphael v. Tesoro Ref. & Mktg. Co. LLC*, No. 2:15-CV-02862-ODW, 2015 WL 5680310 at *2 (C.D. Cal. Sept. 25, 2015) (PAGA claim lacked constitutional standing because "[a]lthough PAGA authorizes representative actions, California state law cannot alter federal procedural and jurisdictional requirements"). (Lauby Decl. ¶ 62).

. . . .

Taking into consideration all defenses raised and the potential for reduction, Plaintiff assigned a 50% risk adjustment on the basis of merits and an additional 30% for discretionary reduction bringing the risk adjusted value of PAGA claims to $897,260. (Lauby Decl. ¶ 64).

(ECF No. 79-1, pp. 44-45).

### f.    Conclusion

As noted above, the discounts of the claims range from 44% to 77% based on the strength of Plaintiff's claims.[10] When adding up the risk-adjusted value of both the class and PAGA claims, the total risk-adjusted value of all claims is $1,742,351.

| CLAIM TYPE | PERCENTAGE DISCOUNT | RISK-ADJUSTED VALUE |
|---|---|---|
| Failure to pay wages | 71% | $144,809 |
| Wage statement | 52% | $117,120 |
| Business expenses | 44% | $85,266 |
| Failure to pay timely wages | 77% | $497,896 |
| PAGA claims | 65% | $897,260 |
| | | *Total Risk-adjusted Value =* $1,742,351[11] |

Below, the Court will discuss the reasonableness of the settlement amount in more detail. However, based on the above discussion, the Court concludes that the parties have sufficiently

---

[10] The Court uses the total discount percentage for the claims. For example, as discussed above, when considering all the certification and merits discounts applied to the various categories of failure-to-pay-wages claims, the claims are discounted by about 71%.

[11] Plaintiff incorrectly states, "[t]aken together, the total risk adjusted value of the class claims and the PAGA claims is $1,738,333." (ECF No. 86-1, p. 73). Correctly totaled, the amount is $1,742,351.

24

considered the strengths and weaknesses of this case in reaching a settlement agreement.

### 2.    The risk, expense, complexity, likely duration of further litigation, and risks of maintaining class action status throughout trial

"Approval of settlement is 'preferable to lengthy and expensive litigation with uncertain results.'" *Munoz v. Giumarra Vineyards Corp.*, 2017 WL 2665075, at *9 (E.D. Cal. June 21, 2017). Moreover, "[e]mployment law class actions are, by their nature, time-consuming and expensive to litigate." *Aguilar v. Wawona Frozen Foods*, 2017 WL 2214936, at *3 (E.D. Cal May 19, 2017).

Plaintiff argues that, without settlement, the parties would need to engage in further litigation, including the certification of the class, and if certified, any discovery regarding damages, with the resulting time and expense potentially outweighing any additional recovery obtained. (ECF No. 79-1, p. 46).

Based on the record evidence, including the discovery already taken and strengths and weakness of the case, the Court concludes that this consideration weighs in favor of approving the parties' proposed settlement.

### 3.    The amount offered in settlement

The amount offered in settlement "is generally considered the most important" factor of any class settlement. *See Bayat v. Bank of the West*, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015). In determining whether the amount offered in settlement is fair and reasonable, a court compares the proposed settlement amount to the maximum potential amount recoverable through successful litigation. *See In re Mego*, 213 F.3d at 459. "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Id.* (citation omitted). For complex class action cases, Ninth Circuit has "a strong judicial policy that favors settlements. Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific Enter. Sec. Lit.*, 47 F.3d 373, 378 (9th Cir. 1995) (internal quotation marks and citation omitted).

### a.    Percentage recovery

Under the parties' prior proposed settlement, the class members would "receive a gross recovery of approximately 10% of the potential maximum value of the class claims and a net

recovery of approximately 6%. And the aggrieved employees [would] receive a gross recovery of approximately 2% of the potential maximum value of the PAGA claims." (ECF No. 41, p. 14). The Court concluded that such a recovery was "too low for the Court to deem it fair, reasonable, and adequate." (*Id.*).

