UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH GUTHRIE, *individually, on a representative basis, and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>ITS LOGISTICS, LLC,<br><br>Defendant. | Case No.   1:21-cv-000729-EPG<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS CERTIFICATION AND APPROVAL OF A CLASS ACTION SETTLEMENT<br><br>(ECF No. 93). |

The parties have reached a settlement in this putative class action case that alleges California state labor law violations. Now before the Court is Plaintiff's unopposed motion to certify the settlement class and issue a final approval of the parties' settlement.[1] (ECF No. 93). The parties have consented to the undersigned handling this case for all purposes. (ECF No. 91).

On January 8, 2026, the Court held a hearing on the motion. (ECF No. 96). Upon consideration of the motion, the discussion at the hearing, and the record, the Court will grant Plaintiff's motion.

I.     **BACKGROUND**

A.     **Procedural History**

Plaintiff filed this action in state court on March 9, 2021, against Defendant and Does 1-

---

[1] As discussed below, the motion includes a request for an award of attorneys' fees for Plaintiff's counsel and a class representative service payment for Plaintiff.

20. (ECF No. 1-1). This complaint alleged that, in connection with Defendant's employment of Plaintiff and other truck drivers, Defendant violated California employment and unfair-and-unlawful-competition laws. Specifically, Plaintiff brought the following claims on behalf of himself and putative class members for alleged violations of California's Labor Code (Counts 1-7) and California's Business and Professions Code (Count 8): (1) failure to pay minimum wages; (2) failure to pay for rest, recovery, and other nonproductive time; (3) failure to provide rest breaks; (4) failure to provide meal periods; (5) failure to reimburse business expenses; (6) failure to timely pay final wages; (7) failure to provide accurate itemized wage statements; and (8) unfair and unlawful competition. (*Id.* at 11-24). Plaintiff also brought claims (Counts 9-16) under California's Private Attorneys General Act (PAGA), Cal. Lab. Code § 2698-2699.5, "which allows aggrieved employees to recover civil penalties for Labor Code violations on behalf of themselves, the state, or other current or former employees." *Callahan v. Brookdale Senior Living Communities, Inc.*, 42 F.4th 1013, 1017 (9th Cir. 2022); (ECF No. 1-1, pp. 24-34).

Defendant filed its answer in state court and removed the case on May 5, 2021. (ECF No. 1, p. 2; ECF No. 1-1, p. 42). A case schedule was entered on August 6, 2021. (ECF No. 15). Shortly thereafter, on September 21, 2021, the parties scheduled a mediation set to occur on March 8, 2022, and requested that the Court vacate all deadlines to allow them "an opportunity to participate in mediation without incurring substantial costs to conduct discovery and prepare briefing for class certification." (ECF No. 16). The Court vacated all deadlines, and on March 16, 2022, Plaintiff filed a status report, stating that the parties had reached a settlement following their mediation. (ECF Nos. 17, 18). The parties had not engaged in any formal discovery or motion practice.

On June 15, 2022, Plaintiff filed a motion for preliminary approval, which included a request for class certification. (ECF Nos. 21, 22, 23). The parties' initial agreement proposed a gross settlement of $350,000, of which $15,000 was to go to Plaintiff's counsel as litigation costs. (ECF No. 22, p. 6). The Court held a hearing on August 16, 2022, discussing its concerns with the proposed settlement, including that Plaintiff failed to specify the valuation of the claims or explain how the parties had reached the settlement amount, and permitted supplemental briefing. (ECF Nos. 28, 29, 31). After a series of extensions, supplemental briefing was finalized on

1   January 13, 2023. (ECF Nos. 32-40).

2        The supplement contained a revised settlement agreement, providing for a gross

3   settlement amount of $365,000 and reflecting an agreement between the parties for Plaintiff's

4   counsel to seek only $9,000 in litigation costs. (ECF No. 38, p. 4). While the gross settlement

5   amount was nearly the same from the initial settlement agreement, the valuation of the claims

6   varied considerably from the previous estimates, with some claims being valued at 35% and 66%

7   of their original amount.

8        On April 5, 2023, the Court issued findings and recommendations, recommending that

9   Plaintiff's motion be denied. (ECF No. 41). The Court's primary reasoning for this

10  recommendation was that the record failed to support Plaintiff's argument that the settlement was

11  fair, reasonable, and adequate to the class members. More specifically, the Court noted that (1)

12  the recovery for the class members and aggrieved employees (for the PAGA claims) was a very

13  low percentage of the estimated value of the claims, (2) Plaintiff failed to explain the

14  methodology behind the allocation of the settlement proceeds, and (3) the circumstances of the

15  case suggested that the parties had agreed to settle for a certain amount without making good-

    faith and informed calculations to reach a fair, reasonable, and adequate settlement.

16       On June 30, 2023, the formerly presiding District Judge issued an order adopting the

17  findings and recommendations in full, overruling the parties' objections, denying Plaintiff's

18  motion, and referring the case back to the undersigned for further proceedings. (ECF No. 51).

19  Among other things, the District Judge noted that the proposed gross settlement amount was low

20  and that the early settlement, without any formal discovery, weighed against approval. (*Id.* at 3).

21       Thereafter, the Court issued a scheduling order, and Plaintiff filed a first amended

22  complaint. (ECF Nos. 54, 56). The first amended complaint alleges fewer claims than the initial

23  complaint—12 counts as opposed to 16. Specifically, Plaintiff brings the following claims: (1)

24  failure to pay minimum and regular wages; (2) failure to pay nonproductive time; (3) breach of

25  contract; (4) failure to reimburse business expenses; (5) failure to timely pay final wages; and (6)

26  failure to provide accurate itemized wage statements. (ECF No. 56, pp. 10-17). Plaintiff also

27  brings related claims (Counts 7-12) under PAGA, *e.g.*, Count 7 is a PAGA assessment for failure

28  to pay minimum and regular wages. (*Id.* at 21-27).

On February 28, 2024, the parties filed a joint status report, asking the Court to suspend the case deadlines to allow them to participate in a mediation to occur in August 2024. (ECF No. 62). After the Court granted this request, the parties filed a series of status reports, informing the Court that they did not settle the case at mediation but they were continuing to negotiate. (ECF No. 67, 69, 71). On December 9, 2024, the parties informed the Court that they had reached a settlement. (ECF No. 73).

After receiving extensions of time, Plaintiff filed an unopposed motion for preliminary class certification and approval of the parties' settlement on March 24, 2025. (ECF No. 79). The following table shows the key terms of the parties' proposed settlement at that time as compared to their prior proposal:

|  | Current Settlement | Prior Proposal |
|---|---|---|
| Gross Settlement Amount (GSA) | $550,000 | $365,000 |
| Attorney's Fees (25% of GSA) | $137,500 | $87,500 |
| Litigation Costs not to Exceed | $27,000 | $9,000 |
| Administrator Costs not to Exceed | $8,000 | $7,500 |
| PAGA Penalties | $100,000 | $35,000 |
| Class Representative Award not to Exceed | $7,500 | $7,500 |
| Expected Net Settlement Amount | $270,000 | $218,500 |

(*Compare* (ECF No. 79-1, p. 7, *with* ECF No. 38, p. 32).

In support of the motion for preliminary approval, Plaintiff provided his declaration, the declarations of his counsel, defense counsel, and Timothy Aboussleman (Defendant's Senior Director of Logistics), the parties' proposed settlement agreement, and the proposed class notice. (ECF Nos. 79, 82, 86, 87).

The Court held a hearing on Plaintiff's motion on May 1, 2025, thereafter, directing Plaintiff to file a supplement addressing various issues, including correcting multiple calculation errors. (ECF Nos. 83, 84). On June 6, 2025, and June 12, 2025, Plaintiff filed his supplements. (ECF Nos. 86, 87).

On August 27, 2025, the Court issued findings and recommendations, recommending that

Plaintiff's motion be granted. (ECF No. 88). Thereafter, the parties consented to the undersigned presiding over this case for all purposes, and the case was reassigned on September 25, 2025. (ECF No. 91).

On September 29, 2025, the Court issued an order consistent with its prior findings and recommendations to grant Plaintiff's motion, set a final approval hearing, and directed Plaintiff to file a combined motion for final settlement approval, an award of attorneys' fees, costs, expenses, and a class representative payment, at least thirty days before the final approval hearing. (ECF No. 92).

Plaintiff timely filed its instant motion on December 9, 2025. (ECF No. 93). The motion is supported by the declarations of Plaintiff's attorneys, Misty Lauby and Brian Mankin; the declarations of Nathalie Hernandez, a case manager for ILYM Group, Inc., which is the settlement administrator; and the declaration of Plaintiff Keith Guthrie. (ECF Nos. 93, 95).

The Court held the final approval hearing on January 8, 2026. (ECF No. 96). Counsel for both parties were present but no putative class members appeared at the hearing. Further none of the putative class members objected to the proposed settlement before the hearing or otherwise filed anything with the Court.

Accordingly, the matter is now ripe for decision.

**B.    Overview of the Settlement Agreement[2]**

**1.    Settlement class and class period; aggrieved employees and PAGA period**

The "settlement class" of 233 class members includes "all current and former truck drivers who resided in California and who were employed by Defendant and paid on a piece-rate basis (e.g. per day or per mile) at any time between March 1, 2019 through June 28, 2024 (the Class Period)."[3] (ECF No. 79-1, p. 6; ECF No. 93-1, pp. 5, 8).

The PAGA claims involve 158 "aggrieved employees," who include "all current and former truck drivers who resided in California and who were employed by Defendant and allegedly paid on a piece-rate basis (e.g. per day or per mile) at any time during the PAGA

---

[2] Plaintiff's instant motion at times relies on Plaintiff's motion for preliminary approval and related filings; accordingly, the Court will sometimes cite these documents. (*See, e.g.*, ECF No. 93-1, p. 5 n.1 and p. 16).

[3] Minor alterations, such as changing capitalization and punctuation, have been made to some quotations without indicating each change.

Period," which is defined as "March 9, 2020 through June 28, 2024." (ECF No. 79-1, pp. 7, 35; ECF No. 79-2, pp. 18, 50, 53; ECF No. 93-1, p. 7).