Turning to the current proposed settlement, if Plaintiff were to prevail on all claims, the estimated recovery would be $5,612,979 ($3,049,379 potential maximum for the class claims[12] + $2,563,600 potential maximum for the PAGA claims). Of the $2,563,600 in potential maximum PAGA penalties the LWDA would receive 75% ($1,922,700) and the remaining 25% ($640,900) would go to the aggrieved employees. *See* Cal. Labor Code § 2699(i). Deducting LDWA's proportion ($1,922,700) of the PAGA penalty from the projected maximum ($5,612,979) leaves $3,690,279 going to the class and aggrieved employees. *See Lusk v. Five Guys Enterprises LLC*, No. 1:17-CV-00762-AWI-EPG, 2022 WL 4791923, at *8 (E.D. Cal. Sept. 30, 2022) (deducting LWDA's portion of estimated PAGA penalty from the projected recovery amount before calculating the percentage rate of recovery). The gross settlement amount ($550,000) is approximately 15% of $3,690,279 and the net settlement ($270,000) amount is approximately 7% of this amount.

If considering the class claims in isolation, the $450,000 of the gross settlement for the class claims ($550,000 gross settlement amount less the $100,000 allocated for PAGA penalties) compared to the maximum value of the class claims $3,049,379, yields a recovery of approximately 15%. If considering the PAGA claims in isolation, the $100,000 of the gross settlement amount allocated for PAGA penalties compared to the maximum value of $2,563,600 yields a recovery of approximately 4%. The below table illustrates these rates of recovery.

| CLAIMS | MAXIMUM POTENTIAL VALUE | SETTLEMENT RECOVERY BASED ON GROSS SETTLEMENT OF | SETTLEMENT RECOVERY BASED ON NET SETTLEMENT OF $270,000 |
|---|---|---|---|

---

[12] This amount is calculated as follows: $2,156,464 (failure-to-timely-pay-wage claims) + $496,655 (failure-to-pay-wages claims) + $244,000 (wage-statement claims) + $152,260 (business-expenses claims) = $3,049,379.

| | | $550,000 | |
|---|---|---|---|
| All Claims | $3,690,279 (this figure does not count amount of PAGA penalties that would go to the LWDA) | 15% | 7% |

| CLAIMS | MAXIMUM POTENTIAL VALUE | SETTLEMENT RECOVERY BASED ON GROSS CLASS RECOVERY OF $450,000 | |
|---|---|---|---|
| Only Class Claims | $3,049,379 | 15% | |

| CLAIMS | MAXIMUM POTENTIAL VALUE | SETTLEMENT RECOVERY BASED ON GROSS PAGA PENALTIES OF $100,000 | |
|---|---|---|---|
| All PAGA Claims | $2,563,600 | 4% | |

Ultimately, the Court finds this recovery, which is higher than the last proposed recovery, reasonable. *Almanzar v. Home Depot U.S.A., Inc.*, No. 2:20-CV-0699-KJN, 2022 WL 2817435, at *12 (internal quotation marks and citation omitted) (E.D. Cal. July 19, 2022) ("In fact, 10% of the verdict value of non-PAGA claims is generally considered the low end of reasonable recovery."); *see Bravo v. Gale Triangle, Inc.*, 2017 WL 708766, at *10 (C.D. Cal. Feb. 16, 2017) ("Thus, Plaintiffs argue that a settlement for fourteen percent recovery of Plaintiffs' maximum recovery is reasonable under the circumstances. The Court agrees.") (internal citation to record omitted); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D. Cal. 2015) ("From here, the agreed upon common fund represents between 27 percent and 11 percent of the total potential

recovery. The Court is satisfied that these numbers are fair.").

In reaching this determination, the Court reiterates that "a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004).

### b. Allocation of settlement shares

The Court also considers whether the allocation of the settlement is fair, reasonable and adequate, with it being "reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits." *In re Omnivision Techs.*, Inc., 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008).