### 2.    Terms of the settlement agreement

The "gross settlement amount" (also called the GSA) that Defendant will pay to settle this case—is $550,000, which is $185,000 more than the previous GSA of $365,000. (ECF No. 79-1, p. 6; ECF No. 93-1, p. 6). This is a "non-reversionary" settlement, meaning that "[u]nder no circumstances will any portion of the [GSA] revert to Defendant." (ECF No. 79-2, p. 67). From the $550,000, a "net settlement amount" of $271,490.91 is expected to go to the settlement class, which is more than the previous net settlement amount of $218,500. (ECF No. 79-1, p. 6). The following table reflects the deductions from the GSA to form the net settlement amount.

| GROSS SETTLEMENT AMOUNT | $550,000 |
|---|---|
| Attorney's Fees (25% of GSA) | $137,500 |
| Litigation Costs | $26,559.09[4] |
| Administrator Costs not to Exceed | $6,950 |
| PAGA Penalties | $100,000 |
| *Labor Workforce Development Agency Payment - 75% from PAGA Penalties* | *$75,000* |
| *Remaining 25% to Aggrieved employees* | *$25,000* |
| Class Representative Service Award not to Exceed | $7,500 |
| **Expected Net Settlement Amount** | **$271,490.91** |

(ECF No. 93-1, p. 9).

From the $271,490.91 net settlement amount for the class claims, the average payment to each of the 233 class members will be approximately $1,165.20 per class member (*i.e.*, $271,490.91/ 233 class members = $1,165.20). (*Id.* at 5). From the $25,000 in PAGA penalties expected to go to 158 aggrieved employees, the average payment is approximately $158.23 per employee (*i.e.*, $25,000 / 158 aggrieved employees = $158.23).[5]

---

[4] Plaintiff's motion alternatively lists litigation costs as $26,559.09 and $26,599.09. (*See* ECF No. 93-1, pp. 9, 20). At the hearing, Plaintiff's counsel confirmed that the correct amount is $26,559.09.
[5] Plaintiff had this figure as $158.53, but as noted above $25,000 / 158 aggrieved employees = $158.23.

1   Settlement payments will be mailed by check, and class members and aggrieved

2   employees will have 180 calendar days after the mailing of the check to cash it. (*Id.* at 6). If a

3   check is not timely cashed, the funds will be issued to the California State Controller's Office in

4   the name of the person to whom the check was issued. (*Id.*).

5   Any class member who does not opt-out of the settlement agreement will be deemed to

6   have released all claims that were alleged, or that could have been alleged, based on the facts in

7   the amended complaint. (ECF No. 79-1, p. 20). All aggrieved employees will be deemed to have

8   released all PAGA claims that were alleged, or that could have been alleged, based on the facts in

9   the amended complaint. (*Id.* at 21).  Further, the settlement agreement includes a limited waiver

10  of rights as to unknown claims under California Civil Code § 1542.[6] (ECF No. 79-2, pp. 69-70).

## II.    SERVICE OF THE CLASS NOTICE

11  When the Court granted Plaintiffs' motion for preliminary approval, it authorized the

12  issuance of the class notice. (ECF No. 92, pp. 2-3). Plaintiffs state as follows on this issue:

13      On October 20, 2025, ILYM Group received the class data file from Counsel for
        Defendants, which contained the name, personnel number, social security number,
14      last known mailing address, last known telephone number, and information
        necessary to calculate class members' settlement amounts. The data file was
15      uploaded to our database and checked for duplicates and other possible
        discrepancies. The Class Data contained 233 individuals with 8,262 Work Weeks
16      during the Class Period and 158 Aggrieved Employees with 7,058 Pay Periods
        during the PAGA period. (Hernandez Decl. ¶ 5).
17

18      As part of the preparation for mailing, all 233 names and addresses contained in
        the Class List were then processed against the National Change of Address
19      ("NCOA") database, maintained by the United States Postal Service ("USPS"), for
        purposes of updating and confirming the mailing addresses of the Settlement Class
20      Members before mailing of the Notice Packet. The NCOA contains requested
        change of addresses filed with the USPS. To the extent that an updated address
21      was found in the NCOA database, the updated address was used for the mailing of
        the Notice Packet. To the extent that no updated address was found in the NCOA
22      database, the original address provided by Counsel for Defendants was used for
        the mailing of the Notice Packet. (Hernandez Decl. ¶ 6).
23

24      On November 3, 2025, the Notice Packet was mailed, via U.S First Class Mail, to
        all 233 individuals contained in the Class List. (Hernandez Decl. ¶ 7).
25

26  (ECF No. 93-3, p. 7). Regardless, any discrepancy as to this amount is negligible.
27  [6] Section 1542 provides as follows: "A general release does not extend to claims that the creditor or
    releasing party does not know or suspect to exist in his or her favor at the time of executing the release and
    that, if known by him or her, would have materially affected his or her settlement with the debtor or
28  released party."

As of the date of this motion, 37 Notice Packets have been returned to ILYM's office as undeliverable. ILYM Group performed a computerized skip trace on the 37 returned Notice Packets that did not have a forwarding address, in an effort to obtain an updated address for purpose of re-mailing the Notice Packet. As a result of this skip trace, 32 updated addresses were obtained and the Notice Packets were promptly re-mailed to those Settlement Class Members, via U.S First Class Mail. (Hernandez Decl. ¶ 8).

As of the date of this motion, a total of 32 Notice Packets have been re-mailed as a result of ILYM Group's skip tracing efforts. (Hernandez Decl. ¶ 9).

As of the date of this motion, a total of 5 Notice Packets were deemed undeliverable as no updated address was found, notwithstanding the skip tracing. (Hernandez Decl. ¶ 10).

As of the date of this motion, ILYM Group has not received any requests for exclusion. The deadline to request exclusion from the Settlement is December 18, 2025. (Hernandez Decl. ¶ 11).

(ECF No. 93-1, pp. 7-8).

On January 6, 2026, Plaintiff filed a supplemental declaration dated the same date from the settlement administrator, stating as follows:

As of the date of this declaration, 39 Notice Packets have been returned to our office as undeliverable. ILYM Group performed a computerized skip trace on the 39 returned Notice Packets that did not have a forwarding address, in an effort to obtain an updated address for purpose of re-mailing the Notice Packet. As a result of this skip trace, 34 updated addresses were obtained and the Notice Packets were promptly re-mailed to those Settlement Class Members, via U.S First Class Mail.

As of the date of this declaration, a total of 34 Notice Packets have been re-mailed as a result of ILYM Group's skip tracing efforts.

As of the date of this declaration, a total of 5 Notice Packets were deemed undeliverable as no updated address was found, notwithstanding the skip tracing.

As of the date of this declaration, ILYM Group has received one request for exclusion. The deadline to request exclusion from the Settlement was December 18, 2025.

As of the date of this declaration, ILYM Group has not received any objections to the Settlement. The deadline to file an objection to the Settlement was December 18, 2025.

As of the date of this declaration, ILYM Group will report a total of 232 Participating Class Members, representing 99.57% of the 233 Settlement Class Members.

 (ECF No. 95, pp. 3-4).

\\\

\\\

8

### III.    LEGAL STANDARDS FOR CLASS CERTIFICATION AND SETTLEMENT AND APPROVAL OF PAGA REPRESENTATIVE ACTION

A court tasked with determining whether to approve a proposed class action settlement will almost always be confronted with a "difficult balancing act." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). "On the one hand, . . . there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Id.* (internal quotation marks and citations omitted). "But on the other hand, settlement class actions present unique due process concerns for absent class members, and the district court has a fiduciary duty to look after the interests of those absent class members." *Id.* (internal quotation marks and citations omitted). "To ensure the interests of the absent class members are properly safeguarded, the judge must adopt the role of a skeptical client and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation." *Lusk v. Five Guys Enterprises LLC*, No. 1:17-CV-00762-AWI-EPG, 2021 WL 2210724, at *2 (E.D. Cal. June 1, 2021) (internal quotation marks and citation omitted).

Class actions are governed by Federal Rule of Civil Procedure 23. There are two stages to approving a class action settlement. In the first stage, "the court preliminarily approves the settlement pending a fairness hearing, temporarily certifies a settlement class, and authorizes notice to the class." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014). The Court has completed this stage, issuing an order preliminarily certifying the class and approving the settlement on September 29, 2025. (ECF No. 92).

At the second stage, at issue here, the Court holds a fairness hearing, entertaining objections from putative class members, and thereafter making "a final determination as to whether the parties should be allowed to settle the class action pursuant to the terms agreed upon." *Ontiveros*, 303 F.R.D. at 363.

"Parties seeking class certification must satisfy each of the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b)," with Plaintiff arguing here that, under Rule 23(b)(3), common questions of law or fact predominate over individual class member questions and that a class action is superior to other methods for fairly and efficiently adjudicating this case. *Briseno v. ConAgra Foods, Inc.*,

844 F.3d 1121, 1124 (9th Cir. 2017); (ECF No. 79-1, p. 30). Plaintiff bears the burden of showing these requirements. *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir. 1977).

After the certification inquiry, the Court considers whether the settlement is "fair, reasonable, and adequate" under Rule 23(e)(2). *See Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (describing factors guiding inquiry under Rule 23(e)(2)). The Court will evaluate the settlement agreement "as a whole" and "for overall fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). The Court does "not have a duty to maximize settlement value for class members," but instead, the "inquiry is much more modest and limited to ensuring that the class settlement is fair, reasonable, and adequate." *In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 678 (9th Cir. 2025). Relatedly, the Court does not "have the ability to delete, modify or substitute certain provisions"; rather, "[t]he settlement must stand or fall in its entirety." *Id.* (internal citation and quotation marks omitted).