Plaintiff describes the allocation of the settlement shares as follows:

The Net Settlement Amount will be allocated and paid based on a number of criteria including: (1) the Net Settlement will be divided up using the percentage of the estimated maximum value attributed to each claim, and/or subclaim to arrive at an estimated total for each claim/subclaim category ("Estimated Total for Claim"); (2) the Estimated Total for Claim will be divided by the total number of weeks worked by the drivers impacted by each claim/subclaim ("Per Claim Workweeks") to arrive at a dollar figure share ("Per Claim Share") for each week worked for that claim/subclaim; (3) each Class Member's workweeks allocated by the number of weeks each driver worked at greater than 50% flat rate ("Flat Rate Driver Weeks Worked") and/or greater than 50% mileage rate ("Mileage Rate Driver Weeks Worked") for the minimum wage claims and by all applicable weeks for the remaining claims ("Other Weeks Worked"); (4) the Per Claim Share will be multiplied by the number of Flat Rate Driver Weeks Worked, the Mileage Rate Driver Weeks Worked, and Other Weeks Worked for every claim that each Class Member was potentially impacted based upon the dates they drove at each rate ("Individual Per Claim Totals"); (5) the Individual Per Claim Totals will be added together for each Class Member to obtain a total individual class settlement payment ("Total Individual Class Settlement Payment"). The average Individual Class Settlement Payment for each of the 235 Class Members is approximately $1,149 ($270,000 Net Settlement Amount/235 Class Members). The average for each of the estimated 160 Aggrieved Employee's share of the PAGA Penalties is approximately $156.25 ($25,000/160).[13] Defendant will separately pay its share of payroll taxes. (Lauby Decl. ¶¶ 37-42).

(ECF No. 79-1, p. 8; *see also* table with formulas at ECF No. 86-1, pp. 43-44).

---

[13] Plaintiff had the formula for the estimated average aggrieved employee's share as "($25,000/150)," which the Court has replaced with "($25,000/160)." (ECF No. 79-1, p. 8). The Court understands Plaintiff's formula to be a typo, as there are 160 aggrieved employees, not 150. (ECF No. 79-1, p. 35). Additionally, using 150 instead of 160 in the calculation would not yield $156.25 per aggrieved employee.

The Court finds this plan for allocation acceptable. Notably, this plan works to ensure that each recipient receives fair payment based on the differing values of the claims and the amount that each person worked based on different types of pay.

### 4. The extent of discovery completed and the stage of proceedings; experience and views of counsel

"An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Riker v. Gibbons*, No. 3:08-CV-00115-LRH, 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010) (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11:42 (4th ed.2002)); *see also Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527–28 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." (citations omitted)). Here, Plaintiff states as follows:

> Both parties conducted extensive investigation allowing them to assess the strengths and weaknesses of the case, including Defendant providing formal discovery and informal discovery and documents in preparation for mediation, including payroll data, time records, and policies and practices for Defendant's compensation systems for the Class, and a sampling of timekeeping and payroll records. The parties participated in two mediations with highly experienced mediators.

(ECF No. 79-1, pp. 46-47).

Compared to the last settlement, which was reached very early in the case, this settlement comes after the Court issued a scheduling order (albeit later vacated), formal discovery, and two mediations. A comparison of this motion with the prior one reveals that the parties have provided more informed factual bases and discussion to support their settlement agreement.

Accordingly, this factor weighs against approval.

### 5. The presence of a government participant

Although there is no governmental party to this lawsuit, the LWDA may express its views. Under California Labor Code § 2699(*l*)(2), a "proposed settlement shall be submitted to the [LDWA] at the same time that it is submitted to the court" for the LWDA's review and approval.

Plaintiff's counsel has filed a declaration, stating as follows: "Plaintiff has concurrently submitted the settlement to the LWDA in accordance with Labor Code § 2699(l)(2)." (ECF No.

79-2, p. 31). Additionally, counsel attaches an email that appears to confirm such submission. (*Id.* at 91).