Plaintiff's PAGA claims are pursued in a representative capacity and differ from a class action. *See Kim v. Reins Int'l California, Inc.*, 9 Cal. 5th 73, 86, 459 P.3d 1123, 1130 (2020) ("Although representative in nature, a PAGA claim is not simply a collection of individual claims for relief, and so is different from a class action."); *see also Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 644 (2022)  (quoting Cal. Lab. Code Ann. § 2699(a) ("PAGA authorizes any 'aggrieved employee' to initiate an action against a former employer 'on behalf of himself or herself and other current or former employees' to obtain civil penalties that previously could have been recovered only by the State in [a Labor and Workforce Development Agency (LWDA)] enforcement action."). "PAGA actions need not satisfy Rule 23 class certification requirements." *Hamilton v. Wal-Mart Stores*, Inc., 39 F.4th 575, 583 (9th Cir. 2022).

However, PAGA claims still require court approval under California Labor Code § 2699(*l*)(2). This provision also requires a plaintiff to submit a proposed settlement to the LWDA. "Although there is no binding authority setting forth the proper standard of review for PAGA settlements, California district courts have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes." *Clayborne v. Lithia Motors, Inc.*, No. 1:17-CV-00588-AWI-

BAM, 2022 WL 16701278, at *2 (E.D. Cal. Oct. 24, 2022) (internal quotation marks and citations omitted).

## IV.    ANALYSIS

The Court begins with the Rule 23(a) factors regarding class certification and then turns to the Rule 23(e) factors regarding settlement approval.

### A.    Rule 23(a) Requirements

#### 1.    Numerosity

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 330 (1980). Courts in the Ninth Circuit have found the requirement satisfied when the class is composed of as few as thirty-nine members. *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citing *Jordan v. L.A. County*, 669 F.2d 1311, 1319 (9th Cir. 1982) (noting that class sizes of thirty-nine, sixty-four, and seventy-one are sufficient to satisfy the numerosity requirement), *vacated on other grounds*, 459 U.S. 810, 103 (1982)).

Here, joinder of the 233 estimated class members as plaintiffs would be impracticable. Thus, the Court finds the numerosity requirement satisfied.

#### 2.    Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Class members need not "have all suffered a violation of the same provision of law"; rather, their claims must "depend upon a common contention." *Dukes*, 564 U.S. at 350. The "common contention . . . must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon*, 150 F.3d at 1019. "Indeed, Rule 23(a)(2) has been construed permissively." *Id.* "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

The claims here are based on Defendant's company-wide policies and practices that led to violations concerning, as Plaintiff alleges, "whether Defendant properly paid all wages, nonproductive time, stop pay, and rest breaks, properly reimbursed business expenses, properly provided accurate itemized wage statements, and timely paid all wages upon termination." (*See* ECF 79-1, p. 26). Thus, the Court finds the commonality requirement satisfied. *See Kincaid v. Educ. Credit Mgmt. Corp., Inc*., No. 2:21-CV-00863-TLN-JDP, 2024 WL 1344595, at *4-10 (E.D. Cal. Mar. 29, 2024) (finding commonality requirement met for similar Labor Code claims); *Goodwin v. Winn Mgmt. Grp. LLC*, No. 1:15-CV-00606-DAD-EPG, 2017 WL 3173006, at *6 (E.D. Cal. July 26, 2017) (same).

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). As the Ninth Circuit has explained, "[t]he test of typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Jones v. Shalala*, 64 F.3d 510, 514 (9th Cir. 1995) (citing *Hanon*, 976 F.2d at 508).

While representative claims must be "reasonably co-extensive with those of absent class members," they "need not be substantially identical." *Hanlon*, 150 F.3d at 1020.  Here, Plaintiff was a truck driver subject to Plaintiff's uniform policies and practices that he alleges resulted in numerous violations of California law, such as "unpaid wages (including not receiving separate hourly compensation for on-duty non-driving time, stop pay and rest breaks), failure to reimburse expenses, and failure to provide accurate wage statements." (ECF No. 79-1, p. 27). And Plaintiff alleges that the putative class members were subjected to these same violations giving rise to the claims alleged in the complaint. (*Id.*). Thus, the Court finds the typicality requirement satisfied.

### 4. Adequacy of representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (citations omitted). "The proper resolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of

interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000), *as amended* (June 19, 2000) (citations omitted).

The Court has already conditionally approved the named Plaintiff as the class representative, (ECF No. 92, p. 2), based on his representation that he can adequately represent the class "because he was employed by Defendant during the Class Period, alleges that he experienced the same wage and hour practices as the rest of the Class, understood his duties as Class Representative, has been willing to undergo the risk of litigation, and has no conflict of interest," (ECF No. 79-1, p. 28).

Likewise, the Court conditionally approved Plaintiff's attorneys as class counsel. (ECF No. 92, p. 2). As for counsel, "[t]he competence of counsel seeking to represent a class" may be evaluated by considering whether they "are labor lawyers experienced in class actions." *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001). Here, Plaintiff's counsel, Attorney Misty Lauby, states in her declaration that, in 2018, she "transitioned to handling exclusively employee vs. employer litigation matters," and has "been the handling attorney on over 47 class action and/or representative PAGA actions." (ECF No. 93-2, p. 2). Further, Attorney Brian Mankin states in his declaration as follows:

> I have handled well over 500 employee vs. employer litigation matters during my 23 years in practice. Over the last 18 years, my practice has almost entirely consisted of representing employees, the majority of which has included class action and representative action wage and hour matters. In total, I have handled well over 300 class action and representative action wage/hour cases, and have been appointed by the court as class counsel and have received final court approval and judgment in over half of those actions to date, and anticipate receiving final approval in many more of those in the future.

(ECF No. 93-4, p. 2).

Accordingly, the Court finds the adequacy requirement satisfied.

## B.    Rule 23(b) Requirements

Plaintiff seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); (ECF No. 79-1, p. 26). The test of Rule

23(b)(3) is "far more demanding," than that of Rule 23(a). *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623-24).

### 1.    Predominance

First, questions of law or fact common to class members must predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). This "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (quoting *Amchem*, 521 U.S. at 623). "This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)." *Id.* "In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues." *Id.* "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1778 (2d ed.1986)).

Here, Plaintiff states as follows:

> There are common issues that may predominate over individual issues in this litigation. For example: (1) whether Defendant's policies resulted in unpaid wages such as non-productive time, stop pay and/or rest breaks; (2) whether Defendant properly reimbursed the Class for business use of their cell phones (3) whether Defendant provided putative Class Members with itemized wage statements that were inaccurate in violation of Labor Code § 226; and (4) whether Defendant failed to pay all wages due and payable to former employees within the times specified under the California Labor Code.

(ECF No. 79-1, p. 26).

Based on the information provided, the Court agrees. Because "[a] common nucleus of facts and potential legal remedies dominates this litigation," the Court finds that the predominance requirement is met. *Hanlon*, 150 F.3d at 1022.

### 2.    Superiority

Under Rule 23(b)(3), a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Pertinent to this finding is (A) the class members' interests in individually controlling the prosecution or

defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.; see Amchem*, 521 U.S. at 616.

The purpose of this "requirement is to assure that the class action is the most efficient and effective means of resolving the controversy," and "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted); *see Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands*, 244 F.3d 1152, 1163 (9th Cir. 2001) ("This case involves multiple claims for relatively small individual sums. . . . If plaintiffs cannot proceed as a class, some – perhaps most – will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover.").

The Court concludes that a class action is a superior method of resolving this action. First, it does not appear economical for each class member to bring his or her claim separately. As Plaintiff notes, the class action litigation here allows the class members to pool their individual claims together, which claims would otherwise not be economical to litigate. (ECF No. 79-1, p. 29). Further, lack of knowledge of the legal system would also likely deprive most class members of the opportunity to pursue their claims outside of a class action.

Second, there also does not appear to be any related pending litigation.

Third, this District is a desirable forum for the litigation as the amended complaint alleges that "Defendants transact business in Merced County and the unlawful acts alleged . . . have a direct effect on Plaintiff and the Represented Employees in Merced County" and "Defendants employed or employ Plaintiff and Represented Employees in Merced County." (ECF No. 56, p. 5). Thus, much of the evidence will likely be found within this District and court proceedings can efficiently proceed here. *See Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 486 (N.D. Cal. 2017) ("This case involves drivers who serviced routes in Northern California, many of whom worked out of Flowers warehouses in San Jose and Salinas, which are in this District. Because much of the evidence will be found here, it would be efficient to try the case here.").

1    Finally, there are no apparent difficulties likely to be encountered in managing this class

2    action.

3    Thus, the Court finds that the superiority requirement is met.

4    **C.    Rule 23(e) Requirements**

5    If a proposed settlement agreement "would bind class members," the Court must find that

6    it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). A court considers whether:

> (A) the class representatives and class counsel have adequately represented the
> class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the
>> class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of
>> payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Ninth Circuit has provided the following guidance regarding Rule 23(e)(2):

> In this Circuit, a district court examining whether a proposed settlement comports
> with Rule 23(e)(2) is guided by the eight "*Churchill* factors," viz., "(1) the strength
> of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of
> further litigation; (3) the risk of maintaining class action status throughout the trial;
> (4) the amount offered in settlement; (5) the extent of discovery completed and the
> stage of the proceedings; (6) the experience and views of counsel; (7) the presence
> of a governmental participant; and (8) the reaction of the class members of the
> proposed settlement."

*Kim*, 8 F.4th at 1178 (quoting *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th

Cir. 2011)); *see Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (listing the

*Churchill* factors). "In addition, the settlement may not be the product of collusion among the

negotiating parties." *In re Mego*, 213 F.3d at 458. "This list is not exclusive and different factors

may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370,

1376 (9th Cir. 1993) (citations omitted).

Moreover, consideration of these factors alone is insufficient. *Id.* at 1179. Because Rule

23(e)(2) also requires courts to "now consider 'the terms of any proposed award of attorney's

fees' when determining whether 'the relief provided for the class is adequate[,]' . . .  courts must

balance the 'proposed award of attorney's fees" vis-à-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *Briseño v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)(C)(iii)). This is done by reviewing the "so-called *Bluetooth* factors to smoke out potential collusion." *Id.* at 1023. Signs of such collusion include:

> (1) "when counsel receive[s] a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class.

*Id.* (quoting *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d at 947).

The Court will begin with the *Churchill* factors and then turn to collusion, the *Bluetooth* factors, and other considerations.