Further, under 28 U.S.C. § 1715(b), the Class Action Fairness Act (CAFA) requires notice of a proposed class action settlement, and certain documents, to be served by each participating defendant on appropriate state and federal officials not later than 10 days after the filing of a proposed settlement.[14] *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1075 (9th Cir. 2017) (noting this requirement). The Ninth Circuit has described this requirement as follows:

> Complementing the expansion of federal jurisdiction to ensure uniformity and fairness is CAFA's class action settlement notice requirement, 28 U.S.C. § 1715, which was intended to "provide a check against inequitable settlements." S.Rep. No. 109–14, at 35 (2005), 2005 WL 627977, at *34; *see In re Uponor, Inc.*, F1807 Plumbing Fittings Prods. Liab. Litig., 716 F.3d 1057, 1064–65 (8th Cir.2013). Section 1715 requires notice of a proposed settlement to be served on the "appropriate" federal and state officials—typically the Attorney General of the United States and "the person in the State who has the primary regulatory or supervisory responsibility with respect to the defendant." 28 U.S.C. § 1715(a). In addition, § 1715 prohibits a court from ordering final approval of a proposed settlement until 90 days after the appropriate government officials were notified. *Id.* § 1715(d). The statute is equally clear that it shall not "be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials." *Id.* § 1715(f). These requirements are intended to give states a role in ensuring that citizens are equitably compensated in class action settlements, but states are free not to participate, leaving that task to the courts, which ultimately retain discretion to approve or disapprove any settlement, regardless of a state's intervention.

*California v. IntelliGender, LLC*, 771 F.3d 1169, 1172-73 (9th Cir. 2014).

Defense counsel, Angela Cash, has filed a declaration stating, "On April 3, 2025, I served on all federal and state officials required to be notified of the settlement in this case, the Class Action Fairness Act Settlement Notice (the CAFA Notice) along with a flash drive containing .PDF versions of the following as required by 28 U.S.C. § 1715," the complaint, Plaintiff's instant motion, and other relevant documents. (ECF No. 82, p. 2).

No governmental entity has yet raised any objection to the settlement. Accordingly, this factor weighs in favor of approval.

---

[14] Section 1715(b) provides in part as follows: "Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement consisting of [various documents and information, including the complaint]."

1

### 6. The reaction of the class members to the proposed settlement

2

At this stage, the reaction of the class members to the proposed settlement is unknown, so

3

this factor cannot be addressed.

4

### 7. Collusion

5

"The potential for collusion reaches its apex pre-class certification because, among other

6

things, (1) the court has not yet approved class counsel, who would owe a fiduciary duty to the

7

class members; and (2) plaintiffs' counsel has not yet devoted substantial time and money to the

8

case, and may be willing to cut a quick deal at the expense of class members' interests." *Briseño*,

9

998 F.3d at 1024.

10

The Court now turns to the *Bluetooth* factors, which are signs courts indicating that class

11

counsel have allowed their own interests to infect settlement negotiations—(1) whether counsel

12

receives a disproportionate amount of the settlement; (2) whether there is a clear "sailing

13

agreement"; (3) and whether the agreement contains a "kicker" or "reverter" clause. *Briseño*, 998

14

F.3d at 1024. The Court "ha[s] an independent obligation to ensure that the award, like the

15

settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*,

16

654 F.3d at 941; *see also Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328–29 (9th

17

Cir. 1999). Where, as here, fees are to be paid from a common fund, the relationship between the

18

class members and class counsel "turns adversarial." *In re Washington Pub. Power Supply Sys.*

19

*Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). As a result, the Court must assume a fiduciary

20

role for the class members in evaluating a request for an award of attorney's fees from the

21

common fund. *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009).