### 1.    The Strength of Plaintiff's case

A court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Adoma v. Univ. of Phoenix, Inc.*, 913 F.Supp.2d 964, 975 (E.D. Cal. 2012) (citation omitted). However, "the court does not reach any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this litigation." *Id.* (internal citation and quotation marks omitted).

In support of the parties' proposed settlement, Plaintiff asserts that various risks and defenses warrant 44% to 77% reductions in the maximum value of the claims. The Court provides an overview of the parties' positions for each claim.

### a.    Failure to pay wages

Plaintiff states that the failure-to-pay-wages claims are based on three theories: "(1) failure to pay for non-productive time such as pre/post trip inspections, fueling, paperwork, etc., under Labor Code § 226.2; (2) failure to pay including stop pay per contract of $12.50 per stop, and (3) unpaid rest period wages per contract." (ECF No. 79-1, p. 36; *see* ECF No. 93-1, p. 13). These claims are based on contract theories and California labor law, including California Labor Code § 226.2, which, in part, requires employees to "be compensated for rest and recovery periods and other nonproductive time separate from any piece-rate compensation." Cal. Lab.

1    Code § 226.2(a)(1).

2    　　Plaintiff calculates a total potential maximum value for the wage claims at $496,655.

3    (ECF No. 79-1, p. 36). Of this amount, $353,030 of the value is based on flat-rate shifts and

4    $143,625 is based on mileage-rate shifts. The higher value for flat rate shifts is because the

5    majority of the shifts worked were flat-rate shifts. (*Id.* at 16, 35). Based on the maximum value of

6    $496,655, Plaintiff calculates a total-risk adjusted value of these claims at $144,808, or

7    approximately a 71% total reduction in the value of the claims. Stated another way, the risk-

8    adjusted value is about 29% of the maximum value. The following table shows the maximum

9    value, total risk-adjusted value, and reductions that Plaintiff makes for each category of claim

     based on the risks posed by class certification and the merits.[7]

| | | **FLAT-RATE DRIVERS** | | |
|---|---|---|---|---|
| **Category** | **Maximum Value** | **Cert Risk** | **Merits Risk** | **Risk Adj. Value** |
| Non-Productive Time | $164,745 | 50% | 50% | $41,186 |
| Stop pay | $91,400 | 50% | 75% | $11,425 |
| Rest Breaks | $96,885 | 50% | 50% | $24,221 |
| *Subtotal for Flat- rate drivers* | *$353,030.00* | | | *$76,832.00* |
| | | **MILEAGE-RATE-DRIVERS** | | |
| | | | | |
| **Category** | **Maximum Value** | **Cert Risk** | **Merits Risk** | **Risk Adj. Value** |
| Non-Productive | $29,064 | 50% | 10% | $13,079 |

---
[7] Unless otherwise noted, the numbers in this order are rounded to the closest whole dollar.

| Time | | | | |
|---|---|---|---|---|
| Stop pay | $103,800 | 30% | 30% | $50,862 |
| Rest Breaks | $10,761 | 50% | 25% | $4,036 |
| *Subtotal for Mileage- rate drivers* | ***$143,625.00*** | | | ***$67,977.00***[8] |
| ***Total Maximum Value of all Failure-to-pay- wages claims*** | **$496,655** | | ***Total Risk- adjusted Value of all Failure-to- pay-wages claims*** | **$144,809**[9] **(approximate 71% reduction from maximum value)** |

Among other arguments, Plaintiff contends that the following reasons warrant discounting the claims:

> This result here is fully supportable as reasonable. First, off-the-clock claims like those involving non-productive time have proven to be extremely difficult to certify by their very nature. Second, Defendant argues that the policies relating to the promises of stop pay and/or rest break pay differ according to pay type and different periods of time that the policies were in effect calling into question whether the criteria for commonality and typicality can be met. Third, Plaintiff's claims for rest breaks and stop pay are dependent on breach of contract theories requiring that Plaintiff prove there was an agreement to pay, but in speaking with a number of other drivers, that theory was called into question because a few of the drivers reported that they believed that their pay rate encompassed all of their work. Fourth, because of the nature of the work, the drivers were subject to somewhat differing conditions, (for example, they operated out of different locations, serviced different clients and routes, and had different hours and numbers of stops). Therefore, Plaintiff made merits-based adjustments on the flat rate claims of 50% for non-productive time and rest breaks due to the risk that Defendant's argument that the flat rate was all inclusive would prevail. An additional 25% deduction was added to the stop pay arguments because alleged promises to pay stop pay to the flat rate drivers by way of the offer letters was ended early in the class period and at least a few of the flat rate drivers Plaintiff's

---

[8] Plaintiff mistakenly totaled this whole dollar amount as $67,976 ($1 less than the correct amount). (ECF No. 79-1, p. 37).

[9] Because of the $1 error identified above, Plaintiff had the total risk-adjusted value of these claims at $1 less ($144,808) than the correct amount ($144,809). (ECF No. 79-1, p. 37).

counsel spoke to had no expectation of being paid any stop pay because they specifically reported that they believed that their flat rate pay encompassed all of their work in a day.

With respect to certification matters, either the claim will be certified, or it will not, making a 50% discount a reasonable estimate, since if the claim fails to be certified, the value to the class is zero. Plaintiff estimates a slightly lower 30% risk on the mileage rate pay, stop pay issues because Defendant does not dispute that the policy existed as to those drivers. However, it does argue that the stop-pay was duly paid when applicable which justifies some certification risk. Moreover, with respect to rest breaks, Defendant argues that it paid rest breaks to MRDs when applicable and that any right to take or be paid for rest breaks is pre-empted by the FMCSA further justifying risk reduction on rest break claims.

(ECF No. 79-1, pp. 38-39).

**b.    Wage statements**

Plaintiff states that the wage-statement claims are based on Defendant's failure "to include all information required by Labor Code § 226(a)," which provision generally requires certain information to be included in an itemized wage statement, *e.g.*, the gross wages the employee earned. (ECF No. 79-2, p. 22; *see* ECF No. 93-1, p. 14). "Plaintiff calculated the maximum potential value of this claim as $244,000 under the $50/$100 formula in § 226(e)[10] on 3,131 total wage statements in the one-year statute of limitations with a $4,000 per employee cap as calculated by Plaintiff's consultant." (ECF No. 79-2, p. 22).

Based on the maximum value of $244,000, Plaintiff calculates a total risk-adjusted value of these claims at $117,120, or approximately a 52% total reduction in the value of the claims. Stated another way, the risk-adjusted value is about 48% of the maximum value. The following table shows the maximum value, total risk-adjusted value, and reductions that Plaintiff makes for this claim based on the risks posed by class certification and the merits.

| | WAGE-STATEMENT CLAIMS | | |
|---|---|---|---|
| Maximum Value | Cert Risk | Merits Risk | Risk Adj. Value |

---

[10] Section 226(e)(1) provides as follows: "An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000) . . . ."

20

| $244,000 | 20% | 40% | $117,120 (approximate 52% reduction from maximum value) |

Among other arguments, Plaintiff contends that the following reasons warrant discounting the claims:

> . . . Defendant raised further defenses, including that: (a) these violations, if any, did not result in any "injury" under § 226(e), (b) the violations, if any, were not "knowing and intentional" and could not support the assessment of penalties, and any (c) "derivative" wage statement claims are without merit. As a result of the defenses, Plaintiff assigned a 20% risk adjustment at the class certification stage and a 40% risk adjustment at the merits stage for a risk adjusted value of $117,120. Plaintiff assigned a small risk at the certification stage because while not certain, the issues seemed well suited to class treatment as it relates to a class-wide wage statement policy. However, a larger deduction was assigned on the merits due to Defendant's potential to defeat the claim on the theory that the flat rate pay structure is equivalent to a "salary" and therefore, listing the hourly rate was not required.

(ECF No. 79-1, pp. 22-23).

### c.    Failure to reimburse for business expenses

Plaintiff's failure-to-reimburse-for-business-expenses claims, relating to Defendant not paying for employee's cell phone expenses, are based on Labor Code § 2802(a), which provides as follows: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer . . . ." (*See* ECF No. 93-1, p. 14).

Plaintiff estimates the maximum potential value of these claims as $152,260. (ECF No. 79-1, p. 40). This number is based on "$20 per 7,613 workweeks between the March 9, 2020 beginning of the three-year statute of limitations for Labor Code § 2802 claims, through September 18, 2021 when Defendant changed its policies." (*Id.* at 39-40).

Based on the maximum value of $152,260, Plaintiff calculates a total risk-adjusted value of these claims at $85,266, or approximately a 44% total reduction in the value of the claims. Stated another way, the risk-adjusted value is about 56% of the maximum value. The following table shows the maximum value, total risk-adjusted value, and reductions that Plaintiff makes for this claim based on the risks posed by class certification and the merits.

| | Business-expenses | | |

| | CLAIMS | | |
|---|---|---|---|
| Maximum Value | Cert Risk | Merits Risk | Risk Adj. Value |
| $152,260 | 20% | 30% | $85,266 (approximate 44% reduction from maximum value) |

Among other arguments, Plaintiff contends that the following reasons warrant discounting the claims:

> Defendant also raised defenses to this claim . . . including that it provided an in-truck messaging system so personal cell phone use was not required and, in 2021, Defendant issued an interoffice memo that told drivers they were no longer required to provide a cell phone for work but establishing a policy to pay for any usage incurred. Consequently, Plaintiff assigned a 20% class certification adjustment and 30% merits adjustment to this claim for a total value of $85,266. The adjustments here are appropriate because certification challenges may arise due to the individualized nature of whether drivers actually utilized their own phones for work and at what cost. For the same reasons, there would also be significant risks when arguing the merits of the claim in trying to establish damages especially after 2021.

(ECF No. 79-1, p. 40).

### d.    Failure to pay timely wages upon separation of employment

Plaintiff's failure-to-pay-timely-wages claims are based on Labor Code §§ 201-203. Section 201(a) states as follows: "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Section 202(a) generally requires payment of wages not later than 72 hours after an employee quits or gives notice that the employee will quit. Section 203(a) provides that, if an employer willfully fails to comply with § 201 or 202 in paying "any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

Plaintiff estimates the maximum potential value of these claims as $2,156,464. (ECF No. 86-1, p. 68). Of this amount, $1,964,483 of the value is based on flat-rate shifts and $191,981 is based on mileage-rate shifts. (*Id.* at 67-68).