22

The Ninth Circuit has approved two methods for determining attorney's fees in cases

23

where the award is taken from the common fund set aside for the entire settlement: the

24

"percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290

25

F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The Court retains discretion in common fund

26

cases to choose either method. *Id.*; *Vu v. Fashion Inst. of Design & Merch.*, No. CV 14-08822

27

SJO (EX), 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22, 2016). Under either approach,

28

"[r]easonableness is the goal, and mechanical or formulaic application of either method, where it

yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance*

1    *Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

2           Under the percentage of the fund method, the Court may award class counsel a given

3    percentage of the common fund recovered for the class. *Id.* In the Ninth Circuit, a twenty-five

4    percent award, which is what is sought here, is the "benchmark" amount of attorneys' fees, but

5    courts may adjust this figure if the record shows "special circumstances justifying a departure."

6    *Id.* (quoting *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.

7    1990)). The Ninth Circuit has permitted courts to award attorney's fees using this method "in lieu

8    of the often more time-consuming task of calculating the lodestar." *Bluetooth*, 654 F.3d at 942. In

9    evaluating a percentage for attorneys' fees, the Court is required to "consider[] all the

10   circumstances of the case and reach a reasonable percentage." *Vizcaino*, 290 F.3d at 1048. Such

11   circumstances include (1) the results reached for the class; (2) the risk to class counsel; (3)

12   counsel's performance; and (4) the amount sought to be awarded compared to the market rate. *Id.*
     at 1048-49.

13          Here, Plaintiff's counsel has requested a benchmark recovery of 25% (or $137,500) and

14   the settlement agreement caps costs at $27,000. (ECF No. 79-1, pp. 7, 47). "Plaintiff's counsel

15   will submit a comprehensive motion for attorneys' fees and costs within the Notice Periods and

16   the deadlines set by the Court in considering the final approval of the settlement that further

17   discusses all of [the relevant] factors." (*Id.* at 47). However, counsel provides a brief explanation

18   of why the benchmark is warranted:

19           A fee award of the 25% benchmark is appropriate for the following reasons: (1)
             Class Counsel obtained a good recovery for the settlement class after diligently
20           litigating the claims, (2) Class Counsel displayed considerable skill
             (commensurate with their extensive class action wage-and-hour experience) in
21           reaching such a favorable settlement given the complex and nuanced issues in the
             litigation, (3) Class Counsel faced substantial risk in this matter because of the
22           myriad defenses to certification and on the merits, (4) the risk and financial burden
             borne by Class Counsel in litigating this contingency-fee action, and (5) the
23           requested 25% fee award is projected to be less than Class Counsel's projected
             lodestar.
24

25   (ECF No. 79-1, p. 47).

26          Without developed argument or evidence, the Court cannot determine whether this request

27   is warranted, nor whether the fees were reasonably incurred. However, as this amount falls within

28   the benchmark, and some support is provided, the Court will recommend that the request be

preliminarily approved, with the understanding that additional information will be needed for final approval.

Next, the proposed settlement contains a clear sailing provision, *i.e.*, a provision that Defendant will not object to a certain fee request. Specifically, "Defendant agrees to not oppose a request by Class Counsel to the District Court for an award of attorneys' fees of not more than twenty-five percent (25%) of the Gross Settlement Amount ($137,500), plus reasonable litigation costs and expenses not to exceed $27,000." (ECF No. 79-2, p. 65).

However, there is no "reverter" clause, *i.e.*, a provision that fees not awarded revert to Defendant rather than the class fund. Rather, the settlement agreement expressly states that "[u]nder no circumstances will any portion of the Gross Settlement Amount revert to Defendant." (*Id.* at 67).

Ultimately, the Court concludes that this factor weighs in favor of approval.

### 8.    Class representative service payment

A court may award incentive payments to named plaintiffs in class action cases. *Rodriguez*, 563 F.3d at 958-59. The purpose of incentive awards is to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id.* To justify notable disparities between a class representative award and what other class members receive, a Plaintiff must present "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).