Based on the maximum value of $2,156,464, Plaintiff calculates a total risk-adjusted value of these claims at $497,896, or approximately a 77% total reduction in the value of the claims.

22

(*Id.* at 68). Stated another way, the risk-adjusted value is about 23% of the maximum value. The following table shows the maximum value, total risk-adjusted value, and reductions that Plaintiff makes for each category of claim based on the risks posed by class certification and the merits.

| | FLAT-RATE DRIVERS | | |
|---|---|---|---|
| Maximum Value | Cert Risk | Merits Risk | Risk Adj. Value |
| $1,964,483 | 50% | 58% | $412,541 |
| | MILEAGE-RATE-DRIVERS | | |
| Maximum Value | Cert Risk | Merits Risk | Risk Adj. Value |
| $191,981 | 43% | 22% | $85,355 |
| **Total Maximum Value of All Flat-rate and Mileage Shifts = $2,156,464** | | | **Total Risk-adjusted Value of All Flat-rate and Mileage Shifts = $497,896** |

Among other arguments, Plaintiff contends that the following reasons warrant discounting the claims:

Defendant argued that Plaintiff's Section 203 claim is derivative of his substantive claims – each of which has significant shortcomings. Moreover, the claim fails because ITS acted with a good faith belief that its pay policies fully and properly compensated its drivers, and Plaintiff has provided no evidence that Defendant "willfully" failed to pay the class any wage.

Due to the derivative nature of the waiting time claims, Plaintiff utilized the average discount attributed to the wage claims above to arrive at the risk adjusted values as set forth [in the table above]:

(ECF No. 79-1, p. 41; *see* ECF No. 93-1, p. 14).

### e.    PAGA claims

"Although the court does not evaluate the settlement of PAGA claims under the Rule 23 criteria, it must still inquire into the fairness of the PAGA settlement." *Wells v. DCI Donor Servs.,*

*Inc.*, No. 2:21-CV-00994-CKD, 2024 WL 4436905, at *11 (E.D. Cal. Oct. 7, 2024). Courts apply standards like Rule 23 in making this assessment, asking if the PAGA settlement is fair, adequate, and reasonable. *See, e.g.*, *Mondrian v. Trius Trucking, Inc.*, No. 1:19-CV-00884-DAD-SKO, 2022 WL 2306963, at *7 (E.D. Cal. June 27, 2022) (applying Rule-23 like standard to PAGA claims). Plaintiff estimates the maximum potential value of these claims as $2,563,600. (ECF No. 79-1, p. 44). Based on this maximum value, Plaintiff calculates a total risk-adjusted value of these claims at $897,260, or a 65% total reduction in the value of the claims. (*Id.* at 45). Stated another way, the risk-adjusted value is 35% of the maximum value. The following table shows the maximum value, total risk-adjusted value, and reductions that Plaintiff offers based on the risks posed on the merits and discretionary reductions.

| | | PAGA CLAIMS | | |
|---|---|---|---|---|
| **Category** | **Maximum Value** | **Merits Risk** | **Discretionary Reduction** | **Risk Adj. Value** |
| Unpaid Wages | $776,000 | 50% | 30% | $271,600 |
| Failure to Pay Wages Each Period | $776,000 | 50% | 30% | $271,600 |
| Business Expenses | $682,000 | 50% | 30% | $238,700 |
| Wage Statement Violations | $313,100 | 50% | 30% | $109,585 |
| Failure to Pay Timely Wages | $16,500 | 50% | 30% | $5,775 |
| | *Total Maximum Potential Value of All PAGA Claims = $2,563,600* | | | *Total Risk-adjusted Value of All PAGA Claims = $897,260* |

Among other arguments, Plaintiff contends that the following reasons warrant discounting the claims:

> First, it is unclear whether stacking is permissible and/or whether the court would award penalties in such a way (especially for purely derivative penalties such as 203 and 204 claims). Second, the maximum figure fails to acknowledge that courts have wide latitude to reduce the amount of civil penalties "based on the facts and circumstances of a particular case" and if "to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." Labor Code § 2699(h); *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1037 (N.D. Cal. 2016) (noting in the context of approving settlement that a reduction in PAGA penalties would be "appropriate" based on the "unjust, arbitrary and oppressive, or confiscatory" factors because (i) the employer did not "deliberately evad[e] a clear obligation to provide legally required pay and benefits to employees," (ii) the employer did not "negligently fail to learn about its obligations under the wage and hour laws," and (iii) the employer's obligations were "genuinely unclear" because "there is no straight answer to the question."). (Lauby Decl. ¶ 61).

> Plaintiff is also cognizant of the risks facing PAGA claims in federal court, including cases holding that PAGA claims do not satisfy constitutional standing requirements. *See, e.g., Raphael v. Tesoro Ref. & Mktg. Co. LLC*, No. 2:15-CV-02862-ODW, 2015 WL 5680310 at *2 (C.D. Cal. Sept. 25, 2015) (PAGA claim lacked constitutional standing because "[a]lthough PAGA authorizes representative actions, California state law cannot alter federal procedural and jurisdictional requirements"). (Lauby Decl. ¶ 62).

> . . . .

> Taking into consideration all defenses raised and the potential for reduction, Plaintiff assigned a 50% risk adjustment on the basis of merits and an additional 30% for discretionary reduction bringing the risk adjusted value of PAGA claims to $897,260. (Lauby Decl. ¶ 64).

(ECF No. 79-1, pp. 44-45; *see* ECF No. 93-1, pp. 14-15).

### f.    Conclusion

As noted above, the discounts of the claims range from 44% to 77% based on the strength of Plaintiff's claims.[11] When adding up the risk-adjusted value of both the class and PAGA claims, the total risk-adjusted value of all claims is $1,742,351.

| CLAIM TYPE | PERCENTAGE DISCOUNT | RISK-ADJUSTED VALUE |
|---|---|---|
| Failure to pay wages | 71% | $144,809 |

---

[11] The Court uses the total discount percentage for the claims. For example, as discussed above, when considering all the certification and merits discounts applied to the various categories of failure-to-pay-wages claims, the claims are discounted by about 71%.

| Wage statement | 52% | $117,120 |
| Business expenses | 44% | $85,266 |
| Failure to pay timely wages | 77% | $497,896 |
| PAGA claims | 65% | $897,260 |
| | | *Total Risk-adjusted Value =* $1,742,351[12] |

Below, the Court will discuss the reasonableness of the settlement amount in more detail. However, based on the above discussion, the Court concludes that the parties have sufficiently considered the strengths and weaknesses of this case in reaching a settlement agreement.

**2. The risk, expense, complexity, likely duration of further litigation, and risks of maintaining class action status throughout trial**

"Approval of settlement is 'preferable to lengthy and expensive litigation with uncertain results.'" *Munoz v. Giumarra Vineyards Corp.*, 2017 WL 2665075, at *9 (E.D. Cal. June 21, 2017). Moreover, "[e]mployment law class actions are, by their nature, time-consuming and expensive to litigate." *Aguilar v. Wawona Frozen Foods*, 2017 WL 2214936, at *3 (E.D. Cal May 19, 2017).

Plaintiff argues that, without settlement, the parties would need to engage in further litigation, including the certification of the class, and if certified, any discovery regarding damages, with the resulting time and expense potentially outweighing any additional recovery obtained. (ECF No. 79-1, p. 46; ECF No. 93-1, pp. 15-16).

Based on the record evidence, including the discovery already taken and strengths and weakness of the case, the Court concludes that this consideration weighs in favor of approving the parties' proposed settlement.

**3. The amount offered in settlement**

The amount offered in settlement "is generally considered the most important" factor of any class settlement. *See Bayat v. Bank of the West*, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015). In determining whether the amount offered in settlement is fair and reasonable, a court

---

[12] Plaintiff incorrectly states, "[t]aken together, the total risk adjusted value of the class claims and the PAGA claims is $1,738,333." (ECF No. 86-1, p. 73). Correctly totaled, the amount is $1,742,351.

compares the proposed settlement amount to the maximum potential amount recoverable through successful litigation. *See In re Mego*, 213 F.3d at 459. "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Id.* (citation omitted). For complex class action cases, Ninth Circuit has "a strong judicial policy that favors settlements. Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific Enter. Sec. Lit.*, 47 F.3d 373, 378 (9th Cir. 1995) (internal quotation marks and citation omitted).

### a.    Percentage recovery

Under the parties' prior proposed settlement, the class members would "receive a gross recovery of approximately 10% of the potential maximum value of the class claims and a net recovery of approximately 6%. And the aggrieved employees [would] receive a gross recovery of approximately 2% of the potential maximum value of the PAGA claims." (ECF No. 41, p. 14). The Court concluded that such a recovery was "too low for the Court to deem it fair, reasonable, and adequate." (*Id.*).

Turning to the current proposed settlement, if Plaintiff were to prevail on all claims, the estimated recovery would be $5,612,979 ($3,049,379 potential maximum for the class claims[13] + $2,563,600 potential maximum for the PAGA claims). Of the $2,563,600 in potential maximum PAGA penalties, the LWDA would receive 75% ($1,922,700) and the remaining 25% ($640,900) would go to the aggrieved employees. *See* Cal. Labor Code § 2699(i). Deducting LDWA's proportion ($1,922,700) of the PAGA penalty from the projected maximum ($5,612,979) leaves $3,690,279 going to the class and aggrieved employees. *See Lusk v. Five Guys Enterprises LLC*, No. 1:17-CV-00762-AWI-EPG, 2022 WL 4791923, at *8 (E.D. Cal. Sept. 30, 2022) (deducting LWDA's portion of estimated PAGA penalty from the projected recovery amount before calculating the percentage rate of recovery). The gross settlement amount ($550,000) is approximately 15% of $3,690,279 and the net settlement ($270,000) amount is approximately 7%

---

[13] This amount is calculated as follows: $2,156,464 (failure-to-timely-pay-wage claims) + $496,655 (failure-to-pay-wages claims) + $244,000 (wage-statement claims) + $152,260 (business-expenses claims) = $3,049,379. Plaintiff relies on the miscalculated amount of $3,090,570 in Plaintiff's motion. (ECF No. 93-1, p. 16). However, after pointing out this error at the preliminary injunction stage, Plaintiff recognized that $3,049,379 is the correct amount. (ECF No. 86, p. 6).