The Ninth Circuit has emphasized, however, that "district courts must be vigilant in scrutinizing all incentive awards." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted). In keeping with that admonition, courts have declined to approve incentive awards that represent an unreasonably high proportion of the overall settlement amount or are disproportionate to the recovery of other class members. *See Ontiveros*, 303 F.R.D. at 365-66 (finding an incentive award of $20,000, comprising 1% of the common fund, to be excessive under the circumstances, and reducing the award to $15,000,

where class representative spent 271 hours on the litigation and relinquished the opportunity to bring several of his own claims in order to act as class representative); *see also Ko v. Natura Pet Prods., Inc.*, Civ. No. 09–2619 SBA, 2012 WL 3945541, at *15 (N.D. Cal. Sept. 10, 2012) (holding that an incentive award of $20,000, comprising one percent of the approximately $2 million common fund was "excessive under the circumstances" and reducing the award to $5,000). In reducing an award, courts have noted that overcompensation of class representatives could encourage collusion by causing a divergence between the interests of the named plaintiff and the absent class members, destroying the adequacy of class representatives. *See Staton*, 327 F.3d at 977-78; *see also Radcliffe*, 715 F.3d at 1165.

Here, the settlement agreement provides for a maximum class representative payment of $7,500. (ECF No. 79-1, p. 48). The motion states that Plaintiff assumed significant risk in bringing this case while employed by Defendant, Plaintiff could have been ordered to pay Defendant's costs if he had lost, and Plaintiff offered invaluable assistance in this case, such as providing documents about Defendant's compensation plan, participating in phone calls to discuss litigation and settlement strategy, and reviewing settlement documents. (*Id.*). Plaintiff filed a supplement on this issue, which generally reiterates the above argument, but also adds:

> Additionally, due to the procedural events in this matter, the Class Period is cut off in June of 2024. Plaintiff separated from his employment with ITS Logistics in November of 2024. As a result, he will not receive any of the Net Settlement Amount that is allocated to the claim for waiting time penalties which has a value of approximately $1,122 for each Class Member that was a former employee as of the end of the Class Period. But to effectuate the settlement on behalf of the class, Plaintiff had to sign a settlement agreement giving the Defendant a full release and 1542 waiver which is far beyond the other Class Members. Class Members, other than Plaintiff, whose employment with ITS Logistics ended after June of 2024 do not release their claims for waiting time penalties and are free to bring such claims if they so choose. The same cannot be said for Plaintiff. Therefore, a service award of $7,500 to Plaintiff, while $2,500 above the standard amount in this District, is well warranted given the amount of time that Plaintiff has devoted to this four-year matter, the risk he has incurred, and his release of claims that goes above and beyond the releases of his fellow Class Members.

(ECF No. 86, pp. 2-3).

Plaintiff also provides a declaration stating, "While I didn't keep contemporaneous records, I estimate that during the over four years that this case has been pending, I've spent at least 60 hours in direct work pertaining to this case." (ECF No. 86-2, p. 2).

The proposed payment represents about 1% of the gross settlement amount ($7,500 / $550,000). And this is about 6.5 times the average $1,149 estimated to go to a class member ($7,500 / 1149). And the Court notes that the requested award is higher than the $5,000 incentive award that has been recognized as "presumptively reasonable" by some courts. *Austin v. Foodliner, Inc.*, No. 16-CV-07185-HSG, 2019 WL 2077851, at *8 (N.D. Cal. May 10, 2019).

The Court cannot fully evaluate the incentive reward request based on the information provided. However, it finds sufficient information to recommend that the settlement be preliminarily approved with this issue to be addressed further at the final approval stage. Among other things, the Court may require additional explanation as to why Plaintiff will not receive a settlement share based on his separation from employment in November 2024 and, if so, why this should result in an increased incentive award.

### 9. Approval of a settlement administrator

The parties agree to use third-party settlement administrator ILYM Group, Inc., with a $8,000 cap in expenditures. (ECF No. 79-1, p. 48). According to Plaintiff, ILYM Group, Inc. has experience in the administration of class action settlements. The Court finds ILYM Group is an appropriate settlement administrator should the settlement be approved.