1  of this amount.

2      If considering the class claims in isolation, the $450,000 of the gross settlement for the

3  class claims ($550,000 gross settlement amount less the $100,000 allocated for PAGA penalties)

4  compared to the maximum value of the class claims $3,049,379, yields a recovery of

5  approximately 15%. If considering the PAGA claims in isolation, the $100,000 of the gross

6  settlement amount allocated for PAGA penalties compared to the maximum value of $2,563,600

7  yields a recovery of approximately 4%. The below table illustrates these rates of recovery.

| CLAIMS | MAXIMUM POTENTIAL VALUE | SETTLEMENT RECOVERY BASED ON GROSS SETTLEMENT OF $550,000 | SETTLEMENT RECOVERY BASED ON NET SETTLEMENT OF $270,000 |
|---|---|---|---|
| All Claims | $3,690,279 (this figure does not count amount of PAGA penalties that would go to the LWDA) | 15% | 7% |
| CLAIMS | MAXIMUM POTENTIAL VALUE | SETTLEMENT RECOVERY BASED ON GROSS CLASS RECOVERY OF $450,000 | |
| Only Class Claims | $3,049,379 | 15% | |
| CLAIMS | MAXIMUM POTENTIAL VALUE | SETTLEMENT RECOVERY BASED ON GROSS PAGA PENALTIES | |

| | | OF $100,000 | | |
|---|---|---|---|---|
| All PAGA Claims | $2,563,600 | 4% | | |

Ultimately, the Court finds this recovery, which is higher than the last proposed recovery, reasonable. *Almanzar v. Home Depot U.S.A., Inc.*, No. 2:20-CV-0699-KJN, 2022 WL 2817435, at *12 (internal quotation marks and citation omitted) (E.D. Cal. July 19, 2022) ("In fact, 10% of the verdict value of non-PAGA claims is generally considered the low end of reasonable recovery."); *see Bravo v. Gale Triangle, Inc.*, 2017 WL 708766, at *10 (C.D. Cal. Feb. 16, 2017) ("Thus, Plaintiffs argue that a settlement for fourteen percent recovery of Plaintiffs' maximum recovery is reasonable under the circumstances. The Court agrees.") (internal citation to record omitted); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D. Cal. 2015) ("From here, the agreed upon common fund represents between 27 percent and 11 percent of the total potential recovery. The Court is satisfied that these numbers are fair.").

In reaching this determination, the Court reiterates that "a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004).

### b.    Allocation of settlement shares

The Court also considers whether the allocation of the settlement is fair, reasonable and adequate, with it being "reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits." *In re Omnivision Techs.*, Inc., 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008).

Plaintiff describes the allocation of the settlement shares as follows:

The Net Settlement Amount will be allocated and paid based on a number of criteria including: (1) the Net Settlement will be divided up using the percentage of the estimated maximum value attributed to each claim, and/or subclaim to arrive at an estimated total for each claim/subclaim category ("Estimated Total for Claim"); (2) the Estimated Total for Claim will be divided by the total number of weeks worked by the drivers impacted by each claim/subclaim ("Per Claim Workweeks") to arrive at a dollar figure share ("Per Claim Share") for each week worked for that claim/subclaim; (3) each Class Member's workweeks allocated by the number of weeks each driver worked at greater than 50% flat rate ("Flat Rate Driver Weeks Worked") and/or greater than 50% mileage rate ("Mileage Rate Driver Weeks Worked") for the minimum wage claims and by all applicable weeks for the

1
2
3
4
5

remaining claims ("Other Weeks Worked"); (4) the Per Claim Share will be multiplied by the number of Flat Rate Driver Weeks Worked, the Mileage Rate Driver Weeks Worked, and Other Weeks Worked for every claim that each Class Member was potentially impacted based upon the dates they drove at each rate ("Individual Per Claim Totals"); (5) the Individual Per Claim Totals will be added together for each Class Member to obtain a total individual class settlement payment ("Total Individual Class Settlement Payment"). . . . Defendant will separately pay its share of payroll taxes. (Lauby Decl. ¶¶ 37-42).

6

(ECF No. 79-1, p. 8; *see also* table with formulas at ECF No. 86-1, pp. 43-44).

7

8

9

The Court finds this plan for allocation acceptable. Notably, this plan works to ensure that each recipient receives fair payment based on the differing values of the claims and the amount that each person worked based on different types of pay.

10

### 4.    The extent of discovery completed and the stage of proceedings; experience and views of counsel

11

12

13

14

15

16

"An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Riker v. Gibbons*, No. 3:08-CV-00115-LRH, 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010) (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11:42 (4th ed.2002)); *see also Nat'l Rural Telecommunications Coop.*, 221 F.R.D. at 528 ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair.") (citations omitted).

17

Here, Plaintiff states as follows:

18

19

20

21

Both parties conducted extensive investigation allowing them to assess the strengths and weaknesses of the case, including Defendant providing formal discovery and informal discovery and documents in preparation for mediation, including payroll data, time records, and policies and practices for Defendant's compensation systems for the Class, and a sampling of timekeeping and payroll records. The parties participated in two mediations with highly experienced mediators.

22

(ECF No. 79-1, pp. 46-47).

23

24

Further, Attorney Lauby has submitted a declaration submitting that this settlement is fair, reasonable, and in the best interests of the class. (ECF No. 93-2, p. 6).

25

26

27

28

Compared to the last settlement, which was reached very early in the case, this settlement comes after the Court issued a scheduling order (albeit later vacated), formal discovery, and two mediations. A comparison of this motion with the prior one reveals that the parties have provided more informed factual bases and discussion to support their settlement agreement.

Accordingly, this factor weighs in favor of approval.

## 5.    The presence of a government participant

Although there is no governmental party to this lawsuit, the LWDA may express its views. Under California Labor Code § 2699(*l*)(2), a "proposed settlement shall be submitted to the [LDWA] at the same time that it is submitted to the court" for the LWDA's review and approval.

Plaintiff's counsel filed a declaration in connection with the preliminary approval motion, stating as follows: "Plaintiff has concurrently submitted the settlement to the LWDA in accordance with Labor Code § 2699(l)(2)." (ECF No. 79-2, p. 31). Additionally, counsel attached an email that appeared to confirm such submission. (*Id.* at 91).

Further, under 28 U.S.C. § 1715(b), the Class Action Fairness Act (CAFA) requires notice of a proposed class action settlement, and certain documents, to be served by each participating defendant on appropriate state and federal officials not later than 10 days after the filing of a proposed settlement.[14] *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1075 (9th Cir. 2017) (noting this requirement). The Ninth Circuit has described this requirement as follows:

> Complementing the expansion of federal jurisdiction to ensure uniformity and fairness is CAFA's class action settlement notice requirement, 28 U.S.C. § 1715, which was intended to "provide a check against inequitable settlements." S.Rep. No. 109–14, at 35 (2005), 2005 WL 627977, at *34; *see In re Uponor, Inc.*, F1807 Plumbing Fittings Prods. Liab. Litig., 716 F.3d 1057, 1064–65 (8th Cir.2013). Section 1715 requires notice of a proposed settlement to be served on the "appropriate" federal and state officials—typically the Attorney General of the United States and "the person in the State who has the primary regulatory or supervisory responsibility with respect to the defendant." 28 U.S.C. § 1715(a). In addition, § 1715 prohibits a court from ordering final approval of a proposed settlement until 90 days after the appropriate government officials were notified. *Id.* § 1715(d). The statute is equally clear that it shall not "be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials." *Id.* § 1715(f). These requirements are intended to give states a role in ensuring that citizens are equitably compensated in class action settlements, but states are free not to participate, leaving that task to the courts, which ultimately retain discretion to approve or disapprove any settlement, regardless of a state's intervention.

---

[14] Section 1715(b) provides in part as follows: "Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement consisting of [various documents and information, including the complaint]."

*California v. IntelliGender, LLC*, 771 F.3d 1169, 1172-73 (9th Cir. 2014).

At the preliminary approval stage, defense counsel, Angela Cash, filed a declaration stating, "On April 3, 2025, I served on all federal and state officials required to be notified of the settlement in this case, the Class Action Fairness Act Settlement Notice (the CAFA Notice) along with a flash drive containing .PDF versions of the following as required by 28 U.S.C. § 1715," the complaint, Plaintiff's instant motion, and other relevant documents. (ECF No. 82, p. 2).

Here, no governmental entity has participated in this case or raised any objection to the settlement. Accordingly, this factor does not weigh against approval.

**6.     The reaction of the class members to the proposed settlement**

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529; *see also Cottle v. Plaid Inc.*, 340 F.R.D. 356, 376 (N.D. Cal. 2021) (observing that a court may assess the reaction of class members by considering "how many class members submitted claim forms and objections" at the final approval stage).

After the class notice was issued, the class members reacted favorably to the proposed settlement terms in that there were no objections and only one request for exclusion. (ECF No. 95, p. 4). Further, no class members appeared at the hearing to voice any objections. This "absence of a negative reaction[] strongly supports settlement." *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010); *see also Manzo v. McDonalds Rests. of Cal., Inc.*, 2022 WL 4586236, at *8 (E.D. Cal. Sept. 29, 2022) ("The lack of any objection weighs in favor of final approval of the settlement").

Accordingly, this factor weighs in favor of approval.

**7.     Collusion, award of attorneys' fees, and costs**

"The potential for collusion reaches its apex pre-class certification because, among other things, (1) the court has not yet approved class counsel, who would owe a fiduciary duty to the class members; and (2) plaintiffs' counsel has not yet devoted substantial time and money to the case, and may be willing to cut a quick deal at the expense of class members' interests." *Briseño*, 998 F.3d at 1024.