### 10. Notice procedures

For proposed settlements under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B); *see also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e)."). A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC*, 361 F.3d at 575 (internal quotations and citations omitted). The absent class members must be provided with notice, an opportunity to be heard, and a right to opt-out of the class. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 349 (2011). "The notice must clearly and concisely state in plain, easily understood language" the following information:

> the nature of the action; (ii) the definition of the class certified; (iii) the class
> claims, issues, or defenses; (iv) that a class member may enter an appearance
> through an attorney if the member so desires; (v) that the court will exclude from

the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

The proposed class notice was filed on June 12, 2025. (ECF No. 87, p. 4-14). Upon reviewing it, the Court concludes the notice satisfied these requirements.

However, the Court notes that the class action notice states that Plaintiff's counsel will ask the Court to approve at the final approval hearing "[u]p to one-third of the Settlement Amount to Class Counsel for attorneys' fees ($137,500) and up to $27,000 for their litigation expenses." (Id. at 7). The Court construes this as a typographical error, as $137,500 is one-quarter (not one-third) of the settlement amount ($550,000). The Court will recommend that the proposed notice be corrected before being sent out.

Additionally, the Court notes that it previously directed Plaintiff to address certain issues regarding the notice. (ECF No. 29, p. 2). In relevant part, Plaintiff agreed to omit a requirement for settlement participants to provide the last four digits of their social security number. (ECF No. 38, p. 10). However, the latest proposed notice requires a participant to provide the last four digits of their social security number to opt out of the settlement. (ECF No. 87, p. 12). The Court understands this to be a typographical error—*i.e.*, Plaintiff mistakenly left this language in from a prior template—and will recommend that the settlement be approved with the proposed class notice eliminating this language.

## IV.    CONCLUSION AND FINDINGS AND RECOMMENDATIONS

Based on the forgoing, IT IS RECOMMENDED[15] as follows:

1. Plaintiff's motion to preliminarily certify the settlement class and approve the parties proposed settlement (ECF No. 79, *see* ECF Nos. 82, 86, 87) be granted.

2. The following class be conditionally certified: All current and former truck drivers who resided in California and who were employed by Defendant, ITS Logistics, LLC and paid on a piece rate basis (*e.g.*, per day or per mile) at any time during the period of March 1, 2019, through June 28, 2024 (the Class Period).

---

[15] The parties are reminded that they may consent to the undersigned handling the instant motion, in which case the Court will issue an order consistent with these findings and recommendations. However, they are free to withhold consent without adverse substantive consequences.

3. Plaintiff's PAGA Claims be conditionally approved for settlement purposes only as representative action under the Private Attorneys General Act under California Labor Code § 2698 et seq. on behalf of the following: All current and former truck drivers who resided in California and who were employed by Defendant, ITS Logistics, LLC and paid on a piece rate basis (e.g. per day or per mile) at any time during the period of March 9, 2020, through June 28, 2024 (the PAGA Period).

4. Plaintiff Keith Guthrie be appointed as the class representative.

5. Plaintiff's counsel Brian Mankin and Misty Lauby be appointed as class counsel.

6. The proposed class notice be approved, with corrections to the typographical errors, and then be disseminated according to the notice plan described in the parties' settlement agreement.

   a. Specifically, the notice states as follows: "Up to one-third of the Settlement Amount to Class Counsel for attorneys' fees ($137,500) and up to $27,000 for their litigation expenses." (ECF No. 87, p. 7). This notice should be corrected to read, "Up to one-quarter of the Settlement Amount to Class Counsel for attorneys' fees ($137,500) and up to $27,000 for their litigation expenses."

   b. Also, the notice shall omit the language requiring a person to provide the "last four digits of your social security number." (ECF No. 87, p. 12).

7. ILYM Group, Inc. be approved as the settlement administrator.

8. A final approval hearing be held on a date to be set by the assigned District Judge in the final order regarding these findings and recommendations.

9. Plaintiff's combined motion for final settlement approval and an award of attorney's fees, costs, expenses, and a service award will be due on a date to be set by the assigned District Judge in the final order regarding these findings and recommendations.

These findings and recommendations are submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and

filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 27, 2025**                    /s/ _Erica P. Grosjean_
                                                        UNITED STATES MAGISTRATE JUDGE