The Court now turns to the *Bluetooth* factors, which are signs indicating that class counsel have allowed their own interests to infect settlement negotiations—(1) whether counsel receives a disproportionate amount of the settlement; (2) whether there is a clear "sailing agreement"; (3) and whether the agreement contains a "kicker" or "reverter" clause. *Briseño*, 998 F.3d at 1024. The Court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941; *see also Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328–29 (9th Cir. 1999). Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). As a result, the Court must assume a fiduciary role for the class members in evaluating a request for an award of attorney's fees from the common fund. *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009).

The proposed settlement contains a clear sailing provision, *i.e.*, a provision that Defendant will not object to a certain fee request. Specifically, "Defendant agrees to not oppose a request by Class Counsel to the District Court for an award of attorneys' fees of not more than twenty-five percent (25%) of the Gross Settlement Amount ($137,500), plus reasonable litigation costs and expenses not to exceed $27,000." (ECF No. 79-2, p. 65). However, there is no "reverter" clause, *i.e.*, a provision that fees not awarded revert to Defendant rather than the class fund. Rather, the settlement agreement expressly states that "[u]nder no circumstances will any portion of the Gross Settlement Amount revert to Defendant." (*Id.* at 67). As for attorneys' fees, the Court concludes that, for the reasons given below, Plaintiff's counsel will not receive a disproportionate amount of the settlement and the requested 25% award is otherwise reasonable.

The Ninth Circuit has approved two methods for determining attorneys' fees in cases where the award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The Court retains discretion in common fund cases to choose either method. *Id.*; *Vu v. Fashion Inst. of Design & Merch.*, No. CV 14-08822 SJO (EX), 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22, 2016). Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it

1    yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance*

2    *Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

3        Under the percentage of the fund method, the Court may award class counsel a given

4    percentage of the common fund recovered for the class. *Bluetooth*, 654 F.3d at 942. In the Ninth

5    Circuit, a twenty-five percent award, which is what is sought here, is the "benchmark" amount of

6    attorneys' fees, but courts may adjust this figure if the record shows "special circumstances

7    justifying a departure." *Id.* (quoting *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d

8    1301, 1311 (9th Cir. 1990)). The Ninth Circuit has permitted courts to award attorney's fees using

9    this method "in lieu of the often more time-consuming task of calculating the lodestar." *Id.* In

10   evaluating a percentage for attorneys' fees, the Court is required to "consider[] all the

11   circumstances of the case and reach[] a reasonable percentage." *Vizcaino*, 290 F.3d at 1048. Such

12   circumstances include (1) the results reached for the class; (2) the risk to class counsel; (3)

13   counsel's performance; (4) the amount sought to be awarded compared to other cases; and (5) the

     contingent nature of counsel's fee. *Id.* at 1048-49.

14       Here, Plaintiff's counsel has requested a benchmark recovery of 25% (or $137,500) and

15   costs of $26,559.09. (ECF No. 93-1, p. 9). The Court will use the percentage-of-the-fund method

16   to evaluate the reasonableness of this request, but as explained further below, will also conduct a

17   cross-check of this amount by considering the lodestar method.

18       Starting with the results achieved for the class, as explained above, counsel achieved a

19   15% recovery of the potential maximum value of the class claims. In consideration with the other

20   circumstances discussed below, the Court concludes that this result supports a benchmark award

21   of 25% of the gross settlement.

22       Moving to the risk to class counsel, including the contingency nature of the fee, Attorney

23   Mankin's declaration states as follows:

24       [M]y firm has been representing Plaintiffs strictly on a contingency fee basis. To
         that end, we have incurred the risk of non-recovery after investing a substantial
25       amount of time, money, and resources, and have done so since the inception of this
         case without any payment or compensation. If Plaintiff had lost this case, we
26       would have recovered nothing, and would have lost our out-of-pocket costs. This
         is not an easy burden for my office, which is a small firm.
27
     (ECF No. 93-4, p. 4).
28

                                            34

The Court concludes that counsel's decision to prosecute this case on a contingency basis, and with advancement of significant litigation costs, constitutes a risk to counsel that warrants the benchmark award of 25%.

Further, Plaintiffs' attorneys have litigated many class action cases and brought years of experience to this case. Notably, Attorney Mankin has "handled well over 500 employee vs. employer litigation matters during [his] 23 years in practice" and has "handled well over 300 class action and representative action wage/hour cases, and ha[s] been appointed by the court as class counsel and ha[s] received final court approval and judgment in over half of those actions to date." (ECF No. 93-4, p. 2). Further, Attorney Lauby has "been the handling attorney on over 47 class action and/or representative PAGA actions. And, on these cases, [she] and/or [her] firm have been appointed Class Counsel on over 27 cases, and have helped recover over $23,000,000 for [her] clients, the employees, and the State of California." (ECF No. 93-2, p. 2). And as discussed above, this case has a long history, during which time Plaintiff's counsel has, among other things, secured a better result for the class than the initial settlement agreement. The Court finds that the performance of counsel warrants the benchmark award of 25%.

In considering the range of fee awards in other common fund cases, the Court notes that other courts have awarded a 25% fee in similar cases. *See Ontiveros*, 303 F.R.D. at 375 (awarding benchmark award of 25%); *see also Booher v. JetBlue Airways Corp.*, No. 4:15-CV-01203-JSW, 2023 WL 3035390, at *1 (N.D. Cal. Mar. 24, 2023) (same); *Brooks v. Life Care Centers of Am., Inc.*, No. SACV 12-00659-CJC(RNBx), 2015 WL 13298569, at *5 (C.D. Cal. Oct. 19, 2015) (same).

Additionally, the Court crosschecks the percentage award with the lodestar method to determine if the fees sought from the common fund are reasonable. *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 930 (9th Cir. 2020) ("[W]e have encouraged courts using the percentage-of-recovery method to perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery amount is reasonable."). The lodestar is determined by multiplying a reasonable hourly rate by the reasonable number of hours spent on the case. *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000) (explaining the loadstar method). When the lodestar is used as a cross-check for a fee award, the Court is not required to perform an

1    "exhaustive cataloguing and review of counsel's hours." *Barbosa v. Cargill Meat Sols. Corp.*,

2    297 F.R.D. 431, 451 (E.D. Cal. 2013) (citation omitted).

3        Plaintiff's motion states as follows: "As detailed in the billing records filed concurrently

4    herewith, class counsel's lodestar of $250,375.00 is far greater than the requested fee award of

5    $137,500." (ECF No. 93-1, p. 20). This amount is based on Attorney Lauby spending 335.50

6    hours on this case at a $650 hourly rate (ECF No. 93-2, p. 3) and Attorney Mankin spending 34

7    hours on this case at a $950 hourly rate (ECF No. 93-4, pp. 5, 6).[15]

8        First, the Court concludes that the collective 369.50 hours expended on this case to be

9    reasonable given that this case has been heavily litigated since May 2021. While the Court finds

10   neither of the hourly rates to be justified, this ultimately does not affect the Court's decision to

11   award the benchmark. "As many cases in the Eastern District observe, prevailing hourly rates in

     the Eastern District of California are in the $400/hour range." *Monterrubio v. Best Buy Stores,*

12   *L.P.*, No. 2:11-CV-03270-MCE-AC, 2013 WL 12432761, at *9 (E.D. Cal. Nov. 20, 2013)

13   (discussing attorneys' fees in employment class action case) (citation and quotation marks

14   omitted). Here, multiplying 369.5 hours by $400 hourly equals $147,800, still more than the

15   $137,500 sought in this case.

16       Accordingly, even with a more conservative hourly fee award, the lodestar crosscheck

17   supports the benchmark 25% requested.

18       Lastly, turning to costs, "[t]here is no doubt that an attorney who has created a common

19   fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses

20   from that fund." *Ontiveros*, 303 F.R.D. at 375 (citation omitted). And attorneys may recover

21   "reasonable litigation expenses incurred for the benefit of the class." *Sanchez*, 2015 WL 4662636,

22   at *20. Costs may also be awarded under California law to an individual who prevails on a PAGA

23   claim. *See* Cal. Lab. Code § 2699(g).

24       Here, the motion seeks $26,559.09 in costs, which is supported by an itemization of such

25   costs attached to Attorney Lauby's declaration. (ECF No. 93-1, pp. 15-17). The Court has

26   reviewed the itemization provided and concludes that these costs are reasonable and thus should

27

28   [15] Specifically, 335.5 hours x $650 hourly = $218,075 for Attorney Lauby. And 34 hours x $950 hourly = $32,300 for Attorney Mankin. $218,075 + $32,300 = $250,375.

1    be awarded.

2                    **8.    Class representative service payment**

3            Plaintiff seeks a class representative service payment of $7,500, arguing as follows.

4    Plaintiff estimates that over 4.5 years, he spent at least 60 hours assisting class
     counsel with their investigation of the claims in this case by actively participating
5    in the case at every juncture. Moreover, he undertook significant, long-term stress
     while continuing to work with the company while the case was ongoing and
6    worried about possible retaliation and his future in the trucking industry without
     any promise that he would prevail but proceeded on behalf of the Class because he
7    felt his fellow employees deserved to be treated fairly under California law.
     Plaintiff also was required to release and waive all potential claims against the
8    company which is something that none of the other Class Members had to do.
     And, due to the procedural events in this matter, the Class Period was cut-off in
9    June of 2024 – several months before Guthrie separated from employment with the
     company making him ineligible for waiting time penalties that other former Class
10   Members received that are valued at approximately $1,122 each. If Plaintiff
     brought his case individually, his waiting time penalties alone were potentially
11   worth over $7,000 ($30.39 final hourly rate x 8 hours per day x 30 days = $7,294).
     (*See* Guthrie Decl. ¶ 3-7).
12

13   (ECF No. 93-1, pp. 21-22).

14          Regarding the tasks performed by Plaintiff, his declaration states as follows:

15   Since first initiating this action on behalf of the proposed class, I believe that I
     have more than adequately performed my duties as a class representative. I have
16   been an active participant in this litigation, including assisting my attorneys in
     various ways and making myself available when needed, as well as proactively
17   updating my attorneys when I found out new information and proactively notifying
     them of new developments at the company. I've had dozens of communications
18   with my attorney between emails, text messages and extensive phone calls to
     discuss status, strategy, mediation, settlement and the approval process. For
19   example, I have assisted my attorneys by compiling and analyzing substantial
     documentation regarding the claims in this case. I have also helped to explain and
20   discuss the company's practices and their general practices and procedures. I have
     also reviewed all settlement documents and believe that this settlement is fair for
21   the class. Finally, I will continue to take all steps necessary to finalize this
     settlement and obtain court approval. While I didn't keep contemporaneous
22   records, I estimate that during the over four years that this case has been pending,
     I've spent at least 60 hours in direct work pertaining to this case.
23

24   (ECF No. 93-5, p. 2).

25          A court may award class representative service payments to named plaintiffs in class

26   action cases. *Rodriguez*, 563 F.3d at 958-59. The purpose of such awards is to "compensate class

27   representatives for work done on behalf of the class, to make up for financial or reputational risk

28

                                                    37

undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id.* To justify notable disparities between a class representative award and what other class members receive, a Plaintiff must present "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).

To evaluate the reasonableness of a requested service payment, the Court may consider several factors, including the number of the named plaintiffs receiving such payments, the time and actions undertaken by the class representatives, the fairness of the hourly rate, and the proportion of the total settlement spent on such awards and comparison to the average award to the class members. *See, e.g., In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 947 (9th Cir. 2015) (considering the number of named plaintiffs that received an incentive payment, the amount of the incentive award, and the proportion of the total incentive award compared to the total settlement fund); *Ontiveros*, 303 F.R.D at 366 (considering the actions undertaken and evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 WL 13239039, at *2 (E.D. Cal. July 6, 2011) (noting the incentive award requested was "reasonably close to the average per class member amount to be received"); *Smith v. Am. Greetings Corp.*, 2016 WL 362395, at *10 (N.D. Cal. Jan. 29, 2016) (noting that "courts consider the proportionality between the incentive payment and the range of class members' settlement awards"). Lastly, Courts have found a service award of $5,000 to be "presumptively reasonable." *See Weiner v. Ocwen Fin. Corp.*, 2024 WL 4458383, at *6 (E.D. Cal. Oct. 10, 2024); *Wong v. Arlo Techs. Inc.*, 2021 WL 1531171, at *12 (N.D. Cal. Apr. 19, 2021) (noting that "[s]ervice awards as high as $5,000 are presumptively reasonable" in the Ninth Circuit and collecting cases).

Upon review, the Court concludes that $7,500 is an appropriate class representative service payment in this case.

First, there is only one named Plaintiff in this case, and thus the Court is not faced with having to determine whether multiple named plaintiffs were necessary to prosecute this case and whether multiple awards are thus fair when considered collectively. *See Staton v. Boeing Co.*, 327

F.3d 938, 977 (9th Cir. 2003) ("In the proposed consent decree in this case, 29 named class representatives are designated to receive payments totaling $890,000. Compared to the three cases just mentioned, the different orders of magnitude in the present case concerning the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment—here up to $50,000, with an average of more than $30,000—are obvious.").

Next, the Court considers the time and actions undertaken by Plaintiff and the fairness of his resulting hourly rate. While Plaintiff did not keep precise records of the time he spent working on this case, he represents that he spent at least 60 hours on tasks like compiling documents for use in the case, advising counsel about company policies, and reviewing settlement documents for fairness to the class. (ECF No. 93-5, p. 2). The Court concludes that such efforts, when considered in combination with other considerations, warrant a slight increase to $7,500 from the presumptively reasonable $5,000 award.

Moreover, the Court notes that Plaintiff's declaration states that he earned, at least at one point, $30.39 per hour while employed by Defendant. (*Id.* at 4). Plaintiff's requested award of $7,500 would net him an hourly rate of $125 for work on this case (*i.e.*, $7,500 / 60 hours = $125 per hour), about four times higher than his standard hourly rate. However, when considered in light of the other circumstances of this case, the Court does not conclude that this higher rate is unwarranted. Most notably, Plaintiff represents that he will not receive any part of the settlement allocated for waiting time penalties based on his waiver of individual claims against Defendant and the timing of his departure. (*Id.* at 3-4). He states that, "[i]f I brought the case individually, the waiting time penalty claims alone could have been valued at over $7,000." (*Id.* at 4). The Court concludes that Plaintiff's relinquishment of his own claims, for the benefit of the class, warrants an award of $7,500. *See Ontiveros*, 303 F.R.D. at 366 (considering plaintiff's relinquishment of his own claims in evaluating incentive award).

Lastly, the Court considers the proportion of the total settlement spent on such awards and comparison to the average award to the class member. The proposed payment represents about 1.4% of the gross settlement amount ($7,500 / $550,000). And this is roughly 6 times the average $1,165 estimated to go to a class member ($7,500 / $1,165). However, such an increase from the

average class member's award must be considered in light of the total amount of the award to Plaintiff. Notably, $7,500 is not an unreasonable total amount compared to other cases where courts have decreased much higher requested awards. *See Ontiveros*, 303 F.R.D. at 365-66 (finding an incentive award of $20,000 to be excessive under the circumstances, and reducing the award to $15,000 where class representative spent 271 hours on the litigation); *see also Ko v. Natura Pet Prods., Inc.*, Civ. No. 09–2619 SBA, 2012 WL 3945541, at *15 (N.D. Cal. Sept. 10, 2012) (holding that an incentive award of $20,000, comprising one percent of the approximately $2 million common fund was "excessive under the circumstances" and reducing the award to $5,000). Simply put, the $2,500 increase from the $5,000 presumed reasonable award amount is a modest adjustment and is warranted for the reasons cited above.

Accordingly, the Court will grant Plaintiff's request for a $7,500 class representative service payment.

### 9.    Costs of a settlement administrator

The Court previously conditionally approved ILYM Group, Inc. as the settlement administrator. (ECF No. 92, p. 3). Plaintiffs have provided the declaration of Nathalie Hernandez, a case manager for ILYM Group, Inc. who notes that the settlement administrator has performed its duties and will continue to perform certain tasks:

> ILYM Group was engaged by the Parties' Counsel and subsequently approved and appointed by the Court to provide notification services and settlement administration, pursuant to the terms of the Settlement, in the above referenced Action. Duties performed to-date and to be performed after Final Approval of the Settlement is granted, include: (a) printing and mailing the *Notice of Settlement of Class and Representative Action,* in both English and Spanish (referred to as "Notice Packet"); (b) receiving and processing requests for exclusion; (c) resolving Settlement Class Members' disputes over the number of workweeks Defendant has record of them working during the Class Period, which was pre-printed on their individualized Notice Packet; (d) calculating individual settlement award amounts; (e) processing and mailing settlement award checks; (f) handling tax withholdings as required by the Settlement and the law; (g) preparing, issuing and filing tax returns and other applicable tax forms; (h) handling the distribution of any unclaimed funds pursuant to the terms of the Settlement; and (i) performing other tasks as the Parties mutually agree to and/or the Court orders ILYM Group to perform.

(ECF No. 93-3, p. 2). Further, the declaration states that "ILYM Group's total fees and costs for services in connection with the administration of this Settlement, which includes fees and costs

incurred to-date, as well as anticipated fees and costs for completion of the settlement administration, are $6,950.00." (*Id.* at 7).

Given that the settlement administrator has undertaken and will complete its duties to administer the settlement, the Court will approve payment of $6,950 to ILYM Group, Inc.

**V.    CONCLUSION AND ORDER**

Based on the forgoing, IT IS ORDERED as follows:

1. Plaintiffs' motion for class certification and final approval is granted as specified below. (ECF No. 93).

2. The following settlement class is certified: All current and former truck drivers who resided in California and who were employed by Defendant, ITS Logistics, LLC and paid on a piece rate basis (*e.g.*, per day or per mile) at any time during the period of March 1, 2019, through June 28, 2024 (the Class Period).

3. Plaintiff's PAGA Claims are approved as a representative action under the Private Attorneys General Act under California Labor Code § 2698 *et seq.* on behalf of the following: All current and former truck drivers who resided in California and who were employed by Defendant, ITS Logistics, LLC and paid on a piece rate basis (e.g. per day or per mile) at any time during the period of March 9, 2020, through June 28, 2024 (the PAGA Period).

4. The Court approves a $550,000 gross settlement amount.

5. Plaintiff's counsel Misty Lauby and Brian Mankin are approved as class counsel and the Court approves an award of $137,500 in attorneys' fees.

6. The Court approves an award of $26,559.09 in costs.

7. Plaintiff Keith Guthrie is approved as the class representative and shall receive a $7,500 class representative service payment.

8. ILYM Group, Inc. is approved as the settlement administrator and the Court approves payment of $6,950 to it.

9. The Court approves a $100,000 PAGA payment, with $75,000 of this amount being paid to the LWDA and the $25,000 remainder going to the aggrieved employees.

10. Upon completion of administration of the settlement, the settlement administrator will

provide written certification of such completion to the Court and counsel for the parties.

11. Because there have been no objections to the settlement, this order is considered effective for implementation purposes on the date that the Court enters this order granting final approval of the settlement.

12. Within 15 days of this order being entered, Defendant shall issue the gross settlement amount, plus its share of payroll taxes, to the settlement administrator.

13. Within 10 days after the receipt of payment, the settlement administrator shall issue all payments to the participating class members, PAGA group members, the LWDA, class counsel, class representative, and pay itself for administration expenses.

14. By no later than August 7, 2026, Plaintiff's counsel shall file a declaration from the settlement administrator setting forth the disbursements that were actually made, including any uncashed checks and status of process of forwarding unclaimed funds to the State Controller.

15. The Clerk of Court is directed to issue a final judgment consistent with this order and then to close this case.

16. The Court shall retain jurisdiction over this case for the purposes of supervising the implementation, enforcement, and interpretation of the settlement agreement and this order.

IT IS SO ORDERED.

Dated:    **January 9, 2026**                    /s/ *Erica P. Grosjean*
                                                 UNITED STATES MAGISTRATE JUDGE

